Daniel F. Lula (California State Bar No. 227295)
RIMÔN P.C.
2029 Century Park East, Suite 400N
Los Angeles, CA 90067
Tel: (617) 963-0419
Fax: (213) 375-3811
daniel.lula@rimonlaw.com

Robert A. Cocchia (California State Bar No. 172315)
RIMÔN P.C.
3579 4th Avenue
San Diego, CA 92103
Tel: (858) 348-4383
Fax: (213) 375-3811
robert.cocchia@rimonlaw.com

Michael S. Lazaroff (New York State Bar No. 2801579)
RIMÔN P.C.
400 Madison Avenue, Suite 11D
New York, NY 10017
Tel: (646) 738-4151
Fax: (212) 363-0270
michael.lazaroff@rimonlaw.com
(*Pro Hac Vice*)
*Attorneys for Plaintiffs Nina Vikhrieva and Sergey Leshkov*

# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NINA VIKHRIEVA and SERGEY LESHKOV, <br><br> Plaintiffs, <br><br> v. <br><br> STEMEDICA CELL TECHNOLOGIES, INC.; ZIUZHITANG CO., LTD.; ZHUHAI HENGQIN JIUZHITANG YONGHE QIHANG FUND; JIUZHITANG MAKER (BEIJING) CELL TECHNOLOGY CO., LTD.; MAYNARD A. HOWE; ROGER J. HOWE; DAVID HOWE; NIKOLAI I. TANKOVICH; DIRK P. O'HARA; SIMON GUO; CRAIG W. CARLSON; MICHAEL K. STEINHAUSER; SANOSTEM GLOBAL LLC; DUNIYA SANOSTEM INC.; AND SHIVINDER S. DEOL, <br><br> Defendants. | Case No.: 3:25-cv-00459-BAS-SBC <br><br><br> **FIRST AMENDED COMPLAINT** <br><br> **AND DEMAND FOR JURY TRIAL** |

- 1 -

Plaintiffs Nina Vikhrieva and Sergey Leshkov (together, "Plaintiffs") by and through their undersigned attorneys, complaining of defendants Stemedica Cell Technologies, Inc. ("Stemedica"), Ziuzhitang Co., Ltd. ("JZT Parent"), Zhuhai Hengqin Jiuzhitang Yonghe Qihang Fund ("JZT Fund"), Jiuzhitang Maker (Beijing) Cell Technology Co., Ltd. ("JZT Maker," and with JZT Parent and JZT Fund, "JZT"), Maynard A. Howe, Roger J. Howe, David Howe, Nikolai I. Tankovich, Dirk P. O'Hara, Simon Guo, Craig W. Carlson, Michael K. Steinhauser, SanoStem Global LLC ("SanoStem Global"), Duniya SanoStem Inc. ("Duniya SanoStem" and with SanoStem Global, "SanoStem"), and Shivinder S. Deol (collectively, "Defendants"), respectfully allege with knowledge as to themselves and otherwise on information and belief for their First Amended Complaint in accordance with Federal Rule of Civil Procedure 15 as follows:

## INTRODUCTION

1.      CardioCell LLC ("CardioCell") was organized as a limited liability company under the laws of the State of Delaware and a global biotechnology company to focus on the therapeutic use and commercialization of stem cells to treat cardiovascular disease.  CardioCell was created initially in 2013 as a subsidiary of Stemedica and was granted an exclusive, perpetual, worldwide license by Stemedica for the manufacturing, exploration and commercialization of therapeutic cardiovascular indications using stem cells.  CardioCell successfully completed Phase IIa clinical trials establishing the safety and efficacy of its multi-billion-dollar therapy for chronic heart failure ("CHF") and was on a clear path of completing Phase IIb/III clinical trials and commercializing therapeutic products, but Stemedica and the other defendants prevented CardioCell from doing so.

2.      The defendants brothers Roger Howe and Maynard Howe (the "Howe brothers"), with the assistance of the Stemedica-appointed directors, JZT, Rivadavia, NovaStem and David Howe, used Stemedica to induce Plaintiffs' investments in CardioCell and other Stemedica affiliates under false pretenses to enrich themselves

at Plaintiffs' expense, caused Stemedica to repeatedly breach its contracts with CardioCell and concealed those breaches, compromised CardioCell's fund-raising efforts, and deprived CardioCell of the funds, stem cells and know-how necessary for the completion of CardioCell's clinical trials and commercialization of multi-billion-dollar therapeutic products. All this fraud was done by the Howe brothers and other defendants through Stemedica for one purpose: to enrich themselves mainly at the expense of Plaintiffs. Plaintiffs were CardioCell's main investors, and their $20 million investment was intended to fund CardioCell's research and clinical data necessary for FDA approval and product commercialization not to enrich Defendants. Because Plaintiffs were the main funders of CardioCell, Plaintiffs are the investors who principally sustained independent damages as a result of CardioCell's destruction.

3.     As a result of the fraudulent scheme orchestrated by the Howe brothers, operating through defendant Stemedica and with the full knowledge and cooperation of the other defendants, CardioCell has lost a multi-billion-dollar stem cell therapy for cardiovascular indications and CardioCell's shareholders, principally Plaintiffs, have had their multi-million-dollar investments destroyed.

4.     This is not the first time Stemedica, and the Howe brothers have been sued for fraudulent behavior. In April 2017, Tiara Holdings II, LLC, one of Stemedica's investors, filed a lawsuit detailing how defendants Roger and Maynard Howe used Stemedica over a nearly ten-year period to defraud investors of over $110 million, using most of the investors' funds to enrich themselves instead of using the funds to grow the company's business (the "Tiara Lawsuit"). However, that case settled and there was no further exposure or information about the wrongful acts.

5.     The wrongdoing here is elaborate and involves an intricate scheme and multiple co-conspirators. Between 2013 and 2025, the Howe brothers and their co-conspirators (i) participated in multiple acts of mail and wire fraud, extortion and bribery, (ii) caused Plaintiffs to give up their interest and veto power in various

valuable Stemedica subsidiaries and exchange their subsidiaries' shares for CardioCell shares, and (iii) repeatedly caused Stemedica to breach contracts with CardioCell in furtherance of a scheme to use CardioCell as a bait to raise millions of dollars from unsuspecting investors like Plaintiffs and then to destroy CardioCell, eliminating the investors, destroying their investments, and co-opting CardioCell's valuable technology.

6.     Rather than applying the invested funds principally toward clinical trials and the use of stem cells for purposes of obtaining FDA approval and eventual product commercialization, as they had falsely represented to Plaintiffs, Defendants misappropriated the funds by, among other things, marketing Stemedica's stem cells to patients in the United States, making efficacy claims in violation of FDA regulations, and subsequently exporting Stemedica's stem cells and directing patients to Mexico and other locations for questionable stem cell procedures that enriched Defendants.

7.     In July 2013, defendant Stemedica, a clinical-stage biopharmaceutical company focused on the development and commercialization of stem cell and protein therapeutics, founded CardioCell as a clinical trials company, and shortly thereafter granted CardioCell an exclusive, perpetual worldwide license for the manufacturing, exploration and commercialization of cardiovascular therapy using stem cells ("Exclusive License").

8.     During multiple in-person meetings and telephone conferences in 2013, with the full knowledge that Stemedica would not honor the Exclusive License and would affirmatively act to undermine CardioCell's efforts to obtain financing, Roger Howe and Nikolai Tankovich, who were appointed to the CardioCell board by Stemedica, and Maynard Howe, made false representations to Plaintiffs Sergey Leshkov and Nina Vikhrieva about CardioCell's tremendous potential in commercializing the cardiovascular therapy, inducing them to invest $5 million in CardioCell.

9.     Also, at various points in 2013 and 2014, the Howe brothers and Nikolai Tankovich made similar false representations about the tremendous potential of Stemedica's other subsidiaries, StemProtein, StemCutis and Stemedica International – which Stemedica intended to let fail – inducing Leshkov and Vikhrieva to invest a total of $15 million in those entities.

10.     The Howe brothers made those false representations knowing that the subsidiaries would be unable to survive and complete the clinical trials necessary to obtain governmental approval of therapeutic uses of stem cells without an adequate supply of stem cells and additional funding, but falsely promised to contribute stem cells and funds as Stemedica was purportedly in negotiations with various international companies that would result in successful business partnerships and new investments.  Defendants' statements about the subsidiaries' and CardioCell's potential were thus false not because their intellectual property was worthless and had no potential, but because Defendants intended to induce the investment under false pretenses and then systematically destroy the subsidiaries and CardioCell by depriving them of resources while retaining their valuable intellectual property.

11.     Yet, in exchange for obtaining a controlling interest in CardioCell, Stemedica provided only limited amount of stem cells for upcoming clinical trials. Stemedica did not make the monetary contributions to CardioCell that it had promised and proceeded to deprive CardioCell of cash while charging millions of dollars for administrative services (which came from Plaintiffs' investment), although most of those services Stemedica never provided.

12.     In 2014, AstraZeneca expressed interest in investing in CardioCell and began negotiations with CardioCell and related due diligence.  Faced with the threat of losing the ability to use CardioCell as investor bait, the Howe brothers prevented the AstraZeneca deal by leaking AstraZeneca's highly sensitive information to other investors.  When AstraZeneca learned that its highly confidential information had been leaked to third parties, it withdrew from the deal.  At the time, Plaintiffs had no

reason to suspect there was an ulterior motive, especially since the Howe brothers and Nikolai Tankovich (who was Plaintiffs' personal friend) continued to assure Plaintiffs that Stemedica would help fund CardioCell's clinical trials and provide stem cells as promised.

13. Further, unbeknownst to Plaintiffs and CardioCell, Stemedica repeatedly violated CardioCell's Exclusive License by granting other companies the right to use Stemedica stem cells for treatment of cardiovascular disease. Specifically, as described herein, despite CardioCell's exclusive worldwide license, Stemedica granted cardiovascular rights to Organismo, Rivadavia, and Clinica Santa Clarita in Mexico. Additionally, while Stemedica was prohibited under the Exclusive License to renew licenses, Stemedica wrongfully renewed the license of ALTACO-XXI LLP ("ALTACO") in Kazakhstan.

14. Despite their fiduciary duties as CardioCell directors, Roger Howe and Nikolai Tankovich concealed these breaches of the Exclusive License from Plaintiffs and CardioCell so that Stemedica could continue to profit from both the Exclusive License granted to CardioCell and the licenses improperly granted to Organismo, Rivadavia, Clinica Santa Clarita, and ALTACO.

15. CardioCell only discovered Stemedica's fraudulently concealed breaches of the Exclusive License with regard to Mexico and Kazakhstan in July 2018, around the time JZT agreed to acquire a 51% equity interest in Stemedica. By that time, Stemedica had consistently delayed the delivery to CardioCell of stem cells necessary to complete CardioCell's clinical trials. CardioCell's non-conflicted directors, therefore, repeatedly asked Roger Howe and Nikolai Tankovich to account for this deficiency. Howe and Tankovich then admitted that the reason for the delay was that Stemedica had undertaken a contractual obligation to provide stem cells to JZT and had been supplying Organismo and Rivadavia with stem cells pursuant to concealed contracts, and thus did not have enough stem cells to provide to CardioCell.

16.     When CardioCell confronted Stemedica about its breach of the Exclusive License, the Howe brothers, Nikolai Tankovich, and Simon Guo on behalf of Stemedica and with the help of the Stemedica-appointed directors, falsely represented that Stemedica would:  (1) return the cardiovascular rights to CardioCell; (2) provide the funds that CardioCell needed to complete the clinical trials; (3) provide the stem cells that CardioCell was entitled to under the Contribution Agreement (as defined below); and (4) arrange for JZT to collaborate with CardioCell on new business ventures as to generate new streams of revenue for CardioCell. Stemedica, however, failed to honor even one of these promises.

17.     The Howe brothers made these false representations to induce plaintiffs Leshkov and Vikhrieva, as CardioCell investors, to:  (1) consolidate their $15 million interest in the other Stemedica subsidiaries and roll that investment into CardioCell; and (2) persuade CardioCell to sublicense its rights under the Exclusive License to Stemedica for use by JZT.

18.     To coerce Leshkov and Vikhrieva's cooperation, as CardioCell's board members and main shareholders, Roger Howe threatened to dissolve CardioCell despite its successful clinical trials if they did not agree to the consolidation proposal.

19.     JZT then confirmed the Howe brothers' representations that JZT would provide CardioCell with new business opportunities and stated that JZT would invest $2.5 million in CardioCell if CardioCell agreed to sublicense its exclusive right to use Stemedica stem cells in China to Stemedica for use by JZT.

20.     Neither Stemedica nor JZT intended to honor their promises. Unbeknownst to Plaintiffs and CardioCell, Stemedica and JZT instead planned to surreptitiously and systematically deprive CardioCell of funds and stem cells and to use CardioCell's exclusive rights for free.  Stemedica and JZT further intended to sell to third parties the very same stem cells that Stemedica had agreed to provide CardioCell under the Contribution Agreement.

21.    In July 2018, in reliance on the Howe brothers' false representations and faced with Roger Howe's threat to dissolve CardioCell, Leshkov and Vikhrieva entered into an Equity Exchange Agreement with Stemedica pursuant to which they exchanged their $15 million interest for Stemedica's 13,621,690 Class A Units in CardioCell.  In return, Stemedica agreed to amend its contract with Rivadavia to remedy the violation of CardioCell's Exclusive License in the Mexican market.

22.    Despite this agreement, Stemedica, under the management of the Howe brothers, failed to amend the Rivadavia contract, while the Howe brothers and other Defendants actively assisted Rivadavia, Rivadavia's subsidiary, NovaStem, and Clinica Santa Clarita with recruiting patients from the United States for cardiovascular treatment at Clinica Santa Clarita in Mexico using Stemedica's stem cells.

23.    In reliance on the Howe brothers' and JZT's false representations, in January 2019, CardioCell also entered into a Sublicense Agreement with Stemedica, pursuant to which CardioCell agreed to sublicense its Chinese cardiovascular rights to Stemedica for use by JZT.  Stemedica, in turn, agreed to provide the funds that CardioCell needed to complete its clinical trials.

24.    In March of 2019, Stemedica promised once again to provide CardioCell with the funds necessary to complete the clinical trials by agreeing to buy CardioCell Series B Preferred Units under a subscription agreement.  Stemedica, however, breached that agreement too by failing to make the last $500,000 payment, which was critical for the completion of CardioCell's clinical trials.

25.    Stemedica also failed to provide the agreed-upon funds under the Sublicense Agreement, which led to the premature termination of CardioCell's clinical trials.  Despite this breach, Stemedica continued to permit JZT to use its stem cells for cardiovascular indications in China, and JZT continued to advertise the cardiovascular indication on its website in violation of the Exclusive License.

26.  Stemedica also repeatedly failed to timely and adequately supply CardioCell with stem cells necessary for the completion of the clinical trials.  While Stemedica claimed that it had difficulties with its manufacturing facilities, in truth, Stemedica was prioritizing stem cell deliveries to Rivadavia, NovaStem, Clinica Santa Clarita, and JZT at CardioCell's expense.

27.  Deprived of the critical funds and stem cells necessary to complete the clinical trials, CardioCell attempted to raise funds from new investors and to partner with another stem cell manufacturer.  However, potential investors declined to be associated or work with the Howe brothers due to their burgeoning reputation for dishonesty and wrongdoing in the biotechnology industry.

28.  When CardioCell was finally able to advance towards a deal with Chinese stem cell manufacturer WuXi, which was interested in investing in CardioCell and assisting with completing its clinical trials and commercializing its products, Stemedica and JZT refused to provide the stem cell manufacturing protocols and know-how that CardioCell was entitled to under the Exclusive License.

29.  Stemedica also undermined CardioCell's efforts to raise funds through angel investors by refusing to answer investor questions about the availability of the Stemedica stem cells needed to complete CardioCell's clinical trials.  As a result, CardioCell was unable to raise the required funds.

30.  In 2023, the Howe brothers hired their friend, Michael K. Steinhauser, as Stemedica's new CEO, to create the impression of a new management and continue Defendants' fraudulent scheme.  In order to avoid liability to Plaintiffs and other Stemedica creditors, the Howe brothers engineered a sale of Stemedica to a newly created company, SanoStem, managed by certain defendants and individuals with whom Stemedica had a prior relationship.

31.  Notably, Duniya SanoStem's website (sanostem.com) announced the February 4, 2025 "full acquisition" in Stemedica, including the "FDA-approved Investigational New Drug (IND) applications for Acute Myocardial Infarction,

Chronic Heart Failure," (a copy is attached hereto as **Exhibit A**). The Sanostem Global website (sanostemglobal.com) stated that SanoStem Global and its subsidiary SanoStem India Private Ltd. have exclusive distribution and manufacturing license from Stemedica for all its cell products to conduct clinical trials and promote stem cells therapies in India, Fiji, Sri Lanka, Bangladesh and Nepal (a copy is attached hereto as **Exhibit B**). However, any such grant of cardiovascular rights from Stemedica to SanoStem would be void because Stemedica had already given an exclusive, perpetual, worldwide license to CardioCell for all cardiovascular indications pursuant to the Exclusive License in 2013. The purported grant would thus violate CardioCell's Exclusive License. Therefore, SanoStem Global could not have received such rights.

32.    SanoStem Global also listed on its website CardioCell's successful clinical trials and a press release, dated April 18, 2018, regarding the same cardiovascular indications granted to CardioCell (a copy is attached hereto as **Exhibit C**), even though SanoStem has no relationship to CardioCell. Moreover, Duniya SanoStem's website indicated that Stemedica's CEO, defendant Michael Steinhauser, was appointed as SanoStem's CEO (a copy is attached hereto as **Exhibit D**) and Stemedica's CMO, defendant Nikolai Tankovich, was appointed as SanoStem's scientific advisory (a copy is attached hereto as **Exhibit E**), indicating that the purportedly new company, SanoStem, is being managed and advised by defendants.

33.    Notably, after Plaintiffs commenced this action on February 27, 2025, the referenced SanoStem Global's website (including the webpages in Exhibits B-C) disappeared from the internet. The Sanostem.com website now contains a different version of the webpage attached to the original complaint as Exhibit D. That webpage states that Stemedica (and not SanoStem) appointed Michael Steinhauser as a CEO (a copy of the relevant webpage is attached hereto as **Exhibit F**). In addition, the content of the webpage attached to the original complaint as Exhibit E

(including the profiles and photos of the SanoStem Team) was removed from the SanoStem.com website. Currently, the SanoStem website only references a "Team" and contains a short description, stating "to advance our exclusive technology, SanoStem has a group of skilled scientists, managers, and technicians" (a copy of the new webpage is attached hereto as **Exhibit G**).

34. To redress this egregious wrongdoing, Plaintiffs seek to recover in this action their substantial losses and harm caused by Defendants' multiple improper acts, including fraud, breaches of fiduciary duty, fraudulent transfers, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

35. Plaintiffs were directly damaged by Defendants' actions because Defendants manipulated Plaintiffs in a unique way and caused them to increase their investment to $20 million by creating the impression that Plaintiffs were investing in a diverse portfolio of four Stemedica subsidiaries, each focused on different stem cell indication and different multi-billion-dollar product, including cardiovascular and skin therapeutic products. Defendants subsequently persuaded Plaintiffs that it was in Plaintiffs' best interest to roll all of their interest into CardioCell by exchanging their subsidiaries' shares for CardioCell shares. Defendants then collapsed CardioCell and eliminated Plaintiffs from the picture. Importantly, before Plaintiffs invested in CardioCell, CardioCell had no funds, so Plaintiffs' investment was the one used to establish CardioCell and generate the valuable clinical data and launch the clinical trials. No other CardioCell shareholder was targeted, manipulated, and damaged like Plaintiffs.

## THE PARTIES

### A.    PLAINTIFFS

36. Plaintiff Nina Vikhrieva is a citizen of Russia and has been a member of CardioCell's board of directors. Vikhrieva is a medical doctor who has conducted clinical research and worked on various biotechnology projects, including the creation and launch of original drugs for the treatment of type 2 diabetes, breast

cancer, and proliferative diseases of the endometrium.  Currently, Vikhrieva is a co-owner of the medical equipment R&D and distributor, Premium Aesthetics Ltd. (https://www.premium-a.ru).  Vikhrieva is a well-respected entrepreneur and leader in the medical equipment distribution industry in Europe.

37.    On December 5, 2013, Vikhrieva invested $2.5 million in CardioCell through a predecessor of CardioInvest.  She also personally invested $335,000 in CardioCell and currently owns 330,000 Series A Preferred Units and holds a $5,000 promissory note.  In addition, Vikhrieva invested $2.5 million in Stemedica's affiliate StemProtein, Inc., $2.5 million in Stemedica's affiliate StemCutis, and $2.5 million in Stemedica's affiliate Stemedica International SA.  In reliance on Stemedica's false representations, Vikhrieva rolled her interest in StemProtein, StemCutis and Stemedica International SA into CardioCell through ProtInvest, Inc. and SkinInvest, Inc.  Vikhrieva also invested $50,000 in Stemedica and owns 30,000 Stemedica common shares.

38.    Plaintiff Sergey Leshkov is a citizen of Russia and has been a member of CardioCell's board of directors.  Leshkov was born and raised in Ukraine where his family still resides.  Leshkov is also a permanent resident of Switzerland and has a Swiss residence card.  Currently, Leshkov is a co-owner of the medical equipment R&D and distributor, Premium Aesthetics Ltd. (https://www.premium-a.ru). Leshkov is a well-respected entrepreneur and leader in the medical equipment distribution industry in Europe.

39.    On December 5, 2013, Leshkov invested $2.5 million in CardioCell through a predecessor of CardioInvest.  Leshkov also invested $2.5 million in Stemedica's affiliate StemProtein, $2.5 million in Stemedica's affiliate StemCutis, and $2.5 million in Stemedica's affiliate Stemedica International SA.  In reliance on Stemedica's false representations, Leshkov rolled his interest in StemProtein, StemCutis and Stemedica International SA into CardioCell through ProtInvest, Inc.

and SkinInvest, Inc.  Leshkov also invested $850,000 in Stemedica and owns 230,000 Stemedica common shares.

40.     Before the filing of the original complaint on February 27, 2025, the entities through which Vikhrieva and Leshkov invested in CardioCell (including CardioInvest, SkinInvest, and Protinvest) assigned any of all of those companies' interest, assets, and claims to their only stakeholders, Vikhrieva and Leshkov.

### B.     DEFENDANTS

41.     Defendant Stemedica Cell Technologies, Inc. ("Stemedica") is a stem cell manufacturing company incorporated under the laws of the State of Nevada with a principal place of business located at 6350 Nancy Ridge Drive, Suite 106, San Diego, California 92121.  Stemedica has six board members, including three JZT representatives (Zhiwei He Liangbin "Jacky" Zhang and Yansong Gao) and three Stemedica representatives (defendants Roger Howe, Maynard Howe, and Nikolai Tankovich).

42.     Defendant Ziuzhitang Co., Ltd. ("JZT Parent") is a publicly traded company organized under the laws of the People's Republic of China and listed on the Shenzhen Stock Exchange in China.  JZT Parent has approximately $500 million in annual revenues.

43.     In 2017, JZT Parent, under the direction and supervision of its Chairman, Zhenguo Li, decided to invest in defendant Stemedica.  To that end, JZT Parent created defendants JZT Fund and JZT Maker.  On its website, JZT Parent states that it "established" JZT Maker "as its fully-owned subsidiary on March 13, 2018" and that JZT Fund is a "buyout fund under its control" (http://en.jztmaker.com/news/39.html) (a copy of that webpage is attached hereto as **Exhibit H**).

44.     In 2018, JZT Parent invested in Stemedica through JZT Fund and proceeded to utilize Stemedica's stem cell technology through JZT Maker.  There is a unity of ownership and interest as well as overlapping management, employees and

facilities between JZT Parent and its subsidiaries JZT Fund and JZT Maker. JZT Parent also exercises complete dominion and control over JZT Fund and JZT Maker.

45. To date, JZT Parent has appointed four members to Stemedica's board, including: (i) Zhiwei He (Assistant to JZT Parent's Chairman, Zhenguo Li); (ii) Liangbin "Jacky" Zhang (JZT Parent's Deputy Financial Director); (iii) Yansong Gao (JZT Maker's General Manager as appointed by JZT Parent); and (iv) Jeff Liu (JZT Parent's corporate attorney who was later removed from Stemedica's website). The four Stemedica board members have been controlled by JZT Parent and acted under its direct instructions at all relevant times. Notably, JZT Parent's appointed director, Jacky Zhang, has been Stemedica's controller since 2020.

46. JZT Parent conducts business in California through Stemedica and has committed the acts alleged herein through JZT Fund and JZT Maker. As such, JZT Parent, JZT Fund, and JZT Maker have acted as if they were the same corporate entity. JZT Fund and JZT Maker are JZT Parent's alter egos and mere conduits of JZT Parent's affairs and wrongful acts.

47. Defendant Zhuhai Hengqin Jiuzhitang Yonghe Qihang Fund ("JZT Fund") is a limited liability partnership enterprise organized under the laws of the People's Republic of China. JZT Fund was created by defendant JZT Parent. JZT Fund owns a significant minority position in Stemedica, although its interest may have increased. JZT Fund's managing director and Assistant to JZT Parent's Chairman, Zhiwei He, is a member of Stemedica's board of directors. As alleged herein, JZT Parent's dominion and control over JZT Fund is so extensive and the boundaries between the two companies are so blurred that JZT Fund is effectively JZT Parent's alter ego.

48. At JZT Parent's direction, JZT Fund routinely sends its lawyers and auditors to Stemedica's facility in San Diego for monitoring and auditing Stemedica's business. JZT Fund, at JZT Parent's direction, engaged defendant Simon Guo (based in California at the time) to act as JZT Fund's agent and negotiate

with CardioCell terms of the Sublicense Agreement and other potential business deals.  JZT Fund, at JZT Parent's direction and acting through Stemedica, appointed Simon Guo to CardioCell's board so that Mr. Guo can monitor CardioCell and participate in its business decisions.  JZT Parent conducts business in California through JZT Fund's employees and agents.  JZT Fund, at JZT Parent's direction, is thus deeply involved in Stemedica's operations and business dealings and repeatedly participated in Stemedica's decision-making process regarding CardioCell.  As such, JZT Parent (through JZT Fund) has purposefully availed itself of the benefits of this District and wrongfully injured Plaintiffs by actively participating in the destruction of CardioCell.

49.    Defendant Jiuzhitang Maker (Beijing) Cell Technology Co., Ltd. ("JZT Maker") is a company incorporated under the laws of the People's Republic of China. JZT Maker is a wholly owned subsidiary of JZT Parent and was created at JZT Parent's direction to be the sole Chinese recipient of stem cell technologies developed by Stemedica.  In fact, JZT Parent's website explicitly states that JZT Parent created JZT Maker to invest in and develop stem cell technologies.

*See* www.hnjzt.com/en/innovate.html ("As a pharmaceutical company originated hundreds of years ago, Jiuzhitang set its sight on the future and made the strategic arrangement of developing China's stem cell sector [].  This endeavor aims at pioneering a path of innovation suitable for China's time-honored pharmaceutical businesses by integrating traditional Chinese medical science with the cutting-edge biotechnology in development and production of stem cell products initiated by Jiuzhitang Co., Ltd., Yonghe Qihang Fund founded Jiuzhitang Maker (Beijing) Cell Technology Co., Ltd. ('Jiuzhitang Maker') in March 2018 with an investment amounting to 200 million yuan.  Jiuzhitang Maker is a biotechnology company focused on the manufacture, R&D and sales of stem cell-based drugs and regenerative care products.").

50.    In addition, JZT Maker's website confirms that JZT Parent invested in JZT Maker and that JZT Maker already built stem cell facilities. *See* http://en.jztmaker.com/intro/1.html ("Jiuzhitang Maker was established with an investment of 200 million yuan made by Yonghe Qihang Fund launched by Jiuzhitang Co., Ltd. ('Jiuzhitang,' stock code: sz000989). Jiuzhitang Maker has built a large-scale allogeneic stem cells R&D and manufacturing facility that meets Chinese, US and EU cGMP standards in Beijing's Daxing Biomedicine Industry Park, the first of its kind in Beijing. With the production and office area totaling about 4500m², the facility has four separate Grade B+A clean zones dedicated to the manufacture of clinical grade stem cell products that comply with Chinese and US drug application requirements.") (a copy of that webpage is attached hereto as **Exhibit I**).

51.    JZT Maker's general manager, Yansong Gao, is a member of Stemedica's board of directors. As alleged herein, JZT Parent's dominion and control over JZT Maker is so extensive and the boundaries between the two companies are so blurred that JZT Maker is effectively JZT Parent's alter ego.

52.    At JZT Parent's direction, JZT Maker routinely sends its managers to monitor Stemedica's operations in San Diego. At JZT Parent's direction, JZT Maker also sends its engineers and scientists to Stemedica's facility in San Diego for training. JZT Maker, at JZT Parent's direction, is thus deeply involved in Stemedica's operations and business dealings and repeatedly participated in Stemedica's decision-making process regarding CardioCell. As such, JZT Parent (through JZT Maker) has purposefully availed itself of the benefits of this District and wrongfully injured Plaintiffs by actively participating in the destruction of Plaintiffs' investment and of CardioCell.

53.    As demonstrated herein, JZT Parent misused the corporate form by improperly exercising complete dominion and control over JZT Fund and JZT Maker and using those entities to intentionally destroy Plaintiffs' investment and

CardioCell. As described herein, JZT Parent and its two subsidiaries, JZT Fund and JZT Maker, have had many overlapping executives and failed to deal with each other at arm's length. JZT Parent made all decisions on behalf of its two subsidiaries. JZT Parent also intentionally failed to adequately capitalize the two subsidiaries as to escape liability for the tremendous damage done to Plaintiffs' investment and CardioCell. JZT Fund and JZT Maker are thus JZT Parent's alter egos and mere conduits of JZT Parent's affairs and wrongful acts.

54. Defendant Maynard A. Howe is a United States citizen residing in Nevada and conducting business in California. He is Stemedica's co-founder and vice chairman of the board of directors. Maynard Howe was also a Stemedica-appointed member of CardioCell's board of directors from September 16, 2019 to November 5, 2020.

55. Defendant Roger J. Howe is a United States citizen residing in California. He is Stemedica's co-founder and board chairman. Roger Howe was also a Stemedica-appointed member of CardioCell's board of directors from July 31, 2013 to August 2018.

56. Defendant David Howe is a United States citizen residing in California. Between 2005 and 2011, David Howe was Stemedica's Senior Vice President and Medical Director. After 2011, David Howe remained associated with Stemedica by means of recruiting U.S. patients for NovaStem and Rivadavia's cardiovascular and other stem cell treatment at Clinica Santa Clarita and other clinics in Mexico using Stemedica's stem cells and was identified as a medical consultant to Stemedica. David Howe is also Roger and Maynard Howe's brother.

57. Defendant Nikolai I. Tankovich is a United States citizen residing in California. He was a Stemedica-appointed member of CardioCell's board of directors from July 31, 2013 to August 2018. Nikolai Tankovich is Stemedica's current President and Chief Medical Officer.

58. Defendant Dirk P. O'Hara is a United States citizen residing in California. Dirk O'Hara was a Stemedica-appointed member of CardioCell's board of directors from August 18, 2018 to November 5, 2020.

59. Defendant Simon Guo used to be a resident of California and/or Ohio, but he now appears to reside in Asia. Simon Guo has been a Stemedica-appointed member of CardioCell's board of directors since March 15, 2019. He was also a JZT-appointed member of Stemedica's board of directors in the time period from 2019 to 2020. Guo was hired by and acted as an agent of JZT to negotiate with CardioCell the Sublicense Agreement and other potential business deals.

60. Defendant Craig W. Carlson is a United States citizen residing in California. Craig Carlson is Stemedica's former Chief Executive Officer. He was also a Stemedica-appointed member of CardioCell's board of directors from August 2018 to September 16, 2019.

61. Defendant Michael K. Steinhauser is a United States citizen residing in Minnesota. Michael Steinhauser is Stemedica's current Chief Executive Officer and Interim Chairman of Stemedica's Board of Directors. Steinhauser has a close relationship with defendants Roger Howe and Maynard Howe and was hired by them in early 2023 to create the impression of a new management and continue their scheme, as described herein. Steinhauser also assisted the Howe brothers with the sale of Stemedica to SanoStem to escape liability to Plaintiffs and other Stemedica creditors. Plaintiffs discussed the allegations in this Complaint with Steinhauser, including that Stemedica did not have right to communicate with the FDA on CardioCell's behalf without CardioCell's permission, and asked for his help in settling the parties' dispute, but he stopped communicating with Plaintiffs and instead participated in the sale of Stemedica's assets to SanoStem.

62. Defendants Maynard A. Howe, Roger J. Howe, Nikolai I. Tankovich, Dirk P. O'Hara, Simon Guo, and Craig W. Carlson misused the corporate form by improperly exercising complete dominion and control over Stemedica and using

Stemedica to intentionally destroy CardioCell.  These individual defendants are thus Stemedica's alter egos.

63.    Defendant SanoStem Global is a limited liability company incorporated under the laws of the State of Delaware and has a principal place of business located at 4000 Stockdale Hwy, Bakersfield, CA 93309.  SanoStem Global SEC's filing explicitly states that Defendant Shivinder Deol is SanoStem Global's managing partner and chairman of the board and indicates that SanoStem Global's address is the same as the address of Duniya SanoStem, i.e., 4000 Stockdale Hwy, Suite D, Bakersfield, CA 93309 (a copy of the SEC form is attached hereto as **Exhibit J**).

64.    Defendant Duniya SanoStem Inc. is a company, which was incorporated under the laws of the State of Delaware on October 30, 2024.  SanoStem has a principal place of business located at 4000 Stockdale Hwy, Suite D, Bakersfield, CA 93309.  SanoStem was created by SanoStem Global to acquire Stemedica as part of Defendants' scheme.

65.    Defendant Shivinder S. Deol is SanoStem Global's chairman and Duniya SanoStem's director.  Deol resides in California.

**C.    THIRD PARTIES THAT HELPED DESTROY CARDIOCELL**

66.    Rivadavia Universal S.A. ("Rivadavia") is a company incorporated under the laws of Panama with a principal place of business in Mexico.  Rivadavia conducts business in California though various agents, including NovaStem's representatives, David Howe, Roger Howe, Maynard Howe, and Nikolai Tankovich, who all help Rivadavia and the associated Clinica Santa Clarita with regularly recruiting U.S. patients for cardiovascular and other stem cell treatments at Clinica Santa Clarita in Mexico with stem cells purchased directly from Stemedica.

67.    NovaStem is a company incorporated under the laws of Mexico with a principal place of business located at 641 East San Ysidro Boulevard, San Diego, California 92173.  NovaStem is a wholly owned subsidiary of Rivadavia.  Rivadavia has allegedly assigned its interest to Hair Wellness LLC ("Hair Wellness").

68.     Hair Wellness is a company incorporated under the laws of the State of Delaware.   Hair Wellness is Rivadavia's purported assignee with respect to the Rivadavia Agreement, as defined below.

69.     Clinica Santa Clarita is a company incorporated under the laws of Mexico.  Clinica Santa Clarita conducts business in California though various agents, including NovaStem' representatives, and David Howe, Roger Howe, Maynard Howe, Nikolai Tankovich who all help Clinica Santa Clarita with regularly recruiting U.S. patients for cardiovascular treatment at Clinica Santa Clarita in Mexico with stem cells purchased directly from Stemedica.

## JURISDICTION AND VENUE

70.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy here exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

71.     This Court also has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 to the extent that the Complaint asserts federal questions under RICO.

72.     The Court has supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. § 1367(a) in that the state-law claims form part of the same case of controversy as the federal-law claims and arise from the same nucleus of operative facts.

73.     The Court has jurisdiction over Defendants because each defendant resides or has sufficient minimum contacts with this District so as to render the Court's exercise of jurisdiction permissible.

74.     Venue in the Southern District of California is proper pursuant to 28 U.S.C. § 1391(b) because this is the judicial district in which individual defendants reside or a substantial part of the events or omissions giving rise to the claims occurred.

75.    Defendants JZT Parent, JZT Fund, and JZT Maker ("JZT Defendants") and Simon Guo are not residents of the United States.  Therefore, pursuant to 28 § U.S.C. 1391(c)(3), JZT Defendants may be sued in any judicial district, including this District.

76.    As detailed herein, JZT Defendants and Simon Guo purposefully directed their activities to California.  JZT Defendants and Simon Guo actively conducted business through Stemedica in California and also targeted CardioCell and participated in CardioCell's destruction in California, where CardioCell conducted its business.  Plaintiffs' claims against JZT Defendants and Simon Guo thus arouse from their purposeful activities in this District.  As such, this Court's exercise of personal jurisdiction over JZT Defendants and Simon Guo would be fair and reasonable.

## RELEVANT FACTS

### I.    CARDIOCELL'S MULTI-BILLION-DOLLAR PRODUCTS

77.    CardioCell's cardiovascular therapy is pure gold.  According to sales forecasts prepared by Objective Capital Partners, LLC in or about 2016, this therapy was set to generate billions of dollars in revenues upon its commercialization.

78.    The power of stem cells is a scientific fact.  Stem cells control the human tissue's ability to regenerate and repair.  Specifically, stem cells produce an array of signaling molecules and growth factors that stimulate and amplify the human body's healing activities.

79.    Stem cells perform two basic roles in cell maintenance and repair. First, they go to areas of damage where they release proteins to spur growth and proliferation.  And second, they recognize the signals of their local environment and control inflammation level.

80.    Patients generally have an option of being treated with their own cells (autologous cells) or cells harvested from a healthy donor (allogeneic cells).

81.     Autologous cells have the advantage of being immunologically matched, but they require invasive biopsy and tend to lack therapeutic potency in older and sicker patients.  In contrast, the allogeneic stem cells have the advantage of producing vigorous therapeutic impact and are available in high doses, although they require good manufacturing practices and strict adherence to safety procedures to avoid contamination.

82.     While all stem cells – including stem cells from embryo, placenta, and bone marrow – are capable of producing signaling molecules and growth factors that trigger healing, stem cell sourcing is a critical consideration in developing the most effective, tissue-specific protocols.

83.     Stemedica is a stem cell manufacturer that was founded in 2005. Stemedica has developed a proprietary platform called BioSmart Technology™ for producing non-embryonic allogeneic stem cells.  However, Stemedica needed a clinical trial company – like CardioCell – to conduct clinical trials in the United States and prove the efficacy and safety of stem cells for treating various conditions, including cardiovascular disease.

84.     Stemedica's platform provides a competitive advantage in its ability to manufacture a reproducible and scalable pipeline of new product candidates in a low-oxygen, low-tension environment.  The platform is also responsible for many of the benefits of the stem cells, including enhanced proliferation, as well as high migratory ability, potency and purity, obviating the need for immunosuppressant agents required in the typical allogeneic therapy.

85.     Stemedica manufactures two types of stem cells:  (i) ischemia-tolerant mesenchymal stem cells ("itMSCs") that are extracted from bone marrow and then expanded through Stemedica's proprietary technology as licensed to CardioCell for the treatment of cardiovascular diseases; and (ii) ischemia-tolerant neural stem cells ("itNSCs") that are extracted from brain tissue and then expanded through

Stemedica's proprietary technology as undifferentiated cells that generate the main phenotypes of cells in the nervous system.

86. The itMSCs – the manufacturing of which has been licensed to CardioCell – act by circulating throughout the body and releasing proteins and growth factors into the damaged tissue, rescuing damaged cells from death and creating the right conditions for the newly mobilized cells to proliferate and repair.

87. With respect to the treatment of cardiovascular disease, the itMSCs can migrate to the damaged tissue in the heart endothelium of vessels of all diameters when they are applied intravenously, helping the cells to regain their functions by integrating into the tissue and recruiting the necessary factors to create new blood vessels and by controlling inflammation.

88. On July 31, 2013, Stemedica formed CardioCell as a clinical trial subsidiary company which was to conduct pre-clinical research, clinical trials and obtain regulatory approval for selling adult stem cells and related cardiovascular indication products in the United States.

89. On October 22, 2013, Stemedica granted CardioCell the Exclusive License, which is an exclusive worldwide license to use Stemedica's itMSCs for the treatment of cardiovascular disease.

90. On October 25, 2013, Stemedica entered an agreement to contribute $35 million in stem cells for CardioCell's clinical trials in exchange for a 71.7% stake in CardioCell, although, as explained below, they did not do so.

91. CardioCell then began its pre-clinical research. And Stemedica, as CardioCell's main shareholder, proceeded to try to attract investors for Stemedica and CardioCell, pitching CardioCell as the holder of the exclusive worldwide right using Stemedica's stem cell technology to create a groundbreaking cardiovascular therapy.

92. During multiple telephone conferences and in-person meetings in 2013, the Howe brothers and Nikolai Tankovich pitched this multi-billion-dollar

groundbreaking therapy and opportunity to Leshkov and Vikhrieva, explaining in detail CardioCell's tremendous potential and upcoming clinical trials, as well as the Exclusive License and the grant of $35 million in stem cells.

93.    Leshkov and Vikhrieva had no reason to doubt the pitch and sincerity of Stemedica, the Howe brothers, and Nikolai Tankovich.  Thus, they each invested $2.5 million in CardioCell (for a total of $5 million) on December 5, 2013.

94.    On April 2, 2014, the United States Food and Drug Administration ("FDA") granted approval for a Phase IIa clinical trial using CardioCell's itMSC therapy to treat Chronic Heart Failure ("CHF").

95.    On April 7, 2015, CardioCell sent a letter to the FDA to officially advise that Stemedica had transferred ownership of IND application No. 15940 to CardioCell and ask the FDA to update the IND records to reflect the new application owner CardioCell and its contact information.  The letter also explicitly stated that Stemedica had transferred "all responsibilities to conduct clinical study STEM-104-M-CHF: A phase IIa, single-blind, placebo-controlled, crossover, multi-center, randomized study to assess the safety, tolerability, and preliminary efficacy of a single intravenous dose of ischemia-tolerant allogeneic mesenchymal bone marrow cells  to subjects with heart failure of non-ischemic etiology."

96.    On August 28, 2016, CardioCell published its groundbreaking data from the Phase IIa clinical trial titled "Safety and Efficacy of Intravenous Infusion of Ischemia-Tolerant Allogeneic Mesenchymal Stem Cells in Patients With Non-ischemic Cardiomyopathy."

97.    The data established that CardioCell's intravenous stem-cell therapy is both safe and effective in treating this condition.

98.    CardioCell thus became the first company in the world to use intravenously-delivered mesenchymal stem cells to treat CHF.

99.     Shortly thereafter, CardioCell had positive discussions with the FDA regarding the upcoming Phase IIb/III clinical trial and would have completed that trial but for Stemedica's wrongful acts detailed herein.

100.     Later in 2016, CardioCell's study titled "A Phase IIa, Single-Blind, Placebo-Controlled, Crossover, Multi-Center, Randomized Study to Assess the Safety, Tolerability and Preliminary Efficacy of a Single Intravenous Dose of Ischemia-Tolerant Allogeneic Mesenchymal Bone Marrow Cells to Subjects With Heart Failure of Non-Ischemic Etiology" was presented and met with great enthusiasm at a "Hot Line" Late-Breaking Session at the European Society of Cardiology Congress.

101.     The results of CardioCell's clinical trials were groundbreaking and transformative.  CHF represents the single largest cause of death in the United States. Approximately 5.5 million individuals suffer from CHF, which generates more than one million hospitalizations annually, with a striking 50% mortality and re-admission rate after 60-90 days post-discharge.

102.     Moreover, CHF has an annual cost in the $31 billion range, which is estimated to grow by 127% to $71 billion by 2030.

103.     Unsurprisingly, the commercialization of CardioCell's therapy through a strategic partnership was set to achieve a five-year revenue projection, approaching $3 billion at a five-year compound annual growth rate, or nearly 70%, and an EBITDA margin in the 40% range.

104.     The potential of CardioCell's CHF therapy is so great that experts in the field projected that an IPO or a strategic partnership between CardioCell and a big pharmaceutical company could have raised up to $10 billion in capital.

105.     In addition to the CHF clinical trials, the FDA also approved another CardioCell clinical trial that would determine whether CardioCell's novel intravenous stem cell therapy improves function in patients with implantation of a left ventricular assist device ("LVAD").

106. On December 11, 2018, CardioCell's clinical trial titled "LVAD" was approved by the FDA for CHF (including ischemic and non-ischemic) and initiated by CardioCell. The "LVAD" clinical trial is designed to deliver itMSCs by intravenous injections and has already generated great interest in the biotechnology field as there are more than six million patients with CHF in the United States.

107. Further, each year, 200,000 to 250,000 heart failure patients need heart transplantation, but with the very low supply of donor hearts, LVAD implants are being used and there is unmet need for non-surgical and effective supplemental stem cell therapy like CardioCell's LVAD therapy.

108. A successful LVAD clinical trial would thus fundamentally transform the old paradigm of CHF treatment and create a base for treatment of acute myocardial infarction ("AMI") using non-surgical and effective supplemental cell therapy like CardioCell's LVAD therapy.

109. Given these groundbreaking scientific studies and clinical trials, there is no doubt that CardioCell would have been able to complete its LVAD Phase IIa trial, obtain FDA approval and commercialize its products but for Defendants' wrongdoing.

110. CardioCell's successful research also shows that CardioCell's technology has the potential to provide a therapeutic solution for treating all cardiovascular dysfunctions which have a significant worldwide market.

111. CardioCell's forecasts in the United States prepared by experts in the field show that the sales of CardioCell's products – including its CHF, AMI, and peripheral artery disease ("PAD") products – may have reached $8 billion in 2029 and $10 billion in 2032, assuming a $6,000 treatment cost per injection.

112. However, because Stemedica has deprived CardioCell of the critical funds, stem cells and manufacturing know-how, CardioCell has been unable to complete the clinical trials and commercialize its multi-billion-dollar products.

Plaintiffs were thus deprived of their investments and the profits they would have made from their investment.

## II.    STEMEDICA'S 2013 EXCLUSIVE WORLDWIDE LICENSE GRANT TO CARDIOCELL

113.    On October 22, 2013, Stemedica and CardioCell signed the Exclusive License whereby Stemedica granted CardioCell exclusive, perpetual, worldwide rights for the manufacturing, exploration and commercialization of therapeutic cardiovascular indications using stem cells.

114.    Pursuant to Section 4.2.1 of the Exclusive License, Stemedica granted CardioCell license rights as follows:

> SCT grants to CardioCell a royalty-bearing license, including the right to sublicense, under the SCT Patents, to make, use, offer for sale, sell and import Licensed Products in the Field in the Territory and to practice any methods or processes in the Licensed Patents in connection with Licensed Products in the Field in the Territory.

115.    The Exclusive License defined "Field" and "Licensed Products" as follows:

> "Field" means diagnosis, prevention and treatment of the following indications in humans: (a) acute myocardial infarction, (b) chronic heart failure (of any nature, including ischemic or non-ischemic), (c) peripheral artery disease, (d) hypertension, (e) coronary artery disease, (f) arrhythmia, (g) atherosclerosis, (h) carotid artery disease, (i) cardiomegaly, (j) congenital heart disease, (k) congestive heart failure, (I) endocarditis (of any nature, including infective and regular), (m) mitral valve prolapsed, (n) valvular heart disease, (o) chronic total occlusion, and (p) diabetic ulcers.

> "Licensed Product" means any bio-pharmaceutical product in all dosage forms and formulations, for administration through any delivery platform or mechanism, in each case that contains a SCT Stem Cell, the manufacture, sale, offer for sale, importation, or use of which (i) would be covered by a Valid Claim; or (ii) embodies, incorporates or is made using SCT Technology in the Field.

116.    Pursuant to Section 3.1 of the Exclusive License, Stemedica granted CardioCell "all technology that may be reasonably necessary or useful to CardioCell to develop, manufacture, seek or obtain regulatory approval for or commercialize the

Licensed Products in the Field or otherwise efficiently exploit the rights and licenses granted to CardioCell in the Field."

117.    Pursuant to Section 3.4.1 of the Exclusive License, Stemedica also agreed to provide to CardioCell a copy of all manufacturing information for the stem cells including a list of all growth factors and other components.

118.    Further, pursuant to Section 3.3.1 of the Exclusive License, Stemedica agreed to supply to CardioCell "all quantities of SCT Stem Cells required for the Clinical Trials conducted by or on behalf of CardioCell or its Affiliates or sublicensees for Licensed Products in the Field."

119.    Stemedica granted to CardioCell these exclusive rights for the worldwide Territory defined as "all countries of the world except Indonesia, Philippines, Thailand, Malaysia, Singapore, Vietnam, Brunei, Cambodia, Laos, Myanmar, and Kazakhstan," with which Stemedica had pre-existing agreements.

120.    Pursuant to Section 4.4 of the Exclusive License, Stemedica also agreed that, upon the expiration of the pre-existing agreements, the referenced countries would automatically become part of the Territory.

## III.    THE CONTRIBUTION AGREEMENT PROVIDING CARDIOCELL WITH $30 MILLION IN STEM CELLS AND STEMEDICA'S BREACH

121.    To obtain a controlling stake in CardioCell, Stemedica agreed to provide CardioCell with stem cells for the clinical trials but made no monetary contribution.

122.    On October 22, 2013, Stemedica and CardioCell entered into a contribution agreement ("Contribution Agreement").

123.    Pursuant to Section 1.1 of the Contribution Agreement, Stemedica "irrevocably and unconditionally agreed to contribute to CardioCell unique ischemia-tolerant Mesenchymal Stem Cells (itMSC) manufactured by Stemedica having an aggregate value of $35 million."

124.    Pursuant to Section 1.4 of the Contribution Agreement, in exchange for the contributed cells, CardioCell agreed to issue to Stemedica 35,850,000 Class A Common Units.

125.    However, Stemedica repeatedly failed to timely and adequately provide stem cells for CardioCell's clinical trials.

126.    Unbeknownst to Plaintiffs and CardioCell, the reason that Stemedica breached the Contribution Agreement and did not provide these stem cells to CardioCell was, as CardioCell later learned, that Stemedica, the Howe brothers and Nikolai Tankovich prioritized stem cell deliveries to Rivadavia, NovaStem, JZT, and ALTACO over CardioCell, but falsely claimed that the late and inadequate deliveries to CardioCell were due to capacity and technical issues at the manufacturing facility.

127.    After CardioCell repeatedly complained about Stemedica's inadequate stem cell supply that had been interfering with the clinical trials, on September 6, 2018, Stemedica's CEO, Craig Carlson, emailed CardioCell's CEO, Sergey Sikora ("CardioCell's CEO"), admitting that Stemedica could not meet CardioCell's requests.  Carlson also falsely represented that Stemedica would meet 77% of CardioCell's request in approximately nine months by end of May 2019.

128.    However, Stemedica continued to delay the stem cell supply and still did not provide even this lesser amount of stem cells by the end of May 2019.

129.    On December 18, 2019, during a CardioCell board meeting, CardioCell's CEO raised the issue of Stemedica's inadequate and untimely stem cell supply to CardioCell explaining yet again that this issue had been interfering with CardioCell's clinical trials.

130.    The same day, Roger Howe sent a PowerPoint presentation slide to CardioCell detailing Stemedica's responses to CardioCell's recent stem cell requests. However, Roger Howe omitted the fact that Stemedica had been prioritizing stem cell deliveries to Rivadavia, NovaStem, and ALTACO for years and plainly failed to provide a reasonable explanation for Stemedica's repeated breaches of the

Contribution Agreement.

131.    Stemedica continued to breach the Contribution Agreement and failed to provide the required amount of stem cells.

132.    Although CardioCell granted Stemedica time extensions and Stemedica signed a new delivery schedule for the remaining stem cells in 2018, that schedule was also breached by Stemedica who did not provide the stem cells pursuant to its obligation.

133.    To date, Stemedica has provided CardioCell with only a small quantity of the stem cells as agreed upon in the Contribution Agreement.

134.    Although pursuant to the Contribution Agreement, Stemedica agreed to provide $35 million in stem cells in exchange for a 70% stake in CardioCell, it breached the Contribution Agreement and only delivered a small amount of the stem cells it was obligated to provide.

135.    Stemedica currently owes CardioCell $27,850,000 in stem cells pursuant to the Contribution Agreement.

136.    This purposeful breach and failure together with the other actions described herein caused the destruction of CardioCell and Plaintiffs' investment.

## IV.    THE ADMINISTRATIVE SERVICE AGREEMENT UNDER WHICH STEMEDICA CHARGED CARDIOCELL MORE THAN $1 MILLION FOR SERVICES THAT STEMEDICA NEVER PROVIDED

137.    On October 25, 2013, Stemedica and CardioCell entered into an administrative services agreement ("Administrative Services Agreement"), pursuant to which Stemedica agreed to provide CardioCell with administrative services.

138.    Stemedica then breached the Administrative Services Agreement and proceeded to improperly charge CardioCell approximately $1.56 million for nearly two years of administrative services, most of which Stemedica did not provide.

139.    Stemedica's administrative charges to CardioCell purportedly for services (most of which Stemedica never provided) burdened CardioCell and further deprived it of the critical funds it needed to complete the clinical trials.

140.    Stemedica signed similar agreements with other Stemedica subsidiaries, including StemProtein and StemCutis.

141.    Under those administrative service agreements, Stemedica improperly charged StemProtein, StemCutis and CardioCell over $4 million for purported administrative services most of which Stemedica never provided.

## V.    STEMEDICA AND THE HOWE BROTHERS' FALSE AND MISLEADING REPRESENTATIONS REGARDING CARDIOCELL AND STEMEDICA'S SUBSIDIARIES

142.    Stemedica and the Howe brothers never intended for CardioCell to complete the clinical trials and achieve commercial success.

143.    Stemedica and the Howe brothers, and Nikolai Tankovich created CardioCell as investor bait to raise millions of dollars for Stemedica while planning to destroy CardioCell – without officially dissolving it – by systematically depriving CardioCell of funds, stem cells, and know-how so that Stemedica and its co-conspirators could repeat the same fraudulent pattern of selling CardioCell's license rights to other third parties unobstructed and defrauding new investors by using CardioCell's groundbreaking scientific data.

144.    Indeed, during multiple in-person meetings and telephone conferences in 2013, Roger Howe and Nikolai Tankovich, who were appointed to the CardioCell board by Stemedica, and Maynard Howe, made false representations to Leshkov and Vikhrieva about CardioCell's tremendous potential in commercializing the cardiovascular therapy and creating a multi-billion-dollar product, as to induce them to invest $5 million in CardioCell.

145.    In the beginning of October 2013, during Leshkov and Vikhrieva's visit to Stemedica in San Diego, the Howe brothers and Tankovich made the same representations about CardioCell to Leshkov and Vikhrieva.

146.    Specifically, during an in-person meeting in San Diego, the Howe brothers and Tankovich provided a written document representing to Leshkov and Vikhrieva CardioCell's 2013 Business Plan and Anticipated Milestones for years 0-4 as follows:  (i) year 0 – Stemedica would invest $4 million in CardioCell to fund the CHF and AMI clinical trials; (ii) year 1 – CardioCell would enter into a licensing deal with big pharma and distribute the first $15 million milestone payment to CardioCell's shareholders; (iii) year 2 – CardioCell would complete the Phase IIa CHF clinical trial and distribute the second $40 million milestone payment to the shareholders; (iv) year 3 – CardioCell would complete the Phase II AMI clinical trial and license the AMI indication as well as distribute the third $40 million milestone payment to the shareholders with a possibility of CardioCell reaching a market capitalization of $300 million in case the company goes public; and (iv) year 4 – CardioCell would complete the Phase II PAD clinical trial and distribute the fourth $40 million milestone payment to the shareholders with a possibility of CardioCell reaching a market capitalization of $500 million.

147.    In or about October 2013, during their presentation at the Ecole Polytechnique Federale de Lausanne in Switzerland, Maynard Howe and Nikolai Tankovich represented to Leshkov that:  (i) Stemedica's subsidiaries, CardioCell, StemCutis, StemProtein and Stemedica International had a tremendous potential; (ii) CardioCell had the exclusive worldwide license for the cardiovascular indication and stem cell manufacturing know-how; (iii) CardioCell had millions of dollars' worth of stem cells at its disposal and did not have to manufacture any stem cells for the duration of the clinical trials; (iv) CardioCell was projected to generate billions of dollars upon the commercialization of the cardiovascular product; and (v) Stemedica would contribute cash to CardioCell to fund the clinical trials as Stemedica was

purportedly in negotiations with various international companies that would result in successful business partnerships and new investments.

148.    On January 12, 2014, Leshkov and Vikhrieva visited San Diego for the first CardioCell's board meeting.  During that meeting, the Howe brothers and Tankovich confirmed their false statements about CardioCell's tremendous value.

149.    Subsequent to these and other in-person meetings, the Howe brothers and Tankovich continued to make similar representations to Leshkov and Vikhrieva at follow-up telephone conferences and Skype calls as to persuade them to continue investing in CardioCell and the other subsidiaries.

150.    The Howe brothers and Tankovich made all these representations with the full knowledge that CardioCell could not survive without stem cells, funds and other support that the Howe brothers and Tankovich knew Stemedica had no intention to supply.

151.    As such, these representations were false and misleading at the time they were made.

152.    Understanding the stem cell technology and realizing the untapped potential of the cardiovascular indications, Leshkov and Vikhrieva were excited about CardioCell's upcoming therapeutic products, which had the potential to change people's lives and generate billions of dollars in revenues.

153.    Leshkov and Vikhrieva thus had no reason to doubt the Howe brothers' and Tankovich's representations or suspect their motives.

154.    In reliance on those statements, on December 5, 2013, Leshkov and Vikhrieva made a $5 million investment in CardioCell (each invested $2.5 million).

155.    Leshkov and Vikhrieva would not have invested in CardioCell if they knew the Howe brothers and Stemedica's plan to violate CardioCell's exclusive license rights and deprive CardioCell of the funds, stem cells, and know-how necessary for the completion of the clinical trial.

156.    Leshkov and Vikhrieva would not have invested in CardioCell if they knew the Howe brothers' and Stemedica's plan to use and abuse CardioCell, and interfere with CardioCell's fund-raising efforts, as described herein.

157.    Leshkov and Vikhrieva would not have invested in CardioCell if they knew that the Howe brothers and Stemedica planned to use the $5 million investment to conduct the Phase IIa CHF clinical trials and generate unprecedented clinical data to attract new Stemedica investors, but did not intend to honor their promise of contributing funds to CardioCell necessary for the completion of the clinical trials.

158.    CardioCell was not Stemedica's and the Howe brothers' only investor bait.  In the time period from 2013 to 2014, the Howe brothers and Tankovich also used Stemedica's subsidiaries StemProtein, StemCutis and Stemedica International, which had exclusive world-wide licenses from Stemedica for various stem cell applications, to induce Leshkov and Vikhrieva to invest more money into groundbreaking stem cell technologies.

159.    StemProtein, for example, was founded by Stemedica to develop and manufacture Stem Cell Factors ("SCFs"), including proteins, polysaccharides, and membrane-enclosed vesicles carrying RNA molecules involved in gene regulation, for applications such as heat-stable nasal and eye drops, intravenous injections, wound dressing, and creams.  The SCFs have a valuable therapeutic effect in tissue regeneration, new blood vessel formation, cell death prevention, and skin anti-scarring.  In December 2016, StemProtein won the 2016 San Diego Manufacturing Award in the Small Company Category.

160.    Stemedica also founded StemCutis to develop and manufacture stem cell-derived dermatological products with valuable therapeutic effect in skin burns, scars, and hair loss.  In March 2017, StemCutis introduced the anti-aging Sinergy Collection skin care products containing a novel and highly effective cosmetic blend of stem cell factors and other natural ingredients.  StemCutis initiated a clinical trial entitled "A Phase I/II, Open-Label Study to Assess the Safety, Tolerability, and

Preliminary Efficacy of a Single Intravenous Dose of Allogeneic Mesenchymal Bone Marrow Cells to Subjects for Cutaneous Photoaging." This groundbreaking trial combined a low-dose fractional resurfacing laser treatment on the face to create a minor inflammatory injury with a single intravenous infusion of non-embryonic adult human bone marrow stem cells to facilitate the homing of the stem cells for highly effective treatment of sun damage and scarring.

161. Stemedica founded Stemedica International to develop stem-cell treatment or neurological disorders, including Alzheimer's disease and Parkinson's disease, among others. Stemedica International completed a pre-clinical trial, developed a clinical trial protocol, and initiated a clinical trial entitled "A Phase IIa Multicenter, Randomized, Single-blind, Placebo-controlled, Crossover Study to Assess the Safety, Tolerability, and Preliminary Efficacy of a Single Intravenous Dose of Allogeneic Human Mesenchymal Stem Cells in Subjects with Mild to Moderate Dementia Due to Alzheimer's Disease."

162. Similar to what they had done with CardioCell, Stemedica and the Howe brothers orchestrated: (1) contribution agreements between Stemedica and each of StemProtein and StemCutis to gain a majority stake in the subsidiaries in exchange for contributing stem cells in the future; and (2) administrative services agreements between Stemedica and each of StemProtein and StemCutis allowing Stemedica to charge the subsidiaries for administrative services Stemedica did not provide as to further deprive the subsidiaries of funds.

163. Stemedica then proceeded to use the subsidiaries' pre-clinical data, successful clinical trials, cell-derived factors, and dermatological products to raise funds.

164. During in-person meetings in San Diego in October 2013 and January 2014, as well as follow-up phone calls and Skype calls between November 2013 and June 2014, the Howe brothers and Tankovich represented to Leshkov and Vikhrieva that: (i) Stemedica would provide all stem cells necessary for pre-clinical research

and clinical trials; (ii) the subsidiaries were projected to generate billions of dollars upon the commercialization of their products; and (iii) Stemedica would contribute cash to the subsidiaries to fund the clinical trials as Stemedica was purportedly in negotiations with various international companies that would result in successful business partnerships and new investments.

165.    However, these statements were false and misleading at the time they were made.

166.    In reliance on all those false statements, Leshkov and Vikhrieva invested $5 million in StemCutis on December 18, 2013, $5 million in Stemedica International on February 12, 2014, and $5 million in StemProtein on June 17, 2014. In each case, Leshkov and Vikhrieva each invested $2.5 million.

167.    Leshkov and Vikhrieva would not have invested $15 million in the subsidiaries if they knew the Howe brothers' statements were false.

168.    After Leshkov and Vikhrieva made their investments in CardioCell, the Howe brothers continued to make false representation about the value of CardioCell and Stemedica's and other investors' upcoming cash contributions to CardioCell as to mislead Leshkov and Vikhrieva that CardioCell would be adequately funded and to prevent them from learning the truth and taking action.

169.    More specifically, on or about August 25, 2016, the Howe brothers represented to Leshkov that a high-profile investor from Saudi Arabia and his son had obtained their country's government approval to invest $400 million in both Stemedica and CardioCell and that the money was already in the United States ready to be transferred to Stemedica and CardioCell.  The Howe brothers invited Leshkov to attend the call with the investor and represented that a substantial part of the investment would be used to fund CardioCell's clinical trials and product commercialization.

170.    The next day, the Howe brothers invited Leshkov to Roger Howe's office and asked him to attend a call with a Saudi Arabian investor and provide

positive comments about his investment in CardioCell as the Saudi Arabian investor was ready to invest but needed to hear from current CardioCell investors. After the call, the Howe brothers and Nikolai Tankovich continued to represent to Leshkov that a substantial part of any Saudi Arabian investment would be used to fund CardioCell's clinical trials and product commercialization.

171.   Although they later confirmed that the Saudi Arabian investor had wired $400 million, the Howe brothers and Stemedica never contributed those funds to CardioCell, as promised. And despite Leshkov and Vikhrieva's multiple inquiries regarding the $400 million wire transfer that seemed to have disappeared, the Howe brothers failed to provide an explanation, and it never became clear what happed to that enormous investment.

172.   Subsequently, whenever Leshkov and Vikhrieva raised questions and concerns about Stemedica's promised funding of CardioCell, the Howe brothers made similar representations about upcoming investments from various companies from around the world, including investors from Iran.

173.   To that end, the Howe brothers repeatedly represented that Stemedica was on the verge of striking lucrative deals with various investors and would contribute cash to CardioCell as soon as they received funds. Stemedica never did so.

174.   Indeed, despite raising more than $200 million over the years from various investors and repeatedly promising to contribute those funds to CardioCell, the Howe brothers failed to fulfill their promise.

175.   The Howe brothers misappropriated those funds through related-party transactions and excessive compensation.

176.   Upon Leshkov and Vikhrieva's $20 million investment, between 2014 and 2017, the Howe brothers and Nikolai Tankovich continued to express their excitement about potential investors' tremendous interest in both Stemedica and

CardioCell as to encourage Leshkov and Vikhrieva to continue investing in those entities.

177.    In the summer of 2016, in a conversation with Leshkov, Nikolai Tankovich stated that if Leshkov bought 200,000 Stemedica shares from Tankovich, Leshkov would be able to easily and quickly get a great return on his money because many investors were ready to invest in Stemedica at a much higher price than the price Tankovich had offered Leshkov.  Tankovich also stated that Leshkov could easily sell his interest and double his investment at any point.

178.    Later in 2017, when Leshkov visited Stemedica in San Diego and raised concerns about Stemedica's unfulfilled promises to fund CardioCell and the other subsidiaries, Tankovich falsely stated that all subsidiaries had tremendous value.  To prevent Leshkov from taking any action, Tankovich falsely stated that the subsidiaries were so valuable that Tankovich's Wall Street friend could sell Leshkov's stake in a flash if Leshkov was interested in selling.

179.    Plaintiffs considered Tankovich their personal friend and trusted him implicitly.  Tankovich's repeated affirmative statements thus dispelled any doubt that CardioCell would succeed by completing its clinical trials and commercializing the invention.

180.    More importantly, Plaintiffs did not have a reason to believe that the Howe brothers, Tankovich, and Stemedica intended to damage CardioCell by compromising CardioCell's clinical trials and failing to provide the promised funds and stem cells when CardioCell needed those funds.

181.    Indeed, each time Plaintiffs raised concerns about the sufficiency of CardioCell's funds, the Howe brothers and Nikolai Tankovich promised Plaintiffs that Stemedica would fund CardioCell upon receiving money from various investors, including investors from Saudi Arabia and Iran.  However, when CardioCell's need for funds arose in 2018, Defendants failed to fulfill their promise.

182.    As detailed below, the first time Plaintiffs had a reason to believe that CardioCell would be damaged and destroyed by the purposeful actions of Stemedica, the Howe brothers, Tankovich, and the other Defendants was in July 2018, when Plaintiffs realized that Stemedica was not planning to provide the funds and stem cells necessary for the critical clinical trials and instead was prioritizing delivery of stem cells to other companies.

## VI.    STEMEDICA'S FAILURE TO DISCLOSE ITS PRE-EXISTING 2012 AGREEMENT WITH ORGANISMO THAT INCLUDED CARDIOCELL'S RIGHTS

183.    Pursuant to Section 8.1.7 of the Exclusive License, Stemedica represented and warranted that Stemedica had not granted any license or sublicense to any third party in conflict with CardioCell's rights.

184.    This representation was false.

185.    Unbeknownst to Plaintiffs and CardioCell, prior to the Exclusive License, on December 13, 2012, Stemedica had entered into a master manufacturer and distributor agreement with the Mexican company, Organismo y Distribucion de Celulas Madre de Mexico SA de CV ("Organismo"), granting Organismo license rights for Stemedica's products ("Organismo Agreement"), including the rights that were subsequently granted to CardioCell.

186.    At the time the Exclusive License was granted to CardioCell, Roger Howe and Nikolai Tankovich were members of the CardioCell board as Stemedica's appointed directors and had a fiduciary duty to disclose to CardioCell the Organismo Agreement.

187.    However, Howe and Tankovich fraudulently concealed the Organismo Agreement from CardioCell.

188.    CardioCell's non-conflicted directors only discovered the existence of the Organismo Agreement and Stemedica's breach of Section 8.1.7 of the Exclusive License in July 2018.  Because of Defendants' fraudulent concealment, CardioCell's

non-conflicted directors (including Plaintiffs) could not have discovered this breach earlier.

## VII.   STEMEDICA'S 2014 GRANT OF CARDIOCELL'S RIGHTS TO ALTACO AND FAILURE TO DISCLOSE THE SAME

189.   On September 15, 2014, unbeknownst to Plaintiffs and CardioCell, Stemedica signed a new manufacturing and distribution agreement with the Kazakhstan company, ALTACO ("ALTACO Agreement"), after Stemedica's prior agreement with ALTACO had expired.

190.   Stemedica entered into this new agreement with ALTACO despite the fact that, pursuant to Section 4.4 of the Exclusive License, upon the expiration of the prior ALTACO agreement, Kazakhstan was automatically added to the definition of Territory, which had been exclusively licensed to CardioCell.

191.   Pursuant to the ALTACO Agreement, Stemedica granted ALTACO exclusive rights for all stem cell indications, including cardiovascular indications, in Kazakhstan, Kyrgyzstan, Uzbekistan, Tajikistan, and Turkmenistan.

192.   Specifically, pursuant to Section 2.2.2 of the ALTACO Agreement, ALTACO agreed "to develop, use, promote and sell the Products in the Field" where the definition of "Field" explicitly included "cardiovascular disease."

193.   Stemedica granted these rights to ALTACO without CardioCell's knowledge (or Plaintiffs' knowledge) and in violation of the Exclusive License.

194.   The Stemedica-appointed directors, Roger Howe and Nikolai Tankovich, concealed this fact from CardioCell and Plaintiffs.

195.   CardioCell's non-conflicted directors (including Plaintiffs) only discovered the ALTACO Agreement and Stemedica's breach of the Exclusive License in that regard in August 2018.   Because of Defendants' fraudulent concealment, CardioCell's non-conflicted directors (including Plaintiffs) could not have discovered this breach earlier.

## VIII. STEMEDICA'S 2015 GRANT OF CARDIOCELL'S RIGHTS TO RIVADAVIA AND CLINICA SANTA CLARITA AND FAILURE TO DISCLOSE THE SAME

196.    On June 22, 2015, unbeknownst to Plaintiffs and CardioCell, Stemedica entered into a master manufacturer and distributor agreement with Rivadavia ("Rivadavia Agreement") granting Rivadavia exclusive rights for all stem cell indications in Mexico and agreeing to make a best effort to supply Rivadavia with 50% of the total itMSCs production.

197.    Section 3.04 of the Rivadavia Agreement explicitly stated:

> [Rivadavia] shall have the exclusive rights in the Territory [i.e., Mexico] for all existing and future products manufactured by [Stemedica] and its affiliates and for all medical indications under the terms and conditions of this Agreement.  For the purpose of clarity, there are not any medical indications and conditions that are excluded from this Agreement.

198.    The Rivadavia Agreement also granted to Rivadavia a right of first refusal for the exclusive rights for the territory of South America, with the exception of Venezuela and Columbia, as well as for the territory of Central America, with the exception of Panama.

199.    The amendment to the Rivadavia Agreement ("Santa Clarita Amendment") allowed Rivadavia's primary customer in Mexico, Clinica Santa Clarita, to purchase stem cells for the same indications directly from Stemedica.

200.    The Rivadavia Agreement and Santa Clarita Amendment thus violated the worldwide exclusive rights that had been granted to CardioCell under the Exclusive License.

201.    The Stemedica-appointed directors, Roger Howe and Nikolai Tankovich, concealed this fact from CardioCell and Plaintiffs.

202.    CardioCell's non-conflicted directors only discovered the existence of the Rivadavia Agreement and Santa Clarita Amendment as well as Stemedica's breach of the Exclusive License in that regard in July 2018.  Because of Defendants'

- 41 -

fraudulent concealment, CardioCell's non-conflicted directors (including Plaintiffs) could not have discovered this breach earlier.

## IX.    STEMEDICA'S AGREEMENT TO SELL 51% EQUITY TO JZT AND ADMISSION ABOUT THE IMPROPER LICENSE GRANTS TO ORGANISMO AND RIVADAVIA

203.    In early 2018, Stemedica announced its plan to sell 51% of its equity to JZT Fund and manufacture stem cells for JZT Fund's subsidiary, JZT Maker.

204.    In March 2018, CardioCell expressed concerns about the potential impact of this new manufacturing obligation on Stemedica's already deficient stem cell deliveries to CardioCell.  However, Stemedica did not address CardioCell's concerns.

205.    JZT Fund announced that it had reached an agreement to invest $70 million in Stemedica as to obtaining a 51% majority holding position. *See, e.g.,* http://en.jztmaker.com/news/32.html ("On 15 May 2018, Jiuzhitang Co., Ltd. officially announced that Jiuzhitang Yonghe Qihang Fund signed Agreement on Equity Investment with Stemedica Cell Technologies, Inc. on May 11.  As set forth in the Agreement, the M&A Fund would invest $70,000,000 in Stemedica in the form of capital increase, thus obtaining a 51% majority holding position of Stemedica.") (a copy of this webpage is attached hereto as **Exhibit K**).

206.    Pursuant to this Equity Investment Agreement, JZT Fund agreed to complete the full $70 million investment in Stemedica by December 1, 2018.

207.    Further, pursuant to the parties' Technology Transfer Agreement, JZT Fund agreed to invest $22 million by May 31, 2018, and another $48 million by December 1, 2018.

208.    In exchange, Stemedica agreed to transfer all intellectual property and itMSC manufacturing protocols to JZT Maker.

209.    Stemedica paid Defendant Simon Guo 6.5% of all funds raised from JZT in connection with the Equity Investment Agreement.

210.    Becoming increasingly concerned about this new transaction, CardioCell's non-conflicted directors (including Plaintiffs) continued to ask the Stemedica-appointed directors, Roger Howe and Nikolai Tankovich, about Stemedica's capacity to manufacture stem cells for CardioCell in light of Stemedica's agreement with JZT and obligation to provide to JZT millions of dollars' worth of stem cells.

211.    In response to CardioCell's questions, Roger Howe and Nikolai Tankovich finally admitted that Stemedica had been manufacturing stem cells for other companies, including Organismo, Rivadavia and Clinica Santa Clarita, and had granted to them CardioCell's cardiovascular rights in violation of the Exclusive License.  Plaintiffs also subsequently learned that Stemedica had sold stem cells to Rivadavia at the discounted price of $30 per 1 million clinical grade stem cells for clinical trial, while the market value of those cells was more than $800 per 1 million clinical grade stem cells.

212.    On July 17, 2018, CardioCell's corporate counsel, Jones Day, sent a letter to Stemedica giving notice of Stemedica's egregious breaches of the Exclusive License including:  (1) failing to identify the pre-existing Organismo Agreement that was in conflict with CardioCell's exclusive worldwide rights; and (2) entering into the Rivadavia Agreement without CardioCell's knowledge and in conflict with CardioCell's rights.

## X.    CARDIOCELL'S DISCOVERY OF THE ALTACO AGREEMENT

213.    After the fraudulently concealed Organismo Agreement and Rivadavia Agreement came to light, CardioCell also discovered that on September 15, 2014, Stemedica had also entered into the ALTACO Agreement in violation of the Exclusive License.

214.    On August 31, 2018, Sergey Leshkov emailed Stemedica's board secretary, Marcie Frank, and copied Roger Howe and Craig Carlson, confronting Stemedica about the ALTACO Agreement.

215.    On September 4, 2018, Craig Carlson responded to Leshkov's August 31 email stating that the cardiovascular indications had been removed from the ALTACO Agreement in the form of an amendment but failed to explain why Stemedica had licensed CardioCell's rights without CardioCell's knowledge and in violation of the Exclusive License.

216.    Craig Carlson attached to his September 4, 2018 email the referenced amendment to the ALTACO Agreement.  The amendment was titled Amendment #1. Curiously, the amendment's date was the same as the date of the fraudulently concealed September 15, 2014 ALTACO Agreement.

217.    Later that day, Craig Carlson sent to Leshkov a pdf containing a copy of the original September 15, 2014 ALTACO Agreement.  That Agreement contained a different Amendment #1 for renewing the ALTACO Amendment, dated September 15, 2017.  This inconsistency suggested that the September 15, 2014 Amendment #1, excluding the cardiovascular indication from the ALTACO Agreement, was likely not actually implemented or effective.

## XI.    STEMEDICA AND THE HOWE BROTHERS' FALSE STATEMENTS LEADING TO THE EQUITY EXCHANGE AGREEMENT

218.    In early 2017, unbeknownst to Plaintiffs and without consulting CardioCell or any of Stemedica's subsidiaries, Stemedica signed a Memorandum of Cooperation with JZT.  As reported by JZT, "[o]n March 21 [2017], David McGuigan, Senior Vice President of Stemedica and Dr. David Howe, Medical Consultant of Stemedica visited Jiuzhitang Co., Ltd.  They traveled to the company's headquarter in Changsha, branch office in Hainan Province, and Boao Lecheng International Medical Tourism Pilot Zone, and then signed Memorandum of Cooperation with Jiuzhitang in Beijing.  Finalization of cooperation with Stemedica symbolizes commencement of Jiuzhitang's entry into the stem cell business."  *See* http://en.jztmaker.com/news/28.html (a copy is attached hereto as **Exhibit L**).

219.    Around the end of 2017 and the beginning of 2018, unbeknownst to Leshkov and Vikhrieva, and without consulting with CardioCell or any of Stemedica's subsidiaries, Stemedica entered into a preliminary agreement with JZT for JZT's $70 million investment in Stemedica on the condition that Stemedica would gain full control of all subsidiaries, including CardioCell, StemProtein, StemCutis, and Stemedica International, in which Leshkov and Vikhrieva had significant stakes.

220.    As such, it was critical for Stemedica to gain control over the subsidiaries from Leshkov and Vikhrieva, who had been appointed to the subsidiaries' board of directors and had a voting veto power.

221.    On March 1, 2018, Roger Howe – who was a director of CardioCell at the time – emailed Leshkov and Vikhrieva, advising them that Stemedica's agreement with JZT required Stemedica to consolidate its subsidiaries, but without disclosing that the JZT deal required Stemedica to gain full control over the subsidiaries and remove Leshkov and Vikhrieva from the subsidiaries' board of directors.

222.    Roger Howe also falsely stated that CardioCell was the subsidiary with a real potential and offered to consolidate Leshkov and Vikhrieva's interest in the subsidiaries.

223.    Because Roger Howe controlled Stemedica and knew CardioCell could not succeed without stem cells, funds, and other support that Stemedica had no intention to supply, his statement about CardioCell's value was false at the time it was made.

224.    In the same March 1, 2018 email, Roger Howe stated that despite the promising cardiovascular clinical trials, without Stemedica's financial support, CardioCell would have to be dissolved, suggesting that Leshkov and Vikhrieva had no choice but to accept Stemedica's consolidation proposal.  Maynard Howe and Nikolai Tankovich confirmed those statements.

225.    Roger Howe also represented that the other subsidiaries had no real value and would be likely dissolved.  This statement later proved false as – after Leshkov and Vikhrieva were removed from the picture – those subsidiaries continued operations and some of them used the groundbreaking clinical data, manufacturing technology, and valuable products (as obtained with Leshkov and Vikhrieva's investments) to continue developing high-potential products and generating revenues.

226.    On March 16, 2018, Leshkov responded to Roger Howe's email in disbelief, emphasizing the subsidiaries' successful clinical trials and significant research and development results, and confronting Stemedica about depriving the subsidiaries of funds by:  (1) refusing to invest cash and only contributing stem cells; (2) overcharging for administrative services that were never provided; (3) incurring and concealing multi-million-dollar debt on behalf of Stemedica International; and (4) interfering with CardioCell's fund-raising efforts.

227.    If Leshkov and Vikhrieva knew that Stemedica would withdraw support from the subsidiaries and deprive them of funds, they would never have invested $20 million in those entities.

228.    After Leshkov and Vikhrieva refused to accept Roger Howe's consolidation proposal, the Howe brothers proceeded to threaten Leshkov and Vikhrieva and demanded that they resign as directors as well as enter into a highly unfavorable deal and give Stemedica full control over the subsidiaries.

229.    However, CardioCell's CEO objected and explained that Leshkov and Vikhrieva had invested in CardioCell based on the Howe brothers and Nikolai Tankovich's representations about CardioCell's tremendous potential, and that CardioCell used that investment to build unprecedented pre-clinical and clinical data.

230.    CardioCell's CEO also stated that Stemedica had used CardioCell's clinical data and publications to cause JZT to invest in Stemedica, and that, although CardioCell's investors had no choice but to agree with Stemedica's demands,

Stemedica had an obligation not to rob CardioCell's investors, especially given that Stemedica had improperly received 70% of CardioCell in exchange for only one million dollars' worth of delivered stem cells, and that Stemedica intentionally compromised CardioCell's fund-raising efforts.

231.    Determined to gain complete control over CardioCell, on May 3, 2018, Roger Howe (who was a CardioCell board member at the time) and Maynard Howe asked CardioCell's CEO to join them in Roger Howe's office and asked CardioCell's CEO to use his influence over CardioCell's board and shareholders to persuade them to enter into the highly unfavorable deal and provide Stemedica with complete control over CardioCell.

232.    When CardioCell's CEO refused to do so, Maynard Howe threatened the CEO to bankrupt CardioCell and discontinue his medical insurance, with the knowledge that he was terminally ill at the time.

233.    Despite the Howe brothers' threats, considering CardioCell's inability to raise funds due to Stemedica's interference as well as the urgent need for cash and stem cells to complete the clinical trials, Leshkov and Vikhrieva reasonably feared that Stemedica would dissolve CardioCell and the other subsidiaries.  As such, Leshkov and Vikhrieva were left with no choice but to ultimately roll into CardioCell their interest in StemProtein, StemCutis, and Stemedica International and sign the Equity Exchange Agreement.

234.    More specifically, on May 4, 2018, there was a conference call attended by Maynard Howe and the Stemedica-appointed directors, Roger Howe and Dirk O'Hara, as well as CardioCell's CEO, CardioCell's outside counsel, Kenneth Polin, Leshkov, and Vikhrieva.

235.    During that meeting, the Howe brothers proposed to Leshkov and Vikhrieva two unacceptable deal options that made no economic sense as they were based on highly unfavorable terms that were fundamentally different from the ones

Stemedica had offered to JZT.  Leshkov and Vikhrieva thus rejected these unacceptable options.

236.    The Howe brothers and Dirk O'Hara never intended to resolve this issue in a fair and equitable manner.  They only proposed these unacceptable deals to induce Leshkov and Vikhrieva to enter into a deal consolidating their interest in the subsidiaries into CardioCell as the only viable option in light of the Howe brothers' insistence that CardioCell was the only subsidiary of real value and Roger Howe's threat to dissolve CardioCell.

237.    As a follow-up to the May 4th call, on May 8, 2018, Stemedica held a meeting in Stemedica's office that was attended by the Howe brothers, Dirk O'Hara, Nikolai Tankovich, Leo Spiegel, Kenneth Polin, and CardioCell's CEO.  Leshkov attended by phone.  Vikhrieva attended in person.

238.    During the May 8 meeting, the parties discussed a third option whereby Leshkov and Vikhrieva would roll their interest in the subsidiaries into CardioCell.

239.    Leshkov and Vikhrieva – relying on Roger Howe's statement that CardioCell was the only subsidiary of real value and faced with Stemedica's two unacceptable deal offers and Roger Howe's prior threat of dissolving CardioCell – agreed to consolidate their $20 million investment into CardioCell.

240.    Leshkov and Vikhrieva would not have entered into the Equity Exchange Agreement if they knew that the Howe brothers and their co-conspirators planned to destroy CardioCell and that the other subsidiaries were not worthless.

241.    Indeed, contrary to the Howe brothers' representations, the subsidiaries were far from worthless.  In fact, the Howe brothers' intent was to:  (1) remove Leshkov and Vikhrieva from the picture under false pretenses; and (2) use the subsidiaries' successful research results as another bait to attract new investors and raise more money repeating the same fraudulent rinse-and-repeat cycle.

## XII.  THE EQUITY EXCHANGE AGREEMENT ROLLING THE INVESTORS' STEMEDICA SUBSIDIARY INTEREST INTO CARDIOCELL

242.    Stemedica, StemProtein, StemCutis, CardioCell, Vikhrieva and Leshkov and others then entered into the Equity Exchange Agreement.

243.    Through this agreement, Defendants targeted Plaintiffs, in a manner different from any of CardioCell's other shareholders.

244.    Pursuant to the Equity Exchange Agreement, Stemedica exchanged 13,621,690 of its Class A CardioCell units for the Investor Units, which included Leshkov's 555,555 nominal shares in Stemedica International, Vikhrieva's 555,556 nominal shares in Stemedica International, ProtInvest Inc.'s 5,000,000 Series A Preferred Units in StemProtein, and SkinInvest, Inc.'s 5,000,000 Series A Preferred Units in StemCutis.

245.    In Section 10(c) of the Equity Exchange Agreement, Stemedica represented and warranted that:

> Stemedica or its affiliates (including JZT) have not granted any cardiovascular rights or license to third parties. Stemedica agrees that, in the event Stemedica breaches this representation and warranty, the CardioCell license under the License Agreement will become royalty-free.

246.    However, unbeknownst to Plaintiffs, this representation and warranty was false as Stemedica had entered into the 2014 ALTACO Agreement.

247.    CardioCell's Exclusive License thus became royalty-free.

248.    Further, pursuant to Section 10(a) of the Equity Exchange Agreement, Stemedica agreed to exclude CardioCell's rights from the Rivadavia Agreement within 90 days as follows:

> Within 90 days of the date of this Agreement, Stemedica shall cause Rivadavia to enter into an amendment to the 2015 Agreement in the form and substance reasonably satisfactory to CardioCell (the "2015 Amendment") pursuant to which (i) all medical conditions previously licensed to CardioCell pursuant to the License Agreement (the "CardioCell Indications") will be excluded in all respects from the 2015 Agreement (including, without limitation, with respect to any rights of first refusal granted pursuant to the 2105 Agreement), and (ii)

- 49 -

> *Rivadavia shall cease and desist all activities pursuant to the 2015 Agreement with respect to the CardioCell Indications immediately upon execution of the 2015 Amendment. In the event the 2015 Amendment is not entered into within 90 days of the date hereof, Stemedica shall hereby be deemed to have automatically forfeited all of its equity interest in and to CardioCell.*

249.    Stemedica, however, failed to amend the Rivadavia Agreement within 90 days of the Equity Exchange Agreement.

250.    The parties to the Equity Exchange Agreement then signed three separate amendments to the Equity Exchange Agreement to provide Stemedica with two more years to amend the Rivadavia Agreement.

251.    Despite the three-time extensions, Stemedica failed to amend the Rivadavia Agreement and thus effectively forfeited its equity interest in CardioCell.

252.    On August 28, 2018, the parties to the Equity Exchange Agreement signed Amendment No. 1 to the Equity Exchange Agreement ("First Amendment") extending the deadline to amend the Rivadavia Agreement to 180 days from the date of the amendment.  In the event that Stemedica failed to amend the Rivadavia Agreement, Stemedica agreed that its equity interest in CardioCell would be reduced to 22.5%.

253.    Under the Equity Exchange Agreement, however, Stemedica had already agreed that its equity interest in CardioCell would be forfeited upon failure to amend the Rivadavia Agreement, so increasing Stemedica's interest for Stemedica's benefit provided no new consideration to CardioCell.

254.    Further, Stemedica had deprived CardioCell of funds, and it was critically important for CardioCell's fund-raising efforts to provide prospective investors with confidence that CardioCell was retaining its exclusive license rights to use Stemedica's stem cells for treatment of cardiovascular disease in Mexico. Thus, although CardioCell did not want to amend the Equity Exchange Agreement and provide any further extensions, CardioCell reasonably feared that if CardioCell

did not sign the three amendments and lost the Mexico rights, it would not have been able to raise funds from outside investors and survive.

255.    On January 3, 2019, Stemedica's CEO, Craig Carlson, emailed CardioCell asking for another extension to amend the Rivadavia Agreement and blaming Rivadavia for the delay.

256.    Carlson, however, failed to explain why Stemedica was having difficulty with resolving the matter and securing the cardiovascular rights for Mexico that belonged to CardioCell according to the explicit worldwide Exclusive License.

257.    Still looking to raise outside funds due to its inability to show to the potential investor an exclusive worldwide license, CardioCell again was left with no choice but to agree to the extension.

258.    On January 21, 2019, the parties signed Amendment No. 2 to the Equity Exchange Agreement ("Second Amendment") extending the deadline to amend the Rivadavia Agreement to March 31, 2019.  Similar to the First Amendment, the Second Amendment stated that in the event that Stemedica failed to amend the Rivadavia Agreement, Stemedica agreed that its equity interest would be reduced to 22.5%.  However, the Second Amendment provided no new consideration to CardioCell.

259.    Once again, Stemedica failed to amend the Rivadavia Agreement by the deadline set forth in the Second Amendment, and it asked for yet another extension.

260.    On March 15, 2019, the parties signed Amendment No. 3 to the Equity Exchange Agreement ("Third Amendment") extending the deadline to amend the Rivadavia Agreement to March 31, 2020.  This was the end date set forth in the Series B Preferred Unit Subscription Agreement ("Subscription Agreement") under which Stemedica had agreed to purchase 1,415,094 Series B Preferred Units for an aggregate price of $1.5 million.

261.    The Third Amendment granting an extension to amend the Rivadavia Agreement thus was explicitly tied to the Subscription Agreement, and the Third Amendment provided that "in the event Stemedica does not purchase 1,415,094 Series B Preferred Units of CardioCell on or before the End Date [i.e., March 31, 2020] … then this Amendment, as such Amendment relates to Section 10(a) [of the Equity Exchange Agreement], shall be deemed null and void."

262.    As Stemedica already had an obligation to perform under the Subscription Agreement and received CardioCell Series B Preferred Units in exchange for its payment under that agreement, the Third Amendment provided no new consideration to CardioCell.

263.    Moreover, Stemedica failed to make the last $500,000 payment under the Subscription Agreement by March 31, 2020, so the Third Amendment became null and void.

264.    On April 1, 2020, CardioCell sent to Stemedica a notice of breach of the Subscription Agreement stating that Stemedica's failure to make the last $500,000 payment by March 31, 2020 had rendered the Third Amendment to the Equity Exchange Agreement null and void.

265.    On April 10, 2020, CardioCell's CEO emailed Maynard Howe asking whether Stemedica had obtained the termination of the cardiovascular stem cell license granted to Rivadavia.

266.    Astoundingly, after repeatedly representing for more than two years that Stemedica would prospectively protect the Exclusive License granted to CardioCell and amend the Rivadavia Agreement as to induce CardioCell to enter into the Equity Exchange Agreement and the three amendments thereof, Maynard Howe responded:  "No – our attorney is investigating the interpretation of this clause relating to Rivadavia as well as the legality of the reduced percentage of ownership of Stemedica in CardioCell."

267.     Despite Stemedica's breaches of the Equity Exchange Agreement and Subscription Agreement, Rivadavia continued to use CardioCell's cardiovascular rights in Mexico and in the United States (through NovaStem) in violation of CardioCell's Exclusive License, and Stemedica continues to profit from the Rivadavia Agreement through licensing fees.

268.     Moreover, the Howe brothers and David Howe assisted Rivadavia and NovaStem with recruiting patients from the United States for cardiovascular treatment in Mexico using Stemedica's stem cells that harmed Plaintiffs and CardioCell.

269.     Unbeknownst to Plaintiffs and CardioCell, in exchange for recruiting U.S. patients for the stem cell treatments using Stemedica stem cells, David Howe not only assisted with recruiting patients on Stemedica's behalf but also routinely accepted payments from third parties related to these treatments.  Indeed, on May 9, 2025, David Howe's counsel in this case sent a letter to Plaintiffs' counsel, among other things, acknowledging third party payments, stating that "Dr. Howe did from time to time accompany patients to Mexico's Clinica Santa Clarity to get stem cell treatments" and that "Dr. Howe's patients paid fees related to the treatment to another entity with which Dr. Howe was associated, and that entity paid Clinica Santa Clarita."

## XIII.  THE SUBLICENSE AGREEMENT GIVING CARDIOVASCULAR RIGHTS TO STEMEDICA FOR USE BY JZT

270.     On January 31, 2019, in reliance on the Howe brothers' and Dirk O'Hara's false representations, CardioCell entered into a Sublicense Agreement with Stemedica.

271.     Notably, when entering into the Sublicense Agreement, CardioCell also relied on statements by JZT, which had confirmed Stemedica's representations that Stemedica would fund CardioCell's clinical trials and JZT would work with CardioCell on new business deals.

272.    Stemedica's representations were memorialized in a July 26, 2018 letter signed by both Stemedica and CardioCell.  Pursuant to this letter, CardioCell agreed to provide Stemedica with cardiovascular rights for JZT's use in China in exchange for:  (i) a payment of up to $1 million in support of the LVAD clinical trial; (ii) a payment of $580,000 for completion of data gathering and analysis of the Phase IIa CHF clinical trial; (iii) payment of CardioCell's basic operating expenses; (iv) material costs associated with helping CardioCell develop clinical trials and/or commercial applications in China for heart-related conditions; (v) 50% of all net revenue that Stemedica receives from China activities associated with the CardioCell indications; and (vi) CardioCell's right to buy back the license rights for China under mutually agreeable market terms should a major pharmaceutical company wish to acquire the exclusive worldwide rights to CardioCell's cardiovascular indication.

273.    The Howe brothers repeatedly represented to Leshkov and Vikhrieva during telephone calls that JZT was especially interested in the cardiovascular indication given its implication in all major diseases.

274.    To ensure that these representations and promises were accurate, in September 2018, Leshkov and Vikhrieva, traveled to China to discuss the matter in-person with JZT.

275.    Specifically, on September 5, 2018, Leshkov and Vikhrieva attended a meeting at the house of JZT Parent's Chairman, Zhenguo Li, in Beijing.  The meeting was also attended by Zhiwei He (Assistant to JZT Parent's Chairman), Guochao Liu (JZT Parent's director and shareholder), Quancheng Zhang (JZT Maker's Chairman), Yansong Gao (JZT Maker's General Manager as appointed by JZT Parent), Jeff Liu (JZT Parent's corporate attorney), Simon Guo (a board member who was subsequently appointed to CardioCell's board by JZT Parent through JZT Fund and Stemedica to monitor CardioCell and participate in its business decisions), Chzan Bo (JZT Parent's translator) and others.

276.    During the September 5, 2018 meeting, JZT Parent's Chairman, Mr. Li, stated that JZT Parent was "unpleasantly surprised" that CardioCell was not part of the deal to purchase a majority interest in Stemedica, especially since Stemedica used CardioCell in their investment pitch.  However, Mr. Li and his team conveyed JZT Parent's interest in investing a significant amount in CardioCell and commencing clinical trials for the cardiovascular indication in China as soon as possible.    They also emphasized the importance of securing rights to the cardiovascular indication due to the significant market share of cardiovascular therapeutic products and the well-known scientific fact that cardiovascular implications accompany almost all major diseases.

277.    On September 6, 2018, Leshkov and Vikhrieva attended a meeting at JZT Maker's office in Beijing.  The meeting was also attended by Zhiwei He, Yansong Gao, Simon Guo, Chzan Bo, Quancheng Zhang, and others.  Leshkov and Vikhrieva made a presentation about CardioCell, its clinical trials, and upcoming products.

278.    During the September 6, 2018 meeting, JZT Parent's team confirmed interest in investing in CardioCell and stated that JZT Parent's involvement in the cardiology field was a top priority.  The team noted that CardioCell was a much better target for going public on the Hong Kong Stock Exchange or Nasdaq in comparison with Stemedica because CardioCell was the company that generated the valuable research data, completed clinical trials, and published multiple high-profile scientific articles.  Indeed, at the time, CardioCell was the only Stemedica-related entity that had completed a Phase II clinical trial.  The team also stated that JZT Parent would send its representatives (including JZT Fund's and JZT Maker's executives) to attend CardioCell's upcoming board meetings as guests so that JZT Parent could become more familiar with CardioCell in advance of JZT Parent's investment in CardioCell.

279.    On September 7, 2018, Leshkov and Vikhrieva attended dinner with Zhiwei He, Guochao Liu, Yansong Gao, Simon Guo, Chzan Bo and others.  Mr. He

and other participants confirmed once again JZT Parent's interest in investing in CardioCell and commencing cardiovascular clinical trials as soon as possible. In fact, at the same meeting, the parties signed a memorandum of cooperation memorializing JZT Parent's intent to invest in CardioCell and commence cardiovascular clinical trials in China.

280. Indeed, JZT Parent was so interested in the cardiovascular indication that the JZT team frequently contacted CardioCell's scientific advisor and board member, Dr. Stephen Epstein, to discuss the technology and invited him to give speeches and presentations in China regarding the cardiovascular research, clinical trials and upcoming technology. Dr. Epstein did visit China in November 2019 and made a presentation about the anti-inflammatory effect of stem cells and potential of using stem cells to treat cardiovascular diseases, as investigated by his team.

281. On October 29, 2018, Simon Guo (acting as JZT's agent) and Sergey Leshkov attended a conference call when Guo presented JZT's proposal to invest only $2 million in CardioCell at a very low valuation. Given CardioCell's groundbreaking clinical trials and tremendous potential, Leshkov rejected the proposal and explained that such low valuation and unfavorable terms were unacceptable and unlikely to be approved by the CardioCell board, especially in light of JZT's promise to invest a significant amount in CardioCell during Leshkov's and Vikhrieva's JZT visit in China.

282. However, Simon Guo did not give up. In January 2019, Guo met with CardioCell's CEO and asked him what would be sufficient for him personally for negotiation. CardioCell's CEO immediately refused to discuss this improper proposal further.

283. In or around January 2019, after realizing that JZT's strategy to invest in CardioCell on the cheap would not work and becoming privy to Stemedica's plan to destroy CardioCell and get back the cardiovascular rights for free, Guo met with CardioCell's CEO again in San Diego and represented (on behalf of JZT) that JZT

would invest $2.5 million in CardioCell and provide bigger business opportunities in the future so that CardioCell can complete the Phase IIb/III CHF clinical trial, but only if CardioCell agreed to enter into the Sublicense Agreement.

284.    Despite Guo's statements, JZT never intended to keep its promises and Guo only made these statements at JZT's direction to induce CardioCell to enter into the Sublicense Agreement as Stemedica and JZT's ultimate goal was to induce CardioCell to sublicense its cardiovascular rights to Stemedica for use by JZT, and then help Stemedica destroy CardioCell, remove the CardioCell stakeholders from the picture, and continue using the cardiovascular rights for free.

285.    Guo and other JZT representatives also continued to promise that JZT would invest in CardioCell but JZT never did. And CardioCell continued inquiring about the promised deals and new business opportunities.

286.    Moreover, JZT knew that Stemedica was prioritizing stem cells deliveries to JZT at CardioCell's expense and encouraged Stemedica to continue doing so.

287.    CardioCell and Plaintiffs, however, had no reason to suspect JZT's ulterior motives and participation in the fraudulent scheme of Stemedica, the Howe brothers, and Nikolai Tankovich. To the contrary, CardioCell firmly believed that JZT would provide CardioCell with exciting new opportunities and additional revenue streams. As such, CardioCell agreed to sublicense its cardiovascular rights to Stemedica for use by JZT Maker in China, Hong Kong, Macau, and Taiwan.

288.    Pursuant to Section 1.02(a)(ii) of the Sublicense Agreement, Stemedica agreed to pay $250,000 to CardioCell within seven days of the first patient's enrollment in the LVAD clinical trial efforts, and the remaining $250,000 within seven days of the last patient's enrollment in the LVAD clinical trial.

289.    Stemedica, however, failed to make the $250,000 payment on September 24, 2019 – within seven days of the first patient's enrollment in the LVAD clinical trial. Indeed, JZT – with the knowledge that the payment was due – failed

and refused to make funds available for Stemedica's payment to CardioCell. Stemedica did not object as the non-payment was consistent with its goal of compromising CardioCell's completion of the clinical trials.

290.    In or about November 2019, CardioCell's CEO traveled to China to discuss Stemedica's failure to pay CardioCell under the Sublicense Agreement and ask for JZT's help since JZT was benefiting from that agreement. However, JZT did not assist with this issue.

291.    On December 9, 2019, CardioCell sent a notice to Stemedica and JZT stating that, as CardioCell had advised Stemedica in early October 2019, Stemedica was in breach of Section 1.02(a)(ii) of the Sublicense Agreement as of September 24, 2019, for failing to make a milestone payment of $250,000 seven days after the first patient's enrollment in the LVAD study, and that Stemedica had 90 days to cure the breach pursuant to Section 2.02 of the Sublicense Agreement.

292.    Although Roger Howe responded to the notice of breach on December 11, 2019, his response was not constructive and failed to provide a solution to the issue.

293.    JZT did not respond to the December 9, 2019 notice of breach.

294.    On February 27, 2020, CardioCell sent another notice to Stemedica stating that Stemedica was in breach of Section 1.02(a)(ii) of the Sublicense Agreement as of September 24, 2019, for failing to make a milestone payment of $250,000 seven days after the first patient's enrollment in the LVAD study.

295.    In the same notice, CardioCell stated that because Stemedica had no sublicense rights for China, JZT must stop violating CardioCell's exclusive rights for cardiovascular indications for that territory. CardioCell also explained that, as a result of Stemedica's non-payment, CardioCell's clinical trial partner, MedStar, had indicated its intent to terminate the clinical trial due to lack of funds and restart the trial upon the payment of $470,000 in additional expenses.

296.    Stemedica did not respond to CardioCell's February 27, 2020 notice of breach.

297.    On March 16, 2020, CardioCell's CEO emailed Roger Howe and Maynard Howe stating that since Stemedica had failed to respond to the February 27, 2020 notice of breach, CardioCell would pursue other avenues for financing the clinical trials.

298.    In the same email, CardioCell's CEO reminded Stemedica that if Stemedica failed to make the last $500,000 payment under the Subscription Agreement by March 31, 2020, the Third Amendment to the Equity Exchange Agreement would become null and void and the cardiovascular rights for Mexico would return to CardioCell.

299.    Stemedica did not respond to the CEO's March 16, 2020 email.

300.    On March 18, 2020, CardioCell's CEO emailed CardioCell's board members, including the Stemedica-appointed directors, Maynard Howe, Dirk O'Hara, and Simon Guo, and copied Roger Howe and Stemedica's board secretary, Marcie Frank, stating that Stemedica was in default of the Sublicense Agreement for failure to make the clinical trial payments.    CardioCell's CEO advised that CardioCell urgently needed other means of financial support.

301.    The same day, the Stemedica-appointed director, Dirk O'Hara, who had a fiduciary duty to CardioCell, replied that Stemedica was not in default and advised that Stemedica was waiting for direction from "our counsel at Wilson Sonsini."

302.    On March 19, 2020, CardioCell's CEO responded to O'Hara's email emphasizing the urgency of the situation, detailing Stemedica's breach and failure to respond to the February 27, 2020 notice, and stating that "both Roger and Maynard acknowledged that Stemedica defaulted on the sublicense agreement."

303.    On May 18, 2020, CardioCell's board chair, Robert Sullivan, sent a letter to Stemedica stating once again that Stemedica was in breach of the Sublicense

Agreement and that despite CardioCell's notice, JZT had continued to improperly use the cardiovascular rights in China and market them on its website.

304. Robert Sullivan also reminded Stemedica that, if Stemedica failed to make the last $500,000 payment under the Subscription Agreement, the Third Amendment to the Equity Exchange Agreement was null and void as of April 1, 2020 and that the cardiovascular rights for Mexico must be returned to CardioCell by July 2, 2020.

305. Stemedica did not respond to Robert Sullivan's May 18, 2020 email.

306. Stemedica subsequently failed both to make the last $500,000 payment under the Subscription Agreement and to return to CardioCell the cardiovascular rights for Mexico.

## XIV.  **JZT'S IMPROPER USE OF CARDIOCELL'S RIGHTS**

307. Although Stemedica breached the Sublicense Agreement, and thus lost its right to sublicense CardioCell's rights for China, JZT Maker improperly continued to use the cardiovascular indications in China.

308. On May 27, 2020, CardioCell's CEO sent a cease and desist email directly to JZT notifying them that due to Stemedica's breach of the Sublicense Agreement, all cardiovascular rights to China had been transferred back to CardioCell effective as of December 23, 2019, and asking them to immediately cease all research and activity with respect to Stemedica's stem cells in the cardiovascular field.  CardioCell also offered to discuss the possibility of JZT Maker obtaining cardiovascular rights directly from CardioCell.

309. The same day, JZT Maker's CEO and Stemedica director, Yansong Gao, responded to the cease and desist email stating that JZT Maker did not use cardiovascular rights and rather focused on the use of the stem cells for nervous system and respiratory indications.

310. JZT Maker's statement was false.

311.   In fact, JZT Maker continued to market the cardiovascular indications and reference CardioCell scientific work on its website at http://en.jztmaker.com/product/10.html and http://en.jztmaker.com/news/42.html (a copy is attached hereto as **Exhibit M**).  Notably, these webpages which were Exhibit F to the original complaint (PageID 115), listing the chronic heart failure and acute myocardial infarction indications (which are CardioCell's indications), disappeared from JZT Maker's website after Plaintiffs filed the Original Complaint on February 27, 2025.

312.   Similarly, JZT Maker continued to recruit rich Chinese patients for cardiovascular treatment in Kazakhstan using Stemedica's stem cells at the ALTACO facility.

313.   On May 28, 2020, and again on June 5, 2020, CardioCell's CEO emailed Yansong Gao asking JZT Maker to remove the cardiovascular indication advertisement from its website.

314.   Yet, JZT Maker continued to advertise the cardiovascular indications on its website.

315.   Moreover, in September 2018, JZT Maker signed a cooperation agreement with NovaStem and ALTACO in an effort to co-build internationalized stem cell research platforms that included cardiovascular research.

316.   JZT Maker continues to participate in that cardiovascular research platform despite the fact that neither JZT Maker nor NovaStem have any cardiovascular rights.

## XV.   RIVADAVIA AND NOVASTEM'S IMPROPER USE OF CARDIOCELL'S RIGHTS

317.   As described herein, Stemedica granted cardiovascular rights to Rivadavia in violation of the Exclusive License.

318.   Despite its claim of negotiations with Rivadavia to get back the cardiovascular rights and return them to CardioCell, Stemedica failed to amend the

Rivadavia Agreement pursuant to the Equity Exchange Agreement and amendments to exclude the cardiovascular indication.

319.  Rivadavia thus continued to knowingly use the cardiovascular indications in Mexico and NovaStem continued to recruit U.S. patients for cardiovascular treatment at Clinica Santa Clarita in Mexico.

320.  On March 8, 2021, CardioCell sent Rivadavia, NovaStem, and Clinica Santa Clarita a cease and desist letter asking them to stop infringing the Exclusive License.

321.  Despite CardioCell's cease and desist letter, Rivadavia and NovaStem continued to violate the Exclusive License.

322.  As of April 10, 2021, NovaStem continued to list the cardiovascular indication on its website at https://www.novastem.com/conditional_treat/heart-failure/ (a copy is attached hereto as **Exhibit N**) and advertised clinics in Mexico that use stem cells manufactured by Stemedica.

323.  In addition, Stemedica has sent stem cells to partners in Mexico and elsewhere.  A 2015 article explains that "Stemedica says about 50 U.S. patients have been treated with its stem cells in clinical trials in Mexico, where Gordie Howe received his treatment in December.  About 80 U.S. patients got them in Kazakhstan, which shares a border with Russia and is a former member of the Soviet Union. (*See* usatoday.com/story/sports/2015/05/18/goride-howe-stem-cells-john-brodie-stemedica-soviet-union-fetal/27504019/ (a copy of is attached hereto as **Exhibit O**).

324.  As explained in a 2016 article with regard to Mexico, "Stemedica ships the cells to a sleek, modern clinic in an old, run-down part of Tijuana, not far from various dental clinics and a taco restaurant." (https://www.usatoday.com/story/sports/nfl/packers/2016/09/05/bart-starr-returns-tijuana-stem-cells/89881768/ (a copy is attached hereto as **Exhibit P**)).  This article explains that "Clinica Santa Clarita in Tijuana has had about 250 patients take part

in its clinical trial over the past two years.  Patients are often charged for these experimental treatments, which cost $30,000." *Id.*

325.    It is also clear that patients were being charged for receiving Stemedica stem cells.  For example, an article from 2016, explained that "[w]hen Stemedica spokesman Dave McGuigan was asked about patients who pay large sums of money to receive Stemedica cells as part of a trial outside the U.S., he said Stemedica and their foreign clinical trial partners put up 'significant dollars' to carry out these studies, and patients are 'asked to participate in those costs.' 'We're talking about people that have a medical condition for which there is often no cure," McGuigan said. "And so they have searched the world to find out what their options are.'" *See* https://www.kpbs.org/news/2016/sep/20/patients-san-diego-stem-cell-companies-costly-unpr/ (a copy is attached hereto as **Exhibit Q**).

326.    In a separate 2015 article, the payment for participation in a clinical trial in Mexico using Stemedica stem cells is listed as $32,000.  *See* Tom Blackwell, *Patients paying for their medical trials?; Practice helps fund research, but raises ethical questions*, Edmonton Journal (August 13, 2015), 2015 WLNR 23894499 (a copy is attached hereto as **Exhibit R**).  That article also details the explanation from Stemedica that "'[a]s funding becomes harder and harder to secure for all the good work that legitimate clinical trials seek to accomplish, society needs to be open to this evolving creative process,' said Dave McGuigan, vice-president of San Diego's Stemedica, the company whose treatment was administered to [Gordie] Howe.  Patient-funded trials can also plug a gap that major pharmaceutical companies are unwilling to fill, testing stem cells and other products that are difficult to patent - and therefore unlikely to attract huge sums of money for traditional testing, said Rafael Carrillo, head of Stemedica's Mexican partner, Novastem." *Id.*

327.    For years, the Howe brothers, David Howe and others actively helped recruit U.S. patients for cardiovascular and other stem cell treatment in Mexico using Stemedica's stem cells.

328.    Specifically, between at least 2011 and early 2016, Roger Howe, Maynard Howe, David Howe, Nikolai Tankovich, and certain Stemedica insiders conducted marketing pitches to potential stem cell treatment patients in a conference room on the ground floor of Stemedica's office at 5375 Mira Sorrento Place, Suite 100, San Diego CA 92121.

329.    During those meetings, the Howe brothers and Nikolai Tankovich overstated the efficacy of treatment with Stemedica's stem cells in curing various health conditions.

330.    Moreover, between 2013 and early 2016, David Howe visited Stemedica's office approximately twice a month and also participated in the marketing pitches to patients for treatment with Stemedica's stem cells. David Howe also sometimes accompanied patients to Mexico for treatment with Stemedica's stem cells.

331.    One 2016 article explains, "I came across the sad tale of Nathaniel Albring, a 12-year-old victim of anoxic encephalopathy due to a near-drowning episode in 2005, whose family was as of June 2015 trying to raise $50,000 to take him to a stem cell clinic in Moscow. What caught my eye was that he was being seen by Dr. David Howe. Yes, the David Howe mentioned in the story is Maynard Howe's physician and chiropractor brother . . . . Also, this isn't the first time he's tried to get patients to a Moscow clinic that is affiliated with GSCH, which Stemedica claims is no longer related to its businesses. . . . Try as Stemedica might to distance itself from such stories, the involvement of David Howe and the media environment fostered by its self-promotion and that of other stem cell businesses makes such distancing impossible." *See* "The Stem Cell Hard Cell, Stemedica Edition", and available at https://sciencebasedmedicine.org/the-stem-cell-hard-sell-stemedica-edition (a copy is attached hereto as **Exhibit S**). This article states that the cost of "Stemedica stem cell treatments" is "$30,000 a pop". *Id.*

332.    Unbeknownst to Stemedica and Plaintiffs, in exchange for marketing Stemedica's stem cells to U.S. patients and accompanying them to Mexico and other countries, David Howe routinely accepted payments. One source claimed that Dr. David Howe received around $10,000 per patient related to these stem cell treatments in some fashion.

333.    Notably, Stemedica charged the Mexican clinics a discounted price of $30 per 1 million stem cells (when the market value of those cells was more than $800 per 1 million stem cells).

## XVI.    STEMEDICA'S INTERFERENCE WITH CARDIOCELL'S FUND-RAISING EFFORTS

334.    CardioCell's groundbreaking research and clinical trials generated great interest from investors, including big pharmaceutical companies, since 2014.

335.    Stemedica, the Howe brothers, Nikolai Tankovich, and JZT, however, conspired to compromise CardioCell's fund-raising efforts to ensure that CardioCell had no funds to complete the clinical trials so that Stemedica and JZT could co-opt CardioCell's exclusive cardiovascular rights.

336.    CardioCell's fundraising was always critical as CardioCell relied mainly on Leshkov and Vikhrieva's investment, which was important in generating the research data but insufficient to complete the clinical trials.

337.    In the fall of 2014, AstraZeneca – one of the world's top 10 pharmaceutical companies in the field of cardiovascular indications – expressed interest in investing in CardioCell, and the parties began negotiations and due diligence.

338.    AstraZeneca quickly advanced the negotiations with CardioCell and prepared a detailed "Combined AstraZeneca-CardioCell Global Development Plan" proposal with carefully calculated costs and budgets.

339.    AstraZeneca successfully completed the due diligence process and presented the "Combined AstraZeneca-CardioCell Global Development Plan" to CardioCell on March 16, 2015, at CardioCell's office in San Diego.

340.    AstraZeneca expressed interest in investing up to $80 million at a valuation of CardioCell between $200 million and $600 million.

341.    AstraZeneca also stated that it was ready to spend up to $650 million for global development costs for the chronic heart failure indication alone and up to $900 million for global development costs for the chronic heart failure indication and acute myocardial infarction combined.

342.    When the AstraZeneca deal advanced to the point where closing was inevitable, Stemedica – faced with the threat of losing the ability to use CardioCell as investor bait and sell CardioCell's exclusive cardiovascular rights to third parties – acted to prevent AstraZeneca's acquisition of CardioCell.

343.    Specifically, Roger Howe – who was a Stemedica-appointed director to CardioCell's board at the time – shared with Maynard Howe the confidential and other highly sensitive information regarding the prospective AstraZeneca acquisition of CardioCell.

344.    Maynard Howe then met with a third-party investor in Detroit, falsely stating that the AstraZeneca deal had closed as to induce him to invest money in Stemedica – as CardioCell's main shareholder.  Without a nondisclosure agreement, Maynard Howe provided the investor with highly sensitive, confidential information about the acquisition and AstraZeneca, a publicly-traded company.

345.    According to CardioCell's CEO, after his meeting with Maynard Howe, the third-party investor called AstraZeneca to confirm the details about the CardioCell deal that Maynard Howe had provided.  When AstraZeneca learned that its highly confidential information had been leaked to third parties, it withdrew from the deal.

346.    As such, Maynard Howe's improper interference effectively prevented AstraZeneca's acquisition of CardioCell.

347.    At the time, CardioCell's non-conflicted directors (including Plaintiffs) had no reason to suspect Stemedica's and the Howe brothers' ulterior motives, including that, unbeknownst to Plaintiffs and CardioCell, Stemedica had licensed CardioCell's exclusive rights to third parties and that the AstraZeneca deal would have exposed the truth and prevented Stemedica's further wrongdoing.

348.    In 2017, CardioCell's CEO met with a potential investor who was ready to invest in CardioCell.  The meeting took place in the StemProtein office.  At the time of the meeting, the Howe brothers were visiting the StemProtein office.  When the investors saw the Howe brothers and learned that they were involved in running CardioCell, he withdrew from the deal.

349.    Also, in 2017, CardioCell negotiated an investment deal with Bayer – the world's number one pharmaceutical company in the field of cardiovascular indications.  Bayer conducted extensive due diligence and sent its investigation teams to CardioCell's research facility and clinical trial facility, as well as to Stemedica's stem cell manufacturing facility.  Bayer successfully completed the due diligence process and was ready to acquire CardioCell.

350.    However, just before the parties were able to close on the deal, the Tiara Lawsuit was filed against Stemedica, the Howe brothers, and Nikolai Tankovich accusing them of defrauding investors.  As a result, Bayer withdrew from the deal.

351.    On March 16, 2018, after Stemedica's repeated failures to fulfill its promises with respect to CardioCell and the other subsidiaries, Leshkov confronted Stemedica about, among other things, compromising CardioCell's fund-raising efforts.  Specifically, Leshkov emailed Roger Howe and copied Maynard Howe, Nikolai Tankovich, Craig Carlson, and others, explaining that CardioCell was close to signing deals with two big pharmaceutical companies but that both deals failed due to Stemedica's interference.  Leshkov explained that the first deal was with

AstraZeneca but that AstraZeneca withdrew from the deal when Stemedica's executives leaked the deal's highly confidential information to a third-party investor in Detroit. Leshkov also explained that the second deal was with Bayer but that Bayer withdrew from the deal despite the successfully completed due diligence because the Tiara Lawsuit was filed against Stemedica, the Howe brothers, and Nikolai Tankovich for defrauding investors.

352.    Roger Howe did not respond to Leshkov's March 16, 2018 email and did not deny that Stemedica and the Howe brothers had compromised CardioCell's fund-raising efforts, destroying Plaintiffs' investments. Similarly, none of Stemedica's executives copied on the March 16, 2018 email denied Leshkov's allegations.

353.    Deprived of the critical funds necessary to complete the clinical trials, CardioCell attempted to raise funds from new investors. However, this proved unsuccessful due to the Howe brothers' actions and bad reputation in the biotechnology industry.

354.    In fact, when CardioCell attempted to raise funds in the end of 2018 and beginning of 2019, investors in the industry declined to work with CardioCell due to its association with Stemedica and the Howe brothers' reputation as "the kiss of death."

355.    Nevertheless, CardioCell continued to look for other sources of funds as well as stem cell manufacturers given Stemedica's failure to timely and adequately provide funds and stem cells as required under the Contribution Agreement.

356.    In September 2019, CardioCell was finally able to negotiate a deal with a new investor – the Chinese company, WuXi – which was ready and able to assist CardioCell with stem cell manufacturing, completing the clinical trials, and commercializing CardioCell's products.

357.    WuXi's Senior Director, Yunling Bai, met with CardioCell's CEO and the Stemedica team to discuss WuXi's investment in CardioCell and the necessary

stem cell manufacturing protocols. However, the Howe brothers refused to provide CardioCell with the stem cell manufacturing protocols and know-how that CardioCell was entitled to under Section 3.4.1 of the Exclusive License.

358.    Further, JZT, on behalf of Stemedica, also refused to provide the stem cell manufacturing protocols and know-how, claiming that only Stemedica and JZT had the ability to manufacture quality products and brazenly stating that "[n]either Stemedica nor [JZT] Maker will give up our business secret to CMO." As a result, of the actions of JZT and Stemedica, the deal with WuXi did not close and Plaintiffs investments were harmed.

359.    CardioCell continued to look for alternative sources of funds. In February 2020, CardioCell asked Objective Capital Partners, LLC ("Objective Capital") to assist with fund raising. However, Objective Capital immediately declined to assist because of CardioCell's association with Stemedica and the Howe brothers.

360.    On May 7, 2020, CardioCell's CEO emailed the CardioCell board, which also included the conflicted Stemedica-appointed directors, Maynard Howe, Dirk O'Hara, and Simon Guo, regarding CardioCell's crowdfunding efforts, stating that CardioCell was still a good target for investors "as long as we solve cell supply issues, Mexico and China issues, and board issues."

361.    The Stemedica-appointed directors had the ability, but made no effort, to resolve any of these issues. Indeed, those directors had conspired with Stemedica and JZT to prevent CardioCell from raising funds and completing the clinical trials.

362.    Moreover, during this time, Stemedica also intentionally failed to respond to CardioCell's requests to answer potential investors' questions including questions about the critical availability of stem cells needed to complete the clinical trials.

363.    Stemedica also intentionally failed to amend the Rivadavia Agreement and return the cardiovascular rights for Mexico to CardioCell with the knowledge

- 69 -

that these rights were important for CardioCell's efforts to raise funds, especially from big pharmaceutical companies.

364.    Finally, Stemedica intentionally allowed JZT to use the cardiovascular rights under the Sublicense Agreement although Stemedica had breached that agreement with the knowledge that these rights were important for CardioCell's efforts to raise funds.

365.    As a result of the conspiracy by Stemedica, the conflicted Stemedica directors, the Howe brothers, and JZT to interfere with CardioCell's fund-raising efforts and refusal to provide the stem cell manufacturing know-how, CardioCell was unable to raise funds necessary for the completion of the clinical trials and commercialization of its therapies.

366.    Accordingly, the Defendants' conspiracy to interfere with CardioCell's fund-raising efforts and deprive CardioCell of funds and stem cells has effectively destroyed Plaintiffs' investments and CardioCell.

## XVII. <u>STEMEDICA'S BREACH OF THE EXCLUSIVE LICENSE BY CONDUCTING COVID CLINICAL TRIALS RELATED TO CARDIOVASCULAR INDICATIONS</u>

367.    More recently, Stemedica breached the Exclusive License by conducting COVID clinical trials related to cardiovascular indications.

368.    Specifically, on September 27, 2020, the FDA granted Stemedica approval to conduct a Phase II clinical trial using Stemedica's itMSC therapy for acute respiratory distress syndrome ("ARDS") in COVID-19 patients.

369.    Mainstream research now indicates that cardiovascular dysfunction is an inherent part of the pathogenic mechanism of COVID-19 and especially ARDS.

370.    As such, Stemedica's research regarding the COVID-19 therapy will inevitably address cardiovascular diseases and thus involve Stemedica's use of cardiovascular rights that have been licensed to CardioCell.

## XVIII. <u>THE TIARA COMPLAINT ACCUSING STEMEDICA, THE HOWE BROTHERS AND NIKOLAI TANKOVICH OF FRAUD</u>

371.  This is not the first time investors have accused Stemedica, the Howe brothers, and Nikolai Tankovich of fraud.

372.  On April 6, 2017, Stemedica's investor, Tiara Holdings II, LLC ("Tiara") filed a complaint in Nevada (Stemedica's place of incorporation) against Stemedica, Roger Howe, Maynard Howe, Nikolai Tankovich and others, asserting that the Howe brothers had operated a nearly ten-year fraudulent investment scheme where they had raised over $110 million from investors for purportedly funding and establishing Stemedica, but instead used the investors' funds to benefit themselves.

373.  Tiara alleged that the Howe brothers had concealed and perpetrated fraud through the use of purported operating subsidiaries, which permitted them to divert millions of dollars to benefit themselves without raising questions or concerns from Stemedica's investors and shareholders.  Tiara also alleged that the full extent of Stemedica's elaborate investment scheme and wrongdoing was not fully known, as the Howe brothers had kept Tiara in the dark.

374.  Tiara asserted claims for fraud against all defendants, breach of contract and accounting against Stemedica, and breach of fiduciary duty and unjust enrichment against the Howe brothers and Nikolai Tankovich.

375.  Stemedica, however, settled the Tiara Lawsuit.

376.  Notably, upon the filing of the Tiara Lawsuit, CardioCell's non-conflicted directors (including Plaintiffs) immediately asked for an explanation from Roger Howe and Nikolai Tankovich, who were the Stemedica-appointed directors at the time.

377.  In response, Roger Howe and Nikolai Tankovich stated that the allegations were baseless and that the lawsuit would be dismissed.

378.    CardioCell's non-conflicted directors (including Plaintiffs) had no reason to doubt their fellow directors, who had a fiduciary duty to act in CardioCell's best interest and seemed to act in good faith.

379.    Subsequently, in June 2017, the Howe brothers – being acutely aware of CardioCell's pressing need for funds – represented to CardioCell that an Iranian investor was interested in investing in CardioCell and that the Howe brothers could facilitate the investment if CardioCell agreed to, among other things, spend a portion of the investment to pay for the settlement amount in the Tiara Lawsuit against Stemedica, the Howe brothers, and Nikolai Tankovich.

380.    The Howe brothers and Tankovich also asked Leshkov and Vikhrieva to see if they could assist with receiving the Iranian investor's funds in Russia for transfer to the United States.  To that end, Vikhrieva contacted a Russian banker who stated that receiving Iranian funds was improper and contrary to international law. Vikhrieva immediately called Tankovich and asked him to advise the Howe brothers that such a transaction was improper and she would not assist further.

## XIX.    THE CONTINUOUS THREAT OF STEMEDICA AND OTHER DEFENDANTS' RICO ENTERPRISE

381.    Acting with impunity for years, the Howe brothers and their co-conspirators have continued to use CardioCell to induce multi-million-dollar investments in Stemedica under false pretenses.

382.    On December 3, 2020, Stemedica's board secretary, Marcie Frank, emailed Stemedica's shareholders, including Leshkov and Vikhrieva, attaching Stemedica's Consolidated Financial Statements for the years ended December 31, 2019 and 2018 to provide the shareholders with an update on Stemedica's financial condition and advise about Stemedica's ongoing fund-raising activities based on those financials.

383.    Astoundingly, however, Stemedica's financials did not reflect the $27,850,000 of stem cell debt to CardioCell.  Moreover, the notes to the financials

did not report the truth about Stemedica's egregious breaches of the Exclusive License, Contribution Agreement, Equity Exchange Agreement and Sublicense Agreement, and Stemedica's potential liabilities about which Stemedica was put on notice.

384. Similarly, on May 25, 2021, Stemedica's board secretary, Marcie Frank, emailed Stemedica's shareholders, including Leshkov and Vikhrieva, attaching Stemedica's Consolidated Financial Statements for the years ended December 31, 2020 and 2019, which Stemedica was using to raise funds from new investors. Stemedica's financials, however, did not reflect the $27,850,000 of stem cell debt to CardioCell and did not report the truth about Stemedica's egregious breaches of the Exclusive License, Contribution Agreement, Equity Exchange Agreement and Sublicense Agreement, and Stemedica's potential liabilities regarding the same.

385. As such, there is a substantial risk that the Howe brothers and their co-conspirators would continue to perpetrate the same fraudulent scheme on other unsuspecting investors.

386. In January and February 2023, Leshkov and Vikhrieva, as Stemedica's shareholders, inquired about Stemedica's financial condition and asked Stemedica six times for a comprehensive list of Stemedica's assets and a copy of Stemedica's directors and officers liability insurance. Stemedica failed and refused to provide this information to Leshkov and Vikhrieva.

387. Stemedica's refusal to provide this basic financial information to its shareholders shows that the Howe brothers have been misappropriating funds and evading the inquiries that would reveal their wrongdoing.

388. In the process of communicating with Stemedica to request financial information, Leshkov and Vikhrieva discovered that Stemedica had also improperly filed FDA documents on CardioCell's behalf without CardioCell's knowledge and authorization. When CardioCell requested copies of Stemedica's communications

- 73 -

with the FDA on CardioCell's behalf, Stemedica refused to provide the records. To date, Stemedica has not provided those records to CardioCell.

389.   Notably, Plaintiffs tried to resolve this case in good faith with Defendants and proceeded to sign a Tolling Agreement (as described below) and six subsequent amendments to the Tolling Agreement to try to settle the dispute with Defendants.

390.   In early 2023, Plaintiffs started communicated with Stemedica's new CEO, Michael Steinhauser. However, Plaintiffs later learned that Steinhauser was a friend of the Howe brothers, had been a Stemedica investor, and had been hired by them to create an impression of a new management that could be trusted. Although, initially, Steinhauser expressed an interest in settling the dispute with Plaintiffs, he subsequently stopped responding to Plaintiffs. As CEO of Stemedica, he appears to have been involved in orchestrating the sale of Stemedica described herein.

391.   Although Steinhauser knew about Plaintiffs' claims against Stemedica and promised to keep them updated on Stemedica's plans, he did not notify Plaintiffs that Stemedica was selling its assets and did not respond to Plaintiffs' inquiries even though he knew that Stemedica's transfer to Sanostem would harm Plaintiffs. Steinhauser's conduct thus appears to indicate that he was involved in and aided Stemedica's fraudulent transfer of assets to SanoStem, by, among other things, failing to notify Plaintiffs about the upcoming sale, preparing and signing sale-related documents as Stemedica's CEO, and advising Stemedica on how to evade Plaintiffs' claims in light of his blatant failure to notify Plaintiffs when they had explicitly asked him to do so.

392.   Steinhauser emailed Leshkov in 2024 discussing potential dissolution of Stemedica and noting that Stemedica could not pay its rent and other expenses.

393.   However, Plaintiffs only learned about Stemedica's potential sale as a result of a mass email sent to Stemedica's shareholders, including Leshkov in September 2024 by Gerbsman Partners ("Gerbsman Email"). This email stated, *inter*

*alia,* that "(Gerbsman Partners) has been retained by Stemedica Cell Technologies, Inc. Stemedica Cell Technologies, Inc. ('Stemedica' or 'the Company') to solicit interest for the acquisition of all, or substantially all, of the assets of Stemedica."  It also stated that "Stemedica maintained a cGMP manufacturing facility in San Diego, California and advanced its clinical efforts through its own sponsored clinical trials as well as through geographic and medical indication licensees.  The acquisition of Stemedica will enable immediate access to Stemedica's intellectual property, manufacturing protocols and CMC's, product inventory, manufacturing know-how and trade secrets, clinical trial data, and clinical trial IND approvals including, but not limited to, two FDA-approved Phase IIb/III clinical trial approvals: one for chronic ischemic stroke and one for chronic heart failure.  To advance the Company's manufacturing and clinical trial strengths, Stemedica has raised approximately $190 million since its inception.  These funds have come from Series A and Series B offerings; a major investment from a fund created by publicly traded Chinese Company, Jiuzhitang Co, Ltd.; debt instruments; and Common (down round) offerings.  Stemedica also generated revenue from product sales and licensing fees prior to COVID."

394.    While the Gerbsman Email stated that "[t]he Company has been unable to recover financially from the loss of income" from around 2020, it does not mention debt or potential legal claims at all.  It does not even mention the claims for which Stemedica had signed numerous tolling agreements.

395.    The one mention of CardioCell is inaccurate as it states: "Stemedica was able to secure a Phase IIb/III IND for a clinical trial treating Chronic Heart Failure using the Company's mesenchymal stem cell.  While the IND rights belong to Stemedica, licensing and rights to conduct this trial are with CardioCell, LLC."  In fact, Stemedica officially notified the FDA in a letter dated, April 7, 2015, that the relevant IND had been transferred to CardioCell and that CardioCell was thus the IND's rightful owner.

396.    The Gerbsman Email also mentions what it calls "Geographic Licensing Partners" which include Novastem, JZT Maker, and Sanostem, LLC.  It states that "Novastem (dba Clinica Santa Clarita) – Mexico.  Novastem has treated several hundred patients for a myriad of indications" and "Sanostem, LLC – India. (Including the territory of Sri Lanka, Bangladesh, Fiji and Nepal).  To date, Stemedica has received a Phase I/IIa (equivalent) approval in India from the Central Drug Standards Control (CDSCO) for the treatment of COVID but has yet to initiate clinical efforts."

397.    On October 22, 2024, Plaintiffs' counsel emailed Stemedica's corporate counsel representing Stemedica in connection with the potential sale, Ajay Gupta (at Gupta Evans & Ayres, PC), and raised concerns about the lack of transparency in Stemedica's apparent attempt to sell its valuable assets with knowledge of Plaintiffs' claims.  In that email, Plaintiffs' counsel requested information about the process involved in the sale of Stemedica, including information about due diligence, the winning bid and Stemedica's assets and valuation.  Gupta did not respond to Plaintiffs' email, suggesting that Stemedica was hiding its apparent fraudulent transfer of assets.

398.    Plaintiffs finally heard about Stemedica's sale on February 5, 2025, when SanoStem's representative, Shivinder Deol, emailed Plaintiffs to inform them that, on February 4, 2025, SanoStem had acquired Stemedica, including the FDA applications regarding Chronic Heart Failure.  Deol included a February 4, 2025 press release regarding SanoStem's full acquisition of Stemedica.  Deol wrote among other things: "Dear Nina and Sergey, Duniya SanoStem Inc (SanoStem) has fully acquired Stemedica's assets including all the IND."

399.    Deol also included in the email  a "Press Release Duniya SanoStem Inc. Acquires Stemedica Cell Technologies, Inc.", which stated: "Bakersfield, CA - February 4, 2025 - Duniya SanoStem Inc., a global biopharmaceutical company, is pleased to announce the full acquisition of Stemedica Cell Technologies, Inc., a

government-licensed cGMP manufacturer of best-in-class Allogeneic (Donor) Adult Stem Cells and Stem Cell Factors."

400.    Plaintiffs were surprised that any company would be willing to acquire Stemedica given Defendants' elaborate fraudulent scheme and Plaintiffs' claims and draft complaint that should have been discovered in due diligence.

401.    Moreover, Plaintiffs were astonished that SanoStem had allegedly purchased CardioCell's exclusive rights without CardioCell's permission despite the fact that CardioCell was the rightful owner of those rights.  Plaintiffs thus replied to Deol's email discussing the draft complaint and claims (which Stemedica had seen) and the fact that CardioCell had exclusive rights for the cardiovascular indication, meaning that Stemedica could not have sold CardioCell's FDA applications to SanoStem.  Deol did not respond to Plaintiffs' email and did not reach out to discuss further or even acknowledge the response.

402.    Stemedica thus allegedly transferred all of its assets to Defendant SanoStem with the knowledge of Plaintiffs' claims.  The main purpose of the transfer was to avoid liability to Plaintiffs and other Stemedica creditors.  As described herein, some of the same people who were in charge of Stemedica, including Michael Steinhauser and Nikolai Tankovich, now appear to operate SanoStem.

403.    As such, there is a substantial risk that the Howe brothers and their co-conspirators would continue to commit fraudulent acts by enticing and defrauding unsuspecting investors.

404.    Importantly, Sanostem had a prior relationship with Stemedica as noted in the Gerbsman Email.  Shivinder Deol also had such a relationship.  For example, in 2018, Deol posted to LinkedIn the following message (in response to a picture of defendants Simon Guo and Stemedica's VP Business Development, David McGuigan, at the Burj CEO Awards & Business Summit 2018 in Shenzhen, China): "Stemedica receives Innovation Award in Biotechnology from CEO Clubs at their annual event in Shenzhen, China! Very proud of all that we've accomplished and the

great work of our entire team!!! Good job Dave Mcquigan!" (a copy is attached hereto as **Exhibit T**).

405. Similarly, in another 2018 LinkedIn post Deol stated: "Proud to be associated with Stemedica's impressive IP' (a copy is attached hereto as **Exhibit U**). Additionally, Deol visited Stemedica's office more than once between 2013 and early 2016, and David Howe introduced Deol to CardioCell's CEO in around 2015 as Stemedica's business partner.

406. After commencing this action on February 27, 2025, Plaintiffs noticed that the sanostemglobal.com website disappeared from the internet.

407. On March 12, 2025, Deol emailed Plaintiffs' counsel, asserting, among other things, that "no money has been paid to date. If the sale does get voided, that will mean eventually, no money will be transferred" in connection with the sale of Stemedica to SanoStem. He also claimed without proof that the SanoStem website point person had made a mistake with the Stemedica-related announcement and thus subsequently removed certain posts.

## XX. PLAINTIFFS' CLAIMS ARE TIMELY

408. As set forth herein, Plaintiffs first learned about Stemedica's fraudulently concealed contracts with third parties on or about July 27, 2018.

409. Moreover, because Defendants actively concealed their breaches and wrongdoing, Plaintiffs had no reason to suspect any issues or wrongdoing of any sort before July 27, 2018, and ultimately uncovered Defendants' elaborate fraudulent scheme to destroy their investments and CardioCell in early 2021.

410. When Plaintiffs confronted Defendants about their fraudulent scheme that had destroyed Cardiocell, Defendants agreed to negotiate a settlement and, on June 24, 2021, Plaintiffs and Defendants signed an agreement tolling the limitations period for these claims (the "Tolling Agreement"). Plaintiffs and Defendants signed

six subsequent amendments to the Tolling Agreement which continued to toll the limitations period through February 28, 2025.

411.    Specifically, the parties signed a Tolling Agreement preserving the claims' status quo from June 24, 2021 through January 31, 2022.

412.    The parties signed First Amendment to Tolling Agreement preserving the claims' status quo from January 31, 2022 through April 30, 2022.

413.    The parties signed Second Amendment to Tolling Agreement preserving the claims' status quo from April 30, 2022 through December 31, 2022.

414.    The parties signed Third Amendment to Tolling Agreement preserving the claims' status quo from December 31, 2022 through June 30, 2023.

415.    The parties signed Fourth Amendment to Tolling Agreement preserving the claims' status quo from June 30, 2023 through August 30, 2023.

416.    The parties signed Fifth Amendment to Tolling Agreement preserving the claims' status quo from August 30, 2024 through February 29, 2024.

417.    The parties signed Sixth Amendment to Tolling Agreement preserving the claims' status quo from February 29, 2024 through February 28, 2025.

418.    Accordingly, no claims are barred by any statute of limitations.

### FIRST CAUSE OF ACTION
**(Fraudulent Inducement To Invest In CardioCell Against Maynard Howe, Roger Howe, And Nikolai Tankovich)**

419.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

420.    Maynard Howe, Roger Howe, and Nikolai Tankovich made misrepresentations to plaintiffs Sergey Leshkov and Nina Vikhrieva about CardioCell's enormous potential.

421.    As discussed above, they represented, among other things, that:  (i) CardioCell had the exclusive worldwide license for the cardiovascular indication and stem cell manufacturing know-how; (ii) CardioCell had $35 million of stem cells at

its disposal and did not have to manufacture any stem cells for the duration of the clinical trials; (iii) CardioCell was projected to generate billions of dollars upon the commercialization of the cardiovascular product; and (iv) Stemedica would contribute cash to CardioCell to fund the clinical trials as Stemedica was purportedly in negotiations with various international companies that would result in successful business partnerships and new investments.

422.    The Howe brothers and Tankovich made these misrepresentations with the full knowledge they were false.

423.    The Howe brothers and Tankovich made these misrepresentations to induce Leshkov and Vikhrieva to invest in CardioCell.

424.    The Howe brothers and Tankovich concealed their intent to defraud the investors by taking their money and then slowly and systematically destroying CardioCell.

425.    Leshkov and Vikhrieva justifiably relied on these misrepresentations and invested more than $20 million in CardioCell.

426.    As a direct and proximate result of the Howe brothers and Tankovich's fraudulent acts, Leshkov and Vikhrieva have been damaged in an amount to be determined at trial, including punitive damages.

## SECOND CAUSE OF ACTION

### (Fraudulent Inducement To Enter Into The Equity Exchange Agreement Against Roger Howe, Maynard Howe, And Dirk O'Hara)

427.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

428.    As discussed above, after promising JZT to gain full control of the subsidiaries in which Leshkov and Vikhrieva had significant stakes and veto power, the Howe brothers made false statements to Leshkov and Vikhrieva about the value of the subsidiaries as to induce them to roll their interest in the subsidiaries into CardioCell.

429.    Specifically, on March 1, 2018, Roger Howe emailed Leshkov and Vikhrieva, advising them that Stemedica's agreement with JZT required Stemedica to consolidate its subsidiaries but concealing that the JZT deal also required Stemedica to gain full control over the subsidiaries and remove Leshkov and Vikhrieva from the subsidiaries' board of directors.

430.    Roger Howe falsely represented to Leshkov and Vikhrieva that CardioCell was the subsidiary of true value and that despite the promising cardiovascular clinical trials, without Stemedica's financial support, CardioCell would have to be dissolved, suggesting that Leshkov and Vikhrieva had no choice but to accept Stemedica's consolidation proposal.

431.    Roger Howe also falsely represented to Leshkov and Vikhrieva that StemCutis, StemProtein and Stemedica International had no value and were likely to be dissolved as to induce Leshkov and Vikhrieva to consolidate their $15 million investment in those subsidiaries into CardioCell.

432.    Roger Howe's representations about the subsidiaries were false as the subsidiaries subsequently used the groundbreaking clinical data, manufacturing technology, and valuable products (as obtained with Leshkov and Vikhrieva's investments) to continue developing high-potential products and generating revenues.

433.    Further, on May 4, 2018, the Howe brothers and Dirk O'Hara intentionally offered to Leshkov and Vikhrieva two deals that made no economic sense and were intended to deceive Leshkov and Vikhrieva about their options with respect to the subsidiaries.

434.    Indeed, the Howe brothers and Dirk O'Hara only proposed the two unacceptable deals to induce Leshkov and Vikhrieva to enter into a deal consolidating their interest in the subsidiaries into CardioCell as the only viable option.

435.    Leshkov and Vikhrieva relied on Roger Howe's statement that CardioCell was the only subsidiary of real value and the Howe brothers' numerous

prior statements that CardioCell had a tremendous potential. And faced with the two unacceptable deal offers as well Roger Howe's prior threat of dissolving CardioCell, Leshkov and Vikhrieva agreed to roll their $15 million investment in the subsidiaries into CardioCell and otherwise consolidate their $20 million investment.

436. The Howe brothers and Dirk O'Hara made these false statements to induce Leshkov and Vikhrieva to sign the Equity Exchange Agreement and roll their interest in the Stemedica subsidiaries, StemProtein, StemCutis, and Stemedica International, into CardioCell.

437. The Howe brothers and Dirk O'Hara concealed their intent to defraud Leshkov and Vikhrieva by causing them to consolidate their $20 million investment into CardioCell and then slowly and systematically destroy CardioCell.

438. Leshkov and Vikhrieva justifiably relied on these false statements, and rolled their interest in the subsidiaries into CardioCell.

439. As a direct and proximate result of the Howe brothers' and Dirk O'Hara's fraudulent acts, Leshkov and Vikhrieva have been damaged in an amount to be determined at trial, including punitive damages.

## THIRD CAUSE OF ACTION
### (Breach Of Fiduciary Duty Against Roger Howe, Maynard Howe, Nikolai Tankovich, Dirk O'Hara, Craig Carlson, And Simon Guo)

440. Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

441. As directors of CardioCell, Roger Howe, Maynard Howe, Nikolai Tankovich, Dirk O'Hara, Craig Carlson, and Simon Guo ("Stemedica Directors") owed Plaintiffs fiduciary duties of due care and loyalty.

442. Specifically, the Stemedica Directors owed Plaintiffs a duty to act in good faith and not engage in self-dealing.

443. The Stemedica Directors also owed Plaintiffs a duty to disclose material information, not to make any misrepresentations, and always act in Plaintiffs' best interest.

444. The individual Stemedica Directors breached their fiduciary duties by, *inter alia*: (i) failing to disclose and concealing the Organismo Agreement, Rivadavia Agreement and ALTACO Agreement; (ii) causing Stemedica to enter into those agreements and provide CardioCell's rights and stem cells to Organismo, Rivadavia and ALTACO at CardioCell's expense; (iii) making misrepresentations and misleading statements to CardioCell's shareholders, Leshkov and Vikhrieva, about CardioCell's potential and independence as to induce them to enter into the Equity Exchange Agreement and roll their $15 million interest in StemProtein, StemCutis and Stemedica International into CardioCell; (iv) making misrepresentations about CardioCell's potential business deals with JZT and their revenue-generating potential; (v) failing to assist CardioCell with resolving Stemedica's inadequate stem cell supply to CardioCell; (vi) failing to assist with returning the CardioCell rights for Mexico; (vii) failing to answer investors' questions about stem cell availability to CardioCell required to complete the clinical trials; (viii) interfering with CardioCell's fund-raising efforts; and (ix) failing to disclose that Stemedica's plan was to deprive CardioCell of funds and stem cells and prevent the completion of the clinical trials and commercialization of the products.

445. Through their failures and intentional bad acts, the Stemedica Directors thus helped Stemedica steal CardioCell's money, including the money that Stemedica received from the concealed grants of CardioCell's license rights to Organismo, Rivadavia and ALTACO. Stemedica then passed the stolen funds to the Stemedica Directors who enriched themselves at Plaintiffs' expense.

446. These misrepresentations and breaches caused Plaintiffs to roll their $15M interest in other subsidiaries into CardioCell and suffer unique harm separate from the harm to other CardioCell shareholders.

447.    As a direct and proximate result of the individual Stemedica Directors' breaches of fiduciary duties, Plaintiffs have been damaged in an amount to be determined at trial.

## **FOURTH CAUSE OF ACTION**
### **(Aiding And Abetting Breach Of Fiduciary Duty Against JZT)**

448.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

449.    As directors of CardioCell, Roger Howe, Maynard Howe, Nikolai Tankovich, Dirk O'Hara, Craig Carlson, and Simon Guo owed Plaintiffs fiduciary duties of due care and loyalty.

450.    The individual Stemedica Directors breached their fiduciary duties by, *inter alia*:  (i) making misrepresentations to Plaintiffs about CardioCell's potential business deals with JZT and their revenue-generating potential; (ii) failing to assist CardioCell with resolving Stemedica's inadequate stem cell supply to CardioCell; (iii) failing to answer investors' questions about stem cell availability to CardioCell required to complete the clinical trials; (iv) interfering with CardioCell's fund-raising efforts; and (v) failing to disclose that Stemedica's plan was to deprive CardioCell of funds and stem cells and prevent the completion of the clinical trials and commercialization of the products.

451.    JZT knowingly participated and substantially assisted in the Stemedica Directors' breaches of fiduciary duty by, among other things:  (i) confirming the Stemedica Directors' misrepresentations that JZT would provide new business deals to CardioCell; (ii) directing Stemedica to prioritize stem cell deliveries to JZT and accepting stem cell supplies with the knowledge that CardioCell needed the same stem cells to complete the clinical trials; (iii) encouraging the Stemedica Directors not to answer investors' questions about stem cell availability to CardioCell required to complete the clinical trials; (iv) refusing to provide (on Stemedica's behalf) the stem cell manufacturing protocols and know-how to CardioCell claiming that only

Stemedica and JZT had the ability to manufacture quality stem cells; and (v) encouraging the Stemedica Directors not to disclose Stemedica and JZT's plan was to deprive CardioCell of funds and stem cells and prevent the completion of the clinical trials and product commercialization.

452.    These misrepresentations and breaches caused Plaintiffs to roll their $15M interest in other subsidiaries into CardioCell and suffer unique harm separate from the harm to other CardioCell shareholders.

453.    As a direct and proximate result of JZT's acts of aiding and abetting the Stemedica Directors' breaches of fiduciary duty, Plaintiffs have been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Fraudulent Concealment Against Roger Howe And Nikolai Tankovich)

454.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

455.    Roger Howe and Nikolai Tankovich were Stemedica's appointed directors to the CardioCell board from July 31, 2013 to August 2019.

456.    Roger Howe and Nikolai Tankovich not only failed to disclose but fraudulently concealed Stemedica's agreements with Organismo, Rivadavia and ALTACO that violated the Exclusive License.

457.    Between 2013 and July 2018, unbeknownst to CardioCell and its shareholders, including Plaintiffs, Stemedica was prioritizing stem cell deliveries to Organismo, Rivadavia and ALTACO, which resulted in untimely and inadequate deliveries to CardioCell, which harmed Plaintiffs' investment.

458.    When Plaintiffs asked Roger Howe and Nikolai Tankovich about the reasons for Stemedica's delayed and inadequate stem cell deliveries to CardioCell, Howe and Tankovich stated that the delays were due to technical and capacity issues at Stemedica's manufacturing facilities.

459.    Howe and Tankovich made these statements with the full knowledge that Stemedica was prioritizing stem deliveries to Organismo, Rivadavia and ALTACO pursuant to the concealed contracts with those entities.

460.    Howe and Tankovich also made false statements to Plaintiffs about Stemedica's intent to fund CardioCell and even invited Plaintiffs to attend conference calls with foreign investors to assure Plaintiffs that Stemedica had the ability to raise funds and intended to contribute to CardioCell, as originally promised.  Howe and Tankovich made those statements with the full knowledge that Stemedica would not invest any money in CardioCell and that, as a result, CardioCell will be unable to pay for the clinical trials and inevitably fail.

461.    Plaintiffs, however, did not have actual or constructive knowledge of those facts.

462.    When, finally, in July 2018, the Organismo and Rivadavia concealed agreements came to light in the context of JZT's acquisition of 51% of Stemedica's equity, Plaintiff acted diligently in trying to uncover more facts and discovered the concealed ALTACO Agreement.

463.    When Defendants' bad acts started coming to light in July 2018 and CardioCell's CEO confronted Defendants about their failure to provide stem cells for CardioCell's clinical trials, Defendants made affirmative statements that the stem cells will be provided and that CardioCell and Plaintiffs had nothing to worry about. Indeed, on September 6, 2018, Stemedica's CFO, Craig Carlson emailed CardioCell's CEO (copy to Roger Howe and David McGuigan), stating: "A commitment for 6 billion cells, (or 45 patient dosages), between now and the end of August in 2019 will be no problem for Stemedica in support of CardioCell's LVAD clinical trial."

464.    If Plaintiffs knew about the concealed facts and Defendants' intent not to honor their promise to provide stem cells and funds, Plaintiffs would not have rolled their $15M interest in other subsidiaries into CardioCell.

465.   As a direct and proximate result of Roger Howe and Nikolai Tankovich's fraudulent concealment of Stemedica's agreements with Organismo, Rivadavia and ALTACO, Plaintiffs have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
**(Intentional Fraudulent Transfer Under Cal. Civ. Code § 3439.04 (a)(1) Against Stemedica, SanoStem, and Shivinder Deol)**

466.   Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

467.   Plaintiffs are creditors of Stemedica.

468.   Defendant Stemedica was aware of Plaintiffs' draft complaint and Plaintiffs' claims against them and Stemedica since at least June 2021.

469.   Defendant was thus aware about Stemedica's liability to Plaintiffs since at least June 2021 but never paid or resolved that liability.

470.   Despite Stemedica's liability to Plaintiffs, Stemedica (as controlled by Defendants Roger Howe, Maynard Howe, Nikolai Tankovich, and Michael Steinhauser) transferred Stemedica and all of Stemedica's assets to Defendant SanoStem (as controlled by Shivinder Deol) with actual intent to hinder, delay, or defraud Plaintiffs as Stemedica's creditors.

471.   The transfer of Stemedica's assets to SanoStem is thus a voidable transfer as defined in Cal. Civ. Code § 3439.04.

472.   As a result of the forgoing, Plaintiffs are entitled to entry of judgment against these defendants for:   (a) voiding the transfer of Stemedica's assets to SanoStem; (b) directing that the transfer be set aside, and (c) recovering the transfer, or the value thereof, from these Defendants for the benefit of Plaintiffs in an amount to be determined by the Court.

### SEVENTH CAUSE OF ACTION

**(Constructive Fraudulent Transfer Under Cal. Civ. Code §§ 3439.04 (a)(2), 3439.05 Against Stemedica, SanoStem, And Shivinder Deol)**

473.   Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

474.   Plaintiffs are creditors of Stemedica.

475.   Defendant Stemedica was aware of Plaintiffs' draft complaint and Plaintiffs' claims against Stemedica since at least June 2021.

476.   Defendant was thus aware about Stemedica's liability to Plaintiffs since at least June 2021 but never paid or resolved that liability.

477.   Despite Stemedica's liability to Plaintiffs, Stemedica (as controlled by defendants Roger Howe, Maynard Howe, Nikolai Tankovich and Michael Steinhauser) transferred Stemedica and all of its assets to defendant SanoStem (as controlled by Shivinder Deol) when:  (i) Stemedica had insufficient assets to pay its debt to Plaintiffs and other creditors; (ii) Stemedica's expenses exceeded its revenues; (iii) Stemedica's liabilities exceeded its assets; (iv) Stemedica was insolvent; (v) the transfer rendered Stemedica unable to pay its debts when due; or (vi) the transfer was made to SanoStem, which is managed by some of the same people that ran Stemedica.

478.   The transfer of Stemedica's assets to SanoStem is a voidable transfer as defined in Cal. Civ. Code §§ 3439.04, 3439.05.

479.   As a result of the forgoing, Plaintiffs are entitled to entry of judgment against these defendants for: (a) voiding the transfer of Stemedica's assets to SanoStem; (b) directing that the transfer be set aside, and (c) recovering the transfer, or the value thereof, from these defendants for the benefit of Plaintiffs in amounts to be determined by the Court.

### EIGHTH CAUSE OF ACTION

**(Aiding and Abetting Intentional Fraudulent Transfer Against Roger Howe, Maynard Howe, Nikolai Tankovich, Michael K. Steinhauser, And Shivinder Deol)**

480.   Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

481.   Plaintiffs are creditors of Stemedica.

482.   Defendants Roger Howe, Maynard Howe, Nikolai Tankovich, Michael K. Stainhauser, SanoStem, and Shivinder Deol were aware of Plaintiffs' draft complaint and/or Plaintiffs' claims before February 4, 2025.

483.   On February 4, 2025, Stemedica transferred its assets to SanoStem with actual intent to hinder, delay, or defraud Plaintiffs as Stemedica's creditors.

484.   This transfer was fraudulent under Cal. Civ. Code § 3439.04 (a)(1).

485.   Defendants Roger Howe, Maynard Howe, Nikolai Tankovich, Michael K. Stainhauser, SanoStem, and Shivinder Deol knew that this transfer was being made to evade Plaintiffs' collection efforts.

486.   Despite their knowledge, these Defendants assisted with the fraudulent transfer by, among other things, preparing and signing documents and advising Stemedica on how to evade Plaintiffs' claims.

487.   As a result of the Defendants' actions, Plaintiffs have been damaged in an amount to be determined at trial.

### NINTH CAUSE OF ACTION

**(Violation Of The Racketeer Influenced And Corrupt Organizations Act Under 18 U.S.C. § 1962(c) Against Defendants Stemedica, JZT Parent, JZT Maker, JZT Fund, Roger Howe, Maynard Howe, David Howe, Nikolai Tankovich, Dirk O'Hara, Simon Guo, and Craig Carlson)**

488.   Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

489.   This claim arises under 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate,

- 89 -

directly or indirectly, in the conduct of such enterprises' affairs through a pattern of racketeering activity…."

490.    Maynard and Roger Howe operated and controlled an enterprise through Stemedica with the help of the conflicted Stemedica-appointed directors.

491.    Subsequently, the enterprise was joined by David Howe, Rivadavia, NovaStem, and JZT.

492.    As such, the enterprise was an association-in-fact between Stemedica, Maynard Howe, Roger Howe, the Stemedica-appointed directors, David Howe, Rivadavia, NovaStem, and JZT.  The participants in this enterprise knowingly agreed to participate in this enterprise and scheme described herein.

493.    This enterprise has continued for many years and its common purpose was to defraud investors such as Plaintiffs.

494.    The enterprise was structured in a way that showed a pattern of using Stemedica's valuable technologies and promises to commercialize multi-billion-dollar stem cell products as a bait for unsuspecting investors and then misappropriating the investments and getting rid of the investors under false pretenses while keeping the valuable technology as a bait for the next round of new investors, just like Plaintiffs here and the plaintiff Tiara Holdings II, LLC in the Tiara case, described herein.

495.    The nature and purpose of the enterprise was to obtain funds from investors under false promises of obtaining FDA approval and commercializing valuable products and then systematically syphon those funds to enrich Defendants while depriving the companies of stem cells and funds as to collapse the companies and eliminate the investors.

496.    Each participant in this enterprise was aware of the general nature of the enterprise and intended to participate in it.  Each participant also assisted the enterprise with achieving its ultimate goal.

497. This enterprise is distinct from the individual defendants and involves a complex and convoluted fraudulent scheme.

498. The enterprise was used as a tool to carry out the elements of the illegal scheme and pattern of racketeering activity, which affected interstate and foreign commerce.

499. Specifically, the enterprise participants conducted a scheme to defraud CardioCell's investors through a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5), consisting of repeated instances of mail and wire fraud as well as extortion and commercial bribery with the common purpose and ultimate goal of raising money and then eliminating the investors by destroying CardioCell, but without officially dissolving it so that Stemedica could continue to raise money by using CardioCell's groundbreaking research and successful clinical trials and selling CardioCell's exclusive cardiovascular rights and stem cells to third parties unobstructed.

500. The enterprise benefited from the wrongful acts of its participants by raising more than $20 million in CardioCell investments from Plaintiffs, using these investments to generate groundbreaking clinical data, and then using that data to raise funds for Stemedica, including $70 million from JZT.

501. The enterprise participants committed the wrongful acts as to effectively destroy CardioCell by depriving it of stem cells, manufacturing know-how, funds and ability to raise funds, and preventing it from completing the clinical trials and commercializing the therapeutic products.

502. The multiple acts of racketeering activities that the enterprise participants committed and/or conspired to commit were related to each other, extended for seven years, had multiple victims (including Leshkov, Vikhrieva, and other CardioCell shareholders and executives) and posed a threat of continuing racketeering and fraudulent activity, and therefore constitutes a pattern of racketeering activity.

503.    Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1), include but are not limited to the following fraudulent acts and racketeering conduct, each of which was taken with an intent to defraud:

**Predicate Act 1:**   During in-person meetings, telephone conferences and Skype calls in 2013, Maynard Howe, Roger Howe and Nikolai Tankovich made false statements to Leshkov and Vikhrieva about CardioCell's value and successful product commercialization.

**Predicate Act 2:**   In the beginning of October 2013, during Leshkov and Vikhrieva's visit to Stemedica in San Diego, the Howe brothers and Tankovich made false statements to Leshkov and Vikhrieva about CardioCell's value and successful product commercialization.

**Predicate Act 3:**   The Howe brothers and Tankovich provided a written document to Leshkov and Vikhrieva entitled "CardioCell's 2013 Business Plan and Anticipated Milestones," which contained false and misleading statements about CardioCell's numerous clinical trials and CardioCell's value.

**Predicate Act 4:**   In or about October 2013, during their presentation at the Ecole Polytechnique Federale de Lausanne in Switzerland, Maynard Howe and Nikolai Tankovich represented to Leshkov that:   (i) Stemedica's subsidiaries, CardioCell, StemCutis, StemProtein and Stemedica International, had tremendous potential; (ii) CardioCell had the exclusive worldwide license for the cardiovascular indication and stem cell manufacturing know-how; (iii) CardioCell had millions of dollars' worth of stem cells at its disposal and did not have to manufacture any stem cells for the duration of the clinical trials; (iv) CardioCell was projected to generate billions of dollars upon the commercialization of the cardiovascular product; and (v) Stemedica would contribute cash to CardioCell to fund the clinical trials as Stemedica was purportedly in negotiations with various international companies that would result in successful business partnerships and new investments.

**Predicate Act 5:**  On January 12, 2014, when Leshkov and Vikhrieva visited San Diego for CardioCell's first board meeting, the Howe brothers and Nikolai Tankovich made more false statements about CardioCell's value and successful product commercialization.

**Predicate Act 6 (Receiving, buying, and selling stolen property under Cal. Penal Code §496):**  From 2014 to 2018, Roger Howe and Nikolai Tankovich – who were CardioCell directors and had fiduciary duty of loyalty – entered into secret agreements with Organismo, Rivadavia, and ALTACO to sell CardioCell exclusive rights to the cardiovascular indication without CardioCell's knowledge and consent, and continued to conceal the contracts for years so that Stemedica could profit from those agreements unobstructed.

**Predicate Act 7 (Extortion under Cal. Penal Code §518):**  On March 1, 2018, Roger Howe emailed Leshkov and Vikhrieva effectively threatening to withhold Stemedica funds from CardioCell and dissolve it, despite its value and potential, as to induce Leshkov and Vikhrieva to consolidate their $15 million investment in other Stemedica subsidiaries and roll it into CardioCell.

**Predicate Act 8:**  On March 1, 2018, Roger Howe emailed Leshkov and Vikhrieva falsely representing that the other subsidiaries had no real value and potential as to induce Leshkov and Vikhrieva to consolidate their $15 million investment in those subsidiaries into CardioCell.  Roger Howe, Maynard Howe, and Nikolai Tankovich confirmed those statements during meetings and conference calls and caused Leshkov and Vikhrieva to exchange their valuable shares in Stemedica's subsidiaries for shares in CardioCell.  After the share exchange, Defendants caused CardioCell to collapse, and Plaintiffs thus lost their entire $20 million investment.

**Predicate Act 9 (Extortion under Cal. Penal Code §518):**  On May 3, 2018, Maynard Howe attempted to extort CardioCell's CEO, who was terminally ill at the time, by stating that Stemedica would cut the CEO's medical insurance if he refused

to use his influence over Leshkov and Vikhrieva to persuade them to enter into a highly unfavorable deal and give Stemedica control over the subsidiaries.

**Predicate Act 10:**   On May 4, 2018, during a CardioCell/Stemedica conference call that Leshkov and Vikhrieva attended by phone, the Howe brothers and Dirk O'Hara proposed to Leshkov and Vikhrieva two unacceptable deal options that made no economic sense as to deceive them that consolidating their interest in the subsidiaries into CardioCell was the only viable option.

**Predicate Act 11:**   On September 4, 2018, Craig Carlson emailed Leshkov what appeared to be a falsified Amendment #1 to the September 15, 2014 ALTACO Agreement to prove to Leshkov that the cardiovascular indication was excluded from the September 15, 2014 ALTACO Agreement.   Inexplicably, Amendment #1 was dated September 15, 2014 (the same as the date of the original agreement) even though the September 15, 2014 ALTACO Agreement already had an Amendment #1, dated September 15, 2017 for the renewal of the September 15, 2014 ALTACO Agreement.

**Predicate Act 12:**   Between May 2018 and March 2019, the Howe brothers, Craig Carlson, and Dirk O'Hara falsely stated during phone calls and in emails that Stemedica would amend the Rivadavia Agreement as to induce Leshkov and Vikhrieva to enter into the amendments to the Equity Exchange Agreement.

**Predicate Act 13:** Stemedica extorted CardioCell to enter into three amendments to the Equity Exchange Agreement, extending the deadline by more than two years for Stemedica to amend the Rivadavia Agreement and return the Mexico rights to CardioCell without new consideration to CardioCell.   Because Stemedica had deprived CardioCell of funds and it was critically important for CardioCell's fund-raising efforts to provide prospective investors with confidence that CardioCell was retaining its exclusive license rights for Mexico, CardioCell reasonably feared that, if CardioCell did not sign the three amendments and lost the Mexico rights, it would not be able to raise funds from outside investors.

**Predicate Act 14:**  In January 2019, Simon Guo met with CardioCell's CEO and tried to bribe him on behalf of JZT by asking what would be sufficient for him personally for negotiation with JZT.

**Predicate Act 15:**  In January 2019, Simon Guo, on JZT's behalf, falsely stated during a meeting with CardioCell's CEO that JZT would invest $2.5 million in CardioCell if CardioCell agreed to enter into the Sublicense Agreement.

**Predicate Act 16 (Commercial Bribery under Cal. Penal Code § 641.3):** Between 2013 and 2020, Maynard Howe, Roger Howe, and David Howe repeatedly recruited U.S. patients for cardiovascular and other stem cell treatment in Mexico and elsewhere using Stemedica's stem cells.  In exchange, David Howe received payments in the amount of approximately $10,000 per patient without knowledge of Stemedica and/or Stemedica's shareholders.  David Howe committed this predicate act multiple times, as detailed herein.

**Predicate Act 17:**  In 2015, Maynard Howe met with an investor in Detroit falsely stating that CardioCell's deal with AstraZeneca had closed and providing him with highly sensitive, confidential information about AstraZeneca and the deal without a nondisclosure agreement in a purported attempt to raise funds for Stemedica, which resulted in AstraZeneca's withdrawal from the deal.

**Predicate Act 18:**  On December 3, 2020, Stemedica's board secretary, Marcie Frank, emailed Stemedica's shareholders, including Leshkov and Vikhrieva, attaching Stemedica's Consolidated Financial Statements for the years ended December 31, 2019 and 2018, which Stemedica was using to raise funds from new investors.  Stemedica's financials, however, did not reflect the $27,850,000 of stem cell debt to CardioCell and did not report the truth about Stemedica's egregious breaches of the Exclusive License, Contribution Agreement, Equity Exchange Agreement, and Sublicense Agreement, and Stemedica's potential liabilities regarding the same.

**Predicate Act 19:**  On May 25, 2021, Stemedica's board secretary, Marcie Frank, emailed Stemedica's shareholders, including Leshkov and Vikhrieva, attaching Stemedica's Consolidated Financial Statements for the years ended December 31, 2020 and 2019, which Stemedica was using to raise funds from new investors.  Stemedica's financials, however, did not reflect the $27,850,000 of stem cell debt to CardioCell and did not report the truth about Stemedica's egregious breaches of the Exclusive License, Contribution Agreement, Equity Exchange Agreement, and Sublicense Agreement, and Stemedica's potential liabilities regarding the same.

**Predicate Act 20:**   Stemedica, Roger Howe, Maynard Howe, Michael Steinhauser, and Nikolai Tankovich fraudulently transferred Stemedica and its assets to avoid liability to Plaintiffs and other creditors.

504.    All of these predicate acts were related in a way that accomplished the purpose of the enterprise by fraudulently inducing investors to fund Stemedica and its subsidiaries under false pretenses and then deprive those companies of resources (including funds and stem cells) and eliminate the investors while enriching Defendants at the investors' expense.

505.    As a direct and proximate result of Defendants' pattern of racketeering activities and violations of 18 U.S.C. § 1961(1), Plaintiffs have been injured in their business and property at least in that Plaintiffs lost their $20 million investment. Plaintiffs have been also injured because CardioCell has been effectively destroyed and CardioCell's shareholders, including Plaintiffs, have lost their investments and ability to profit from the multi-billion-dollar therapeutic products.

506.    Defendants' pattern    racketeering    activities    (including    the aforementioned predicate acts) was the proximate cause of Plaintiffs' injury because the injury was the foreseeable and direct result of Defendants' wrongful conduct, and not the result of independent actions by third parties.

**TENTH CAUSE OF ACTION**
**(Violation Of The Racketeer Influenced And Corrupt Organizations Act Under 18 U.S.C. § 1962(d) Against Defendants Stemedica, JZT Parent, JZT Maker, JZT Fund, Roger Howe, Maynard Howe, David Howe, Nikolai Tankovich, Dirk O'Hara, Simon Guo, and Craig Carlson)**

507.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

508.    This claim alleges a violation under 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [18 § U.S.C. 1962]."

509.    Defendants conspired to violate 18 U.S.C. § 1962(c).

510.    The enterprise participants agreed, whether expressly or tacitly, that some person would commit at least two of the predicate acts set forth above in the course of participating in the scheme to defraud the CardioCell investors in violation of 18 U.S.C. § 1962(c).

511.    The enterprise participants were aware of the scope and nature of the fraudulent scheme of the enterprise.

512.    The enterprise participants intended to benefit themselves and did benefit themselves as a result of participating in the fraudulent scheme.

513.    There is no plausible excuse for the manner in which the co-conspirators participated in the affairs of this criminal enterprise.

514.    As a direct and proximate result of Defendants' pattern of racketeering activities and violations of 18 U.S.C. § 1961(1), Plaintiffs have been injured in their business and property at least as in that Plaintiffs lost their $20 million investment. Plaintiffs were also injured as CardioCell has been effectively destroyed and CardioCell's shareholders, including Plaintiffs, have lost their investments and ability to profit from the multi-billion-dollar therapeutic products.

515.    Defendants' pattern of racketeering activities (including the aforementioned predicate acts) was the proximate cause of Plaintiffs' injury because

the injury was the foreseeable and direct result of Defendants' wrongful conduct, and not the result of independent actions by third parties.

## ELEVENTH CAUSE OF ACTION
### (Accounting Against Stemedica)

516.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

517.    Plaintiffs Leshkov and Vikhrieva are Stemedica's shareholders.

518.    Stemedica raised over $200 million from different investors but failed to build and develop Stemedica and CardioCell despite its many promises in that regard.

519.    Stemedica's executives, Roger Howe, Maynard Howe, and Nikolai Tankovich have been misappropriating funds from Stemedica and Stemedica's subsidiaries (in which Plaintiffs invested) through excessive compensation and third party transactions, including, among others, syphoning funds from the Stemedica subsidiaries via the improper charges under the guise of administrative service fees, extending loans to third parties from the subsidiaries' funds and failing to ensure payment of those loans, and charging the subsidiaries for travel expenses by family members.

520.    As Stemedica's shareholders, Leshkov and Vikhrieva requested from Stemedica six times basic information about Stemedica's financial condition, including a comprehensive list of Stemedica's assets and a copy of Stemedica's directors and officers liability insurance.

521.    Stemedica refused and failed to provide the requested items.

522.    As a result of the Howe brothers' concealment of their wrongful acts, Leshkov and Vikhrieva, are unable, without detailed accounting, to verify the full extent of the fraud and misappropriation of assets for the relevant period.

523.    As a result of the Howe brothers' wrongful conduct and omissions and Stemedica's refusal to provide basic financial information, Leshkov and Vikhrieva were compelled to retain counsel to protect their interests.

524.    Leshkov and Vikhrieva are entitled to a detailed accounting of Stemedica's financial records and a reimbursement of the attorneys' fees and costs incurred in the prosecution of this action.

## TWELFTH CAUSE OF ACTION
### (Unjust Enrichment Against the Individual Defendants)

525.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.

526.    By their wrongful acts and omissions, the individual defendants were unjustly enriched to Plaintiffs' detriment.

527.    Specifically, Plaintiffs invested more than $20 million in CardioCell. Defendants used Plaintiff's investment to generate unprecedented clinical data and then destroyed CardioCell so that Stemedica and Defendants can continue to profit by licensing CardioCell's cardiovascular rights and sell the $27,850,000 worth of CardioCell stem cells to third parties and to otherwise enrich themselves as described herein.

528.    Plaintiffs seek restitution from the individual Defendants.

529.    Plaintiffs also seek an order from this Court disgorging all profits, benefits and other compensation obtained by the individual Defendants due to their wrongful conduct.

530.    Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

531.    Accordingly, Plaintiffs pray for the following remedies:

(a)    Recoupment, disgorgement of profits and/or return of the funds that Plaintiffs invested as a result of Defendant's fraud and other wrongful activity;

(b)     Monetary damages according to proof, including compensatory damages, lost interest, lost profits, and incidental and consequential damages in an amount to be determined at trial;

(c)     Treble damages for RICO under 18 U.S.C. § 1964(c);

(d)     Punitive damages;

(e)     Pre-judgment interest;

(f)     Detailed accounting of Stemedica's financial records and transactions;

(g)     Attorney's fees and costs of suit to the extent permitted by law;

(h)     An order (a) voiding the transfer of Stemedica's assets to SanoStem, (b) directing that the transfer be set aside, and (c) recovering the transfer, or the value thereof, from these Defendants for the benefit of Plaintiffs in an amount to be determined by the Court; and

(i)     Such other relief that the Court deems just and proper.

## JURY DEMAND

532.    Plaintiffs demand a trial by jury.


Dated: May 30, 2025                    RIMÔN P.C.


By: _/s/ Michael S. Lazaroff_
Michael S. Lazaroff
400 Madison Avenue, Suite 11D
New York, NY 10017
Tel: (646) 738-4151
Fax: (212) 363-0270
michael.lazaroff@rimonlaw.com
(_Pro Hac Vice_)

Daniel F. Lula
2029 Century Park East
Suite 400N
Los Angeles, CA 90067
Tel: (617) 963-0419
Fax: (213) 375-3811
daniel.lula@rimonlaw.com

Robert A. Cocchia
RIMÔN P.C.

3579 4th Avenue
San Diego, CA 92103
Tel: (858) 348-4383
Fax: (213) 375-3811
robert.cocchia@rimonlaw.com

*Attorneys for Plaintiffs*
*Nina Vikhrieva and Sergey Leshkov*