# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NINA VIKHRIEVA and SERGEY LESHKOV,<br><br>                                    Plaintiffs,<br><br>          v.<br><br>STEMEDICA CELL TECHNOLOGIES, INC.; ZIUZHITANG CO., LTD.; ZHUHAI HENGQIN JIUZHITANG YONGHE QIHANG FUND; JIUZHITANG MAKER (BEIJING) CELL TECHNOLOGY CO., LTD.; MAYNARD A. HOWE; ROGER J. HOWE; DAVID HOWE; NIKOLAI I. TANKOVICH; DIRK P. O'HARA; SIMON GUO; CRAIG W. CARLSON; MICHAEL K. STEINHAUSER; SANOSTEM GLOBAL, LLC; DUNIYA SANOSTEM, INC.; SHIVINDER S. DEOL,<br><br>                                    Defendants. | Case No. 25-cv-00459-BAS-SBC<br><br>**ORDER:**<br><br>**(1) GRANTING DAVID HOWE'S MOTION TO DISMISS (ECF No. 37);**<br><br>**(2) GRANTING IN PART AND DENYING IN PART MAYNARD HOWE, NIKOLAI TANKOVICH, CRAIG CARLSON, ROGER HOWE, AND DIRK O'HARA'S MOTION TO DISMISS (ECF No. 38); AND**<br><br>**(3) DENYING MICHAEL STEINHAUSER'S MOTION TO DISMISS (ECF No. 39)** |

- 1 -

25cv0459

This action stems from a failed $20 million investment in a clinical-stage biotechnology company that pursued stem cell treatments for cardiovascular diseases. Plaintiffs Nina Vikhrieva and Sergey Leshkov are trying to hold six entities and nine individuals responsible for their loss. They bring two claims under the Racketeer Influenced and Corrupt Organizations Act and an array of state law causes of action against the Defendants.

Presently before the Court are three motions to dismiss. Seven Defendants contend Plaintiffs' claims are barred by the statute of limitations or lack plausibility. The motions are fully briefed.

For the following reasons, the Court grants David Howe's Motion to Dismiss. In addition, the Court grants in part and denies in part Maynard Howe, Nikolai Tankovich, Craig Carlson, Roger Howe, and Dirk O'Hara's Motion to Dismiss. Finally, the Court denies Michael Steinhauser's Motion to Dismiss.

## BACKGROUND

### I.    The Failed Investment in CardioCell

Plaintiffs' allegations span a hundred pages, and the Court provides only a snapshot here. (First Am. Compl. ("FAC"), ECF No. 32.) The Court draws the following facts from the First Amended Complaint and accepts them as true to resolve the Motions to Dismiss.

At the epicenter of this dispute is the relationship between CardioCell, LLC and Defendant Stemedica Cell Technologies, Inc. (FAC ¶ 1.) Stemedica is "a clinical-stage biopharmaceutical company focused on the development and commercialization of stem cell and protein therapeutics." (*Id.* ¶ 7.) In 2013, Stemedica created a subsidiary, CardioCell, to focus on commercializing stem cell therapies for cardiovascular disease. (*Id.* ¶¶ 1, 7.) Around the same time, Stemedica granted CardioCell an exclusive, worldwide license to use Stemedica's stem cell technology for cardiovascular indications. (*Id.*)

Plaintiffs tied their fortunes to the CardioCell subsidiary. They invested $5 million in 2013. (FAC ¶ 8; *see also id.* ¶¶ 37–39.) Plaintiffs contributed another $15 million to other Stemedica affiliates during 2013 and 2014. (*Id.* ¶¶ 8–10.) Then, in 2018, Plaintiffs

- 2 -

consolidated those other interests into CardioCell, for an aggregate exposure of approximately $20 million. (*Id.* ¶ 21.)

In the mid-2010s, CardioCell completed preliminary clinical trials that allegedly demonstrated the safety and efficacy of its stem cell therapies. (FAC ¶¶ 96–98, 100–01.) Plaintiffs contend, however, that the parent company—Stemedica—reneged on its commitments to CardioCell, which sealed the subsidiary's fate. Stemedica purportedly failed to provide promised funding to complete the clinical trials, failed to deliver the stem cells needed for CardioCell's treatments, and instead burdened the subsidiary with substantial administrative charges. (*Id.* ¶¶ 11, 16, 24–26, 90, 117–18, 121–39, 171, 173–81.)

By 2020, Stemedica owed CardioCell nearly $28 million in stem cells. (FAC ¶ 383.) Stemedica was busy trying to raise funds from new investors, but Plaintiffs allege Stemedica was not disclosing its stem cell debt to CardioCell or the parent company's "egregious breaches" of several related contracts. (*Id.* ¶¶ 383–84.)

By 2024, however, Stemedica "could not pay its rent and other expenses." (FAC ¶ 392.) The company began exploring a dissolution or sale. (*Id.* ¶¶ 392–93.) Allegedly, "to avoid liability to Plaintiffs and other Stemedica creditors," Stemedica was sold to "a newly created company," Defendant SanoStem Global, LLC. (*Id.* ¶ 30.) This sale allegedly included all of Stemedica's assets, including the rights to CardioCell's investigational therapies and its regulatory filings. (*Id.* ¶¶ 393–401.)

Plaintiffs further allege that two brothers, Defendants Roger Howe and Maynard Howe, orchestrated a "fraudulent scheme" through Stemedica to destroy Plaintiffs' investments. (FAC ¶ 3.) Plaintiffs claim that these Defendants and others "used Stemedica to induce Plaintiffs' investments in CardioCell and other Stemedica affiliates under false pretenses to enrich themselves at Plaintiffs' expense." (*Id.* ¶ 2.) Plaintiffs claim Defendants then orchestrated the sale of Stemedica while refusing to provide information to shareholders, which would have revealed that the Howe brothers "have been

- 3 -

25cv0459

misappropriating funds and evading inquiries that would reveal their wrongdoing." (*Id.* ¶ 387; *see also id.* ¶¶ 400–03.)

Plaintiffs seek to hold Roger Howe, Maynard Howe, and thirteen other Defendants responsible in this lawsuit. (FAC ¶¶ 41–65.) Although Plaintiffs cast a wide net in their Complaint, the Court focuses on seven of the Defendants in these Motions to Dismiss.

## II.    The CardioCell Defendants

Five of the seven Defendants moving to dismiss are connected to CardioCell and its board of directors. These are the two "Howe brothers" who allegedly orchestrated the fraudulent scheme—Maynard Howe and Roger Howe—as well as three other individuals: Nikolai Tankovich, Craig Carlson, and Dirk O'Hara. (FAC ¶¶ 54–58, 60.) All these individuals served as Stemedica-appointed members of CardioCell's board of directors during at least part of the events alleged in the Complaint. (*See id.*) Four of the five individuals also held roles at Stemedica: Maynard Howe "is Stemedica's co-founder and vice chairman of the board of directors," Roger Howe "is Stemedica's co-founder and board chairman," Tankovich "is Stemedica's current President and Chief Medical Officer," and Carlson "is Stemedica's former Chief Executive Officer." (*Id.* ¶¶ 54–55, 57, 60.) For simplicity, the Court refers to these five individuals as the CardioCell Defendants.

In their ninth and tenth claims, Plaintiffs sue the CardioCell Defendants for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). (FAC ¶¶ 488–515.) In addition, some of Plaintiffs' state law causes of action implicate the CardioCell Defendants. These are:

- o The first claim for fraudulent inducement to invest in CardioCell against the Howe brothers and Nikolai Tankovich (*id.* ¶¶ 419–26);
- o The second claim for fraudulent inducement to enter into an equity exchange agreement against the Howe brothers and Dirk O'Hara (*id.* ¶¶ 427–39);
- o The third claim for breach of fiduciary duty against the CardioCell Defendants (*id.* ¶¶ 440–47);

- 4 -

25cv0459

o The fifth claim for fraudulent concealment against Roger Howe and Nikolai Tankovich (*id.* ¶¶ 454–65);

o The eighth claim for aiding and abetting a fraudulent transfer against the Howe brothers and Nikolai Tankovich (*id.* ¶¶ 480–87); and

o The twelfth claim for unjust enrichment against the CardioCell Defendants (*id.* ¶¶ 525–30).

The CardioCell Defendants move to dismiss the RICO claims and the state law causes of action under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. (CardioCell Defs.' Mot. to Dismiss, ECF No. 38.)

**III.    Michael Steinhauser**

The sixth Defendant moving to dismiss is Michael Steinhauser. He "is Stemedica's current Chief Executive Officer and Interim Chairman of Stemedica's Board of Directors." (FAC ¶ 61.) He "has a close relationship with Defendants Roger Howe and Maynard Howe." (*Id.*) Steinhauser supposedly "assisted the Howe brothers with the sale of Stemedica to SanoStem to escape liability to Plaintiffs and other Stemedica creditors." (*Id.*)

Steinhauser is named in Plaintiffs' eighth cause of action for aiding and abetting a fraudulent transfer. (FAC ¶¶ 480–87.) He also appears to be named in the twelfth cause of action for unjust enrichment. (*See id.* ¶¶ 525–30.) Steinhauser moves to dismiss the eighth cause of action under Rules 12(b)(6) and 9(b). (Steinhauser's Mot. to Dismiss, ECF No. 39.) He also filed a Joinder in the CardioCell Defendants' Motion, which seeks dismissal of the unjust enrichment claim.[1] (ECF No. 40.)

---

[1] The Court denies Plaintiffs' request to strike Steinhauser's Joinder and instead incorporates Plaintiffs' Opposition to the CardioCell Defendants' Motion to Dismiss to the extent it is relevant to Steinhauser's Joinder in the Motion. (*See* Pls.' Opp'n to Steinhauser's Mot. 1 n.1.)

25cv0459

## IV.   David Howe

The final Defendant moving to dismiss is David Howe, who is the brother of Roger Howe and Maynard Howe.[2] (FAC ¶ 56.)  David Howe served as Stemedica's Senior Vice President and Medical Director from 2005 to 2011.  (*Id.*)  Plaintiffs claim he then "remained associated with Stemedica" and "was identified as a medical consultant to Stemedica." (*Id.*)

According to Plaintiffs, David Howe helped recruit U.S. patients for cardiovascular and other stem cell treatments at clinics in Mexico, which used stem cells purchased from Stemedica.  (FAC ¶¶ 56, 66, 69; *see also id.* ¶¶ 327–30.)  David Howe allegedly "accepted payments" in return "for marketing Stemedica's stem cells to U.S. patients and accompanying them to Mexico and other countries." (*Id.* ¶ 332.)

Plaintiffs include David Howe as a Defendant in their ninth and tenth causes of action for violations of RICO.  (FAC ¶¶ 488–515.)  Finally, they sue him for unjust enrichment in their twelfth claim. (*Id.* ¶¶ 525–30.)  David Howe moves to dismiss the three claims against him under Rules 12(b)(6) and 9(b).  (D. Howe's Mot. to Dismiss, ECF No. 37.)

Plaintiffs oppose all three Motions to Dismiss.  (Opp'n to D. Howe's Mot., ECF No. 47; Opp'n to CardioCell Defs.' Mot., ECF No. 46; Opp'n to Steinhauser's Mot., ECF No. 48.)  The Court finds these motions suitable for determination on the papers submitted and without oral argument.  *See* Fed. R. Civ. P. 78(b); CivLR 7.1(d)(1).

## LEGAL STANDARDS

## I.   Failure to State a Claim

To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial

---

[2]  To stay consistent with the Complaint, when the Court refers to the "Howe brothers," it is referring to only the alleged masterminds of the scheme—Maynard Howe and Roger Howe—and not David Howe.  (*See* FAC ¶ 2.)

25cv0459

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In resolving a motion to dismiss, the court must assume the truth of the complaint's "well-pleaded factual allegations." *Iqbal*, 556 U.S. at 679. The court does not credit legal conclusions—including those masquerading as factual allegations—or other conclusory assertions. *Id.* at 678–79.

## II.      Pleading Fraud with Particularity

Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." "Rule 9(b) demands that the circumstances constituting the alleged fraud be 'specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.'" *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)). "This means that allegations of fraud must be stated with 'specificity including an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *E.g.*, *SVGRP LLC v. Sowell Fin. Servs., LLC*, No. 5:16-cv-7302-HRL, 2017 WL 1383735, at *4 (N.D. Cal. Apr. 18, 2017) (quoting *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007)).

<strong>ANALYSIS</strong>

## I.      RICO

Two of the three Motions to Dismiss challenge Plaintiffs' ninth and tenth RICO claims, which are at the heart of their federal lawsuit. (FAC ¶¶ 488–515.) "Although the RICO statute was originally enacted to combat organized crime, 'it has become a tool for

25cv0459

everyday fraud cases brought against respected and legitimate enterprises.'" *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1248 (9th Cir. 2019) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)).

"RICO, codified at 18 U.S.C. §§ 1961–1968, extends civil and criminal penalties for acts performed as part of an ongoing criminal organization or enterprise, known as 'prohibited activities.'" *Glob. Master Int'l Grp., Inc. v. Esmond Nat., Inc.*, 76 F.4th 1266, 1270 (9th Cir. 2023) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 232 (1989)). As to civil liability, RICO provides a private cause of action for persons "injured in [their] business or property by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c).

Section 1962 in turn defines a series of "prohibited activities" under RICO. 18 U.S.C. § 1962. Subsections (a) through (c) prohibit certain "pattern[s] of racketeering activity" in relation to an "enterprise." *Id.* § 1962(a)–(c). The remaining subsection, (d), makes it illegal to conspire to violate subsections (a), (b), and (c). *Id.* § 1962(d).

Thus, the elements of a civil RICO claim are: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property." *Glob. Master Int'l Grp., Inc.*, 76 F.4th at 1271 (quoting *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL-CIO*, 770 F.3d 834, 837 (9th Cir. 2014)). Further, to state a RICO conspiracy claim, the plaintiff must "adequately plead a substantive violation of RICO." *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010).

In their ninth claim against eleven Defendants, Plaintiffs allege those Defendants violated 18 U.S.C. § 1962(c) by participating in an enterprise and scheme "to defraud investors such as Plaintiffs." (FAC ¶ 493.) Plaintiffs identify twenty purported predicate acts for their RICO claim, including supposed extortion and commercial bribery offenses under California state law. (*Id.* ¶ 503.) Plaintiffs claim the injury to their "business and property" is that they "lost their $20 million investment" in CardioCell and the other Stemedica subsidiaries. (*Id.* ¶ 505.) Their tenth claim alleges a RICO conspiracy claim

under 18 U.S.C. § 1962(d) because "Defendants conspired to violate 18 U.S.C. § 1962(c)." (*Id.* ¶ 509.)  Thus, the tenth claim is closely tied to the ninth claim.  *See Sanford*, 625 F.3d at 559.

Having sketched the contours of the RICO claims, the Court turns to Defendants' Rule 12(b)(6) challenges.  Defendants first argue the RICO claims must be dismissed because they are untimely.

## A.    Statute of Limitations

Plaintiffs ordinarily do not need to plead around an anticipated affirmative defense in their complaint.  *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892, 902 (9th Cir. 2013). "When an affirmative defense is obvious on the face of a complaint, however, a defendant can raise that defense in a motion to dismiss." *Id.*  Consequently, a claim may be dismissed as untimely under Rule 12(b)(6), but "only when the running of the statute of limitations is apparent on the face of the complaint." *Thomas v. Cnty. of Humboldt, California*, 124 F.4th 1179, 1191 (9th Cir. 2024).

The statute of limitations for civil RICO claims is four years.  *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  Plaintiffs filed this action on February 27, 2025.  (ECF No. 1.)  Thus, to be timely, Plaintiffs' RICO claims ordinarily need to have accrued no earlier than February 27, 2021.  *See Agency Holding Corp.*, 483 U.S. at 156.  Most of Plaintiffs' factual allegations arose before this date, however, which brings the statute of limitations to the forefront.  (*See generally* FAC ¶¶ 1–407.)

Plaintiffs anticipated this affirmative defense.  They allege the parties tried to negotiate a resolution of this far-ranging dispute in 2021.  (FAC ¶ 410.)  As part of those negotiations, "Plaintiffs and Defendants signed an agreement tolling the limitations period for these claims (the 'Tolling Agreement')" on June 24, 2021.  (*Id.*)  Plaintiffs allege the parties "signed six subsequent amendments to the Tolling Agreement, which continued to toll the limitations period through February 28, 2025."  (*Id.*; *see also id.* ¶¶ 411–17 (identifying the amendments to the Tolling Agreement).)

25cv0459

Most federal statutes of limitations can be tolled by agreement. *See Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 107 (2013) (explaining that usually "parties are permitted to contract around a default statute of limitations" and can "agree not only to the length of a limitations period but also to its commencement"). The civil RICO limitations period is borrowed from the Clayton Act, *see Agency Holding Corp.*, 483 U.S. at 156, which does not expressly prohibit tolling, *see* 15 U.S.C. § 15b. *Cf. Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (referencing a similar tolling agreement for antitrust claims brought under the Clayton Act). Thus, contractual tolling is permissible here. *See Heimeshoff*, 571 U.S. at 107.

Accepting the contractual tolling allegations as true, the statute of limitations was tolled from June 24, 2021, to February 28, 2025—for a total of about 3 years and 9 months. (*See* FAC ¶¶ 410–17.) Because the case was filed on February 27, 2025, there is no gap between the expiration of the Tolling Agreement and the commencement date. (*See* ECF No. 1.) Therefore, looking backward, the Court begins with the date the tolling agreement went into effect: June 24, 2021, and then subtracts the full four-year limitations period. *See Agency Holding Corp.*, 483 U.S. at 156. That means the earliest date Plaintiffs' RICO claims could have accrued and remained timely—the cutoff date—is June 24, 2017. *Cf. Hexcel Corp.*, 681 F.3d at 1060.



Some of the events described in the Complaint occurred after the cutoff date, but many events still arose beforehand during 2013 to 2016. (*See, e.g.*, FAC ¶¶ 8–12, 96–100, 169–71.) Defendants highlight those earlier allegations to argue Plaintiffs must have been aware of their RICO claims before June 24, 2017. To resolve this challenge, the Court starts by reviewing the Ninth Circuit's injury discovery rule for RICO claims. The Court then turns to when Plaintiffs' RICO claims allegedly accrued.

25cv0459

## 1. Injury Discovery Rule

"Accrual is the date on which the statute of limitations begins to run." *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). The Ninth Circuit has "faithfully followed the 'injury discovery' rule" for RICO claims. *Grimmett v. Brown*, 75 F.3d 506, 511 (9th Cir. 1996). Under this rule, the claim accrues based on discovery of the injury, not based on discovery of the last predicate act or the pattern of racketeering activity.[3] *Id.*; *see also Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("But in applying a discovery accrual rule, we have been at pains to explain that discovery of the injury, not discovery of the other elements of a claim, is what starts the clock.").

Consistent with this rule, the limitations clock starts "when a plaintiff knows or should know of the injury which is the basis for the action." *Stitt v. Williams*, 919 F.2d 516, 525 (9th Cir. 1990); *accord Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1415 (9th Cir. 1987); *see also Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 275 (9th Cir. 1988) (holding that a civil RICO claim accrues "when [the plaintiff has] actual or constructive knowledge of the fraud"). "Thus, the 'injury discovery' rule creates a disjunctive two-prong test of actual or constructive notice, under which the statute begins running under either prong." *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001).

### i. Actual Notice

Under the first prong of the injury discovery rule, a RICO claim accrues when the plaintiff has actual notice of the injury. *Pincay*, 238 F.3d at 1109. The stage-setting case is *Grimmett v. Brown*, 75 F.3d 506, 509 (9th Cir. 1996). There, Joanne Siragusa divorced her husband in 1983 and, as part of the divorce, relinquished her community property interest in his shares of several medical practices in exchange for monthly payments. *Id.*

---

[3] The limitations period for a criminal RICO charge runs from the most recent predicate act, but the Supreme Court rejected such a rule for civil RICO claims. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188 (1997). Then, in *Rotella v. Wood*, 528 U.S. 549, 553 (2000), the Court likewise rejected another relaxed rule—the injury and pattern discovery rule—which provided that "a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and a pattern of RICO activity." Although the Supreme Court did not "settle upon a final rule" for RICO claims, the Court left undisturbed the injury discovery rule used by the Ninth Circuit. *Id.* at 554 n.2.

25cv0459

at 509.  When he failed to pay, Siragusa obtained a state court judgment in 1987, and the ex-husband filed for bankruptcy in 1989.  *Id.*

That same year, the bankruptcy trustee filed an adversary complaint alleging that Siragusa's ex-husband, his attorney Patricia Brown, and others conspired to deprive Siragusa of her divorce proceeds by reorganizing the medical practices and using "secret side agreements" to pay the ex-husband.  *Grimmett*, 75 F.3d at 509.  Five years later, Siragusa filed a civil RICO action alleging that attorney Brown "masterminded the entire scheme."  *Id.*  The court dismissed the suit as untimely.  *Id.*

On appeal, Siragusa argued the suit was timely because she did not learn of Brown's pattern of racketeering until 1990—when another victim of the scheme came forward. *Grimmett*, 75 F.3d at 511.  The Ninth Circuit rejected this argument and applied the injury discovery rule, holding that the 1989 adversary complaint in bankruptcy court made it "clear that Siragusa knew in May 1989 that she had suffered injury."  *Id.* at 512.  Because Siragusa had actual notice of her injury on that date, she had until May 1993 to file suit. *See id.*  Dismissal was proper because she did not file her RICO case until November 1994. *Id.*

### ii.    Constructive Notice

Under the second prong of the injury discovery rule, a RICO claim accrues when the plaintiff "should know" of that injury.  *Grimmett*, 75 F.3d at 510.  Ordinarily, the court "leaves the question of whether a plaintiff knew or should have become aware of a fraud to the jury."  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005) (citation modified) (quoting *Beneficial Standard Life Ins. Co.*, 851 F.2d at 275).  However, a plaintiff is "deemed" to have constructive notice if the plaintiff "had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud."  *Id.* (quoting *Pincay*, 238 F.3d at 1110).

Two Ninth Circuit cases applying the constructive notice prong are instructional. First, in *Pincay v. Andrews*, 238 F.3d 1106, 1107 (9th Cir. 2001), the plaintiffs were "professional horse racing jockeys who have been inducted into the sport's Hall of Fame."

- 12 -

From 1969 to 1988, the defendant investment advisors and their company recommended the plaintiffs "dozens of investment opportunities, and they partook in many of these." *Id.* The relationship soured, and the plaintiffs sued, alleging a RICO claim based on the defendants taking "more than 5% of their yearly income" from the investments. *Id.* at 1110. A jury found in the plaintiffs' favor. *Id.*

On appeal, the Ninth Circuit held the verdict on the RICO claims must be reversed because the plaintiffs were deemed to have constructive notice of their injury. *Pincay*, 238 F.3d at 1110. The Ninth Circuit pinpointed written disclosures the plaintiffs received of the defendants' financial interest in many of the investments. *Id.*; *see also id.* at 1107–08. "It is hard to imagine what would constitute 'enough information to warrant an investigation' if receiving a written disclosure of one's purported injury does not." *Id.* at 1110. Therefore, as a matter of law, the appellate court held the plaintiffs "received constructive notice of their injuries at least as early as 1980," which made their RICO claims untimely. *Id.*; *see also Volk*, 816 F.2d at 1414–15 (affirming summary judgment on similar grounds).

Conversely, in *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 365 (9th Cir. 2005), the Ninth Circuit found there was a genuine issue of material fact as to whether the plaintiffs "knew of or should have discovered the fraud." That case arose from DuPont fraudulently withholding evidence of a contaminated fungicide, which had killed the plaintiffs' plants. *Id.* at 356–58. One key fact was that DuPont had been sanctioned in the District of Georgia for the fraud. *Id.* at 358. The district court reasoned the Hawaii-based plaintiffs "had constructive notice" of the fraud no later than the date of that sanctions order, which would have made the RICO claim untimely. *Id.*

The Ninth Circuit reversed. It reasoned there was a question of fact as to whether "the attention received" by the sanctions order issued in Georgia could be imputed to the Hawaiian plaintiffs as a matter of law. *Living Designs, Inc.*, 431 F.3d at 365. The court pointed to an analogous case that reasoned newspaper articles could not be relied upon as a matter of law to impute knowledge to the plaintiffs about reported environmental

25cv0459

contamination. *Id.* at 365–66 (citing *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1152–53 (9th Cir. 2002)). Further, the Ninth Circuit rationalized that the plaintiffs introduced "evidence that their attorney did not realize the import of the [sanctions] order until much later." *Id.* "This, along with other evidence in the record, [was] sufficient to create a triable factual issue as to whether these parties should have known about the alleged fraud when [the] sanction[s] order was issued." *Id.*

### 2. Plaintiffs' Discovery of Their Injury

<u>Injury</u>. To apply the injury discovery rule here, the Court starts by identifying Plaintiffs' alleged RICO injury. *See, e.g.*, *Pincay*, 238 F.3d at 1110. Plaintiffs allege they suffered an injury to their property when they "had their multi-million-dollar investments destroyed." (FAC ¶ 3.) They contend Defendants' alleged interference with CardioCell's fundraising efforts and Stemedica's failure to provide the promised stem cells for clinical trials "effectively destroyed Plaintiffs' investments and CardioCell." (*Id.* ¶ 366; *see also id.* ¶ 505.)

The CardioCell Defendants cast Plaintiffs' injury in a different light. They argue Plaintiffs' purported injury is "the diminution in value of their investment in CardioCell," which is "based on conduct dating back to 2013." (CardioCell Defs.' Mot. 7:23–8:1.) Meaning, from Defendants' vantage point, Plaintiffs suffered an injury when the value of their investments started to decrease, as opposed to when those investments were allegedly "destroyed" in the late 2010s. (*Id.*)

Defendants' argument is a reasonable one, but it depends on factual determinations that are inappropriate at the Rule 12(b)(6) stage. Indeed, it may very well be that, by the cutoff date, Plaintiffs' investments in CardioCell and the Stemedica subsidiaries were worth pennies on the dollar, and Plaintiffs were aware of that fact. If so, Plaintiffs potentially suffered a cognizable RICO injury before the cutoff date. But the Complaint does not include factual allegations to that effect. And to reach that conclusion, the Court would need to draw reasonable inferences in favor of Defendants, which is not the framework under Rule 12(b)(6). *See Shields v. Credit One Bank, N.A.*, 32 F.4th 1218, 1220

25cv0459

(9th Cir. 2022). Thus, at this stage, the Court accepts as true Plaintiffs' allegations regarding their RICO injury.

Actual Notice. Plaintiffs' RICO claims are untimely if they had actual notice of their injury outside of the limitations period. *Pincay*, 238 F.3d at 1109. Having read the hundred-page Complaint cover to cover, the Court concludes it does not reveal that Plaintiffs had actual notice of their injury before June 24, 2017. For example, the Complaint does not show instances where Defendants provided written disclosures to Plaintiffs stating that the investments would be destroyed. *See id.* at 1110. Nor does the Complaint reveal Plaintiffs were party to a prior proceeding where they raised this injury, which the Court could rely on to conclude they must have had notice by that date. *See Grimmett*, 75 F.3d at 512. Hence, as to the actual notice prong, the Court concludes the Complaint does not show the RICO claims accrued outside of the statute of limitations.

Constructive Notice. Alternatively, Plaintiffs' claims are time-barred if they "had enough information to warrant an investigation which, if reasonably diligent, would have led to discovery of the fraud." *See Living Designs, Inc.*, 431 F.3d at 365. Even at the pleadings stage, this prong is a closer call.

Plaintiffs argue the Complaint shows they did not have enough information to warrant an investigation until during the limitations period. (Opp'n to CardioCell Defs.' Mot. 3:9–11.) They highlight the Complaint's allegation that they "had no reason to suspect any issues or wrongdoing of any sort before July 27, 2018." (FAC ¶ 409.) That date is when Plaintiffs claim they first "realized that Stemedica was not planning to provide the funds and stem cells necessary for the critical clinical trials and instead was prioritizing delivery of stem cells to other companies." (*Id.* ¶ 182; *see also id.* ¶ 408.) Plaintiffs also point to Stemedica's failure on September 24, 2019, to make a $250,000 clinical trial payment, which was purportedly critical for CardioCell's survival. (*Id.* ¶ 289.) If Plaintiffs had notice of their injury as of either of these dates, their claims would be timely in light of the parties' Tolling Agreement discussed above.

25cv0459

Defendants, however, contend the lengthy Complaint shows Plaintiffs had knowledge of facts that would warrant an investigation into the alleged fraud before the cutoff date. Defendants are not short on ammunition. They rely on allegations that include:

o In the fall of 2014, a deal between CardioCell and AstraZeneca allegedly fell apart after Maynard Howe provided an "investor with highly sensitive, confidential information about the acquisition and AstraZeneca, a publicly-traded company." (FAC ¶ 344.) "According to CardioCell's CEO, after his meeting with Maynard Howe, the third-party investor called AstraZeneca to confirm the details about the CardioCell deal that Maynard Howe had provided." (*Id.* ¶ 345.) "When AstraZeneca learned that its highly confidential information had been leaked to third parties, it withdrew from the deal." (*Id.*)

o In August 2016, the Howe brothers represented to one of Plaintiffs "that a high-profile investor from Saudi Arabia and his son had obtained their country's government approval to invest $400 million in both Stemedica and CardioCell and that the money was already in the United States ready to be transferred to Stemedica and CardioCell." (FAC ¶ 169.) But after "they later confirmed that the Saudi Arabian investor had wired $400 million, the Howe brothers and Stemedica never contributed those funds to CardioCell, as promised." (*Id.* ¶ 171.) And despite Plaintiffs' "multiple inquiries regarding the $400 million wire transfer that seemed to have disappeared, the Howe brothers failed to provide an explanation, and it never became clear what happened to that enormous investment." (*Id.*)

o In 2017, CardioCell had "negotiated an investment deal with Bayer—the world's number one pharmaceutical company in the field of cardiovascular indications." (FAC ¶ 349.) "Bayer successfully completed the due diligence process and was ready to acquire CardioCell." (*Id.*) "However, just before the parties were able to close on the deal, the Tiara Lawsuit was filed against Stemedica, the Howe brothers, and Nikolai Tankovich accusing them of defrauding investors. As a result, Bayer withdrew from the deal." (*Id.* ¶ 350.)

o In the referenced Tiara Lawsuit, an investor in Stemedica—Tiara Holdings II, LLC—alleged "the Howe brothers had operated a nearly ten-year fraudulent investment scheme where they had raised over $110 million from investors for purportedly funding and establishing Stemedica, but instead used the investors' funds to benefit themselves." (FAC ¶ 372.) "Tiara alleged that the Howe brothers had concealed and perpetrated [the] fraud through the use of purported operating subsidiaries, which permitted them to divert millions of dollars to benefit themselves without raising questions or concerns from Stemedica's investors and shareholders." (*Id.* ¶ 373.)

(CardioCell Defs.' Mot. 9:9–12:4 & App. A.)

Defendants' constructive notice argument has considerable force, but like their injury argument above, it is not dispositive at this stage of the litigation. Under the default rule, the Court should leave the issue of whether Plaintiffs "knew or should have become aware of a fraud to the jury." *See Living Designs, Inc.*, 431 F.3d at 365. The Court agrees with Defendants that Plaintiffs' allegations suggest there may be enough information for a factfinder to determine Plaintiffs had constructive notice of their injury before the date they now allege in their Complaint. But when the allegations are construed in Plaintiffs' favor, there is not enough here for the Court to deviate from the default rule and deem that Plaintiffs had constructive knowledge before the cutoff date as a matter of law. *See id.*

Take, for example, Plaintiffs' allegations concerning the Tiara Lawsuit brought by other investors against Stemedica in Nevada state court. (FAC ¶¶ 372–77.) That lawsuit was filed in April 2017—only three-and-a-half months before the cutoff date. (*See id.* ¶ 372.) Plaintiffs allege they "immediately asked for an explanation from Roger Howe and Nikolai Tankovich," who told Plaintiffs that "the allegations were baseless and that the lawsuit would be dismissed." (*Id.* ¶ 377.) The case then settled. (*Id.* ¶ 375.)

When reasonable inferences are drawn in Plaintiffs' favor, the fact that several Defendants were accused of similar wrongdoing is not tantamount to DuPont being sanctioned for $115 million by a district court in *Living Designs, Inc.*, 431 F.3d at 358.

- 17 -

25cv0459

And in that case—where the court had the benefit of a summary judgment record—the Ninth Circuit still found there was a "genuine issue of material fact as to when [the plaintiffs] knew of or should have discovered the fraud." *Id.* at 365. The Court is limited to reviewing the Complaint here, and with that narrow prism, the Court cannot conclude the Tiara Lawsuit provided Plaintiffs with inquiry notice of their RICO injury. *Cf. E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392, 1400 (9th Cir. 1989) (reasoning that "[t]he filing by others of a similar lawsuit against the same defendants" is not equivalent "to actual or constructive knowledge of the . . . claim . . . 'because that suit might well be frivolous or baseless'" (quoting *In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1171 (5th Cir. 1979))).

Nor is the Court persuaded by Defendants' other arguments. Defendants contend the RICO statute of limitations should have started from the discovery of each of the predicate acts listed in the Complaint, such as the funds that allegedly disappeared from a Saudi Arabian investor in August 2016. (CardioCell Defs.' Mot. 8:8–12:4.) But the test is whether Plaintiffs had notice of their injury, not whether they had knowledge of one part of the pattern of racketeering activity. *See, e.g.*, *Grimmett*, 75 F.3d at 510. At this point, the Court cannot resolve the factual issue of whether this predicate act put Plaintiffs on constructive notice that their investments in several subsidiaries would later be destroyed. *See Living Designs, Inc.*, 431 F.3d at 365. Stated differently, when viewed under Rule 12(b)(6)'s framework, the Complaint does not reveal the RICO claims accrued in August 2016 as a matter of law.

Overall, given the parties' Tolling Agreement, Plaintiffs plausibly allege their RICO claims accrued within the limitations period under the Ninth Circuit's injury discovery rule.[4] It is not "apparent on the face of the complaint" that the claims are time-barred. *See*

---

[4] Because the Court resolves the Motions to Dismiss on this ground, the Court does not reach Plaintiffs' arguments concerning: (a) the Ninth Circuit's separate accrual rule, or (b) fraudulent concealment as a basis for tolling the statute of limitations. (*See* Opp'n to CardioCell Defs.' Mot. 9:28–15:7.)

25cv0459

*Thomas*, 124 F.4th at 1191.  Consequently, Defendants' statute of limitations defense is not persuasive at the pleadings stage.  *See id.*

### B.    Standing

The CardioCell Defendants next argue Plaintiffs lack standing under RICO because their injuries are derivative of CardioCell's injuries, and Plaintiffs do not satisfy RICO's proximate cause requirement. (CardioCell Defs.' Mot. 13:11–16:19.)  When plaintiffs sue under RICO, they must satisfy the statutory standing requirement.  *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th Cir. 2008).  RICO plaintiffs only have standing if, "and can only recover to the extent that," they have been injured in their "business or property by the conduct constituting the violation."  *Id.* (quoting *Sedima, S.P.R.L.*, 473 U.S. at 496).  Thus, to demonstrate statutory standing, the plaintiffs must allege: (1) that their alleged harm qualifies as an injury to their business or property; and (2) "that [their] harm was by reason of the RICO violation," which requires demonstrating proximate cause.  *Glob. Master Int'l Grp., Inc.*, 76 F.4th at 1271 (quoting *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1118–19 (9th Cir. 2017)).  The Court assesses each requirement in turn.

### 1.    Qualifying Injury

To satisfy the first statutory standing requirement, the plaintiffs must demonstrate "(1) harm to a specific property interest cognizable under state law, and (2) that the injury resulted in 'concrete financial loss.'"  *Glob. Master Int'l Grp., Inc.*, 76 F.4th at 1274 (citation omitted) (quoting *Canyon Cnty.*, 519 F.3d at 975); *see also Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc) ("Without a harm to a specific business or property interest—a categorical inquiry typically determined by reference to state law—there is no injury to business or property within the meaning of RICO.").  Moreover, the plaintiffs' injury must not be derivative.  *See Sparling v. Hoffman Const. Co.*, 864 F.2d 635, 640 (9th Cir. 1988), *abrogated on other grounds by Smith v. Spizzirri*, 601 U.S. 472, 473–74 & n.1 (2024).  For instance, if the plaintiffs are shareholders in a corporation, and the corporation

25cv0459

is the one that suffered the injury, the plaintiffs do not have standing under RICO to assert a claim for those indirect injuries. *Id.* at 640–41.

To illustrate, in *Sparling v. Hoffman Construction Co.*, the plaintiffs were the sole shareholders of a corporation that acted as a subcontractor for the construction of a high school. 864 F.2d at 636. As part of the project, the plaintiffs' corporation "provided payment and performance bonds" to the defendant general contractor. *See id.* Plaintiffs brought a RICO suit against the general contractor, but their individual claims were dismissed because the district court reasoned that any RICO claim belonged to the corporation that issued the performance bonds, not the individual shareholders.[5] *Id.* at 640. The plaintiffs appealed, arguing that because they were both shareholders and the "guarantors of the bonds given by [the corporation], they had standing to bring the RICO claim." *Id.* at 640.

The Ninth Circuit affirmed the dismissal, joining other circuits "in holding that there is no shareholder standing to assert RICO claims where the harm is derivative of harm to the corporation." *Sparling*, 864 F.2d at 636. "If it is derivative, the shareholder has no standing to assert the RICO claim." *Id.* The Ninth Circuit reasoned that the individual plaintiffs "must show either an injury distinct from that to other shareholders or a special duty between [the defendant] and the [individual plaintiffs] if they are to have standing to assert RICO claims based on injury to the corporation." *Id.* Because the wrong alleged in *Sparling* was "a fraud on the corporation," and because the individual plaintiffs could not "show an injury distinct from that to other shareholders," they could not demonstrate standing. *Id.*; *cf. Pan Pac. Retail Props., Inc. v. Gulf Ins. Co.*, 471 F.3d 961, 967 (9th Cir. 2006) ("The derivative claims sought relief based on injuries to the corporation and only indirectly to the shareholders, in particular the decreased consideration paid for the shareholders' shares.").

---

[5] The plaintiffs' wholly owned corporation also brought a RICO claim against the defendant, but the trial court dismissed that claim because it was subject to arbitration. *See Sparling*, 864 F.2d at 637.

25cv0459

The CardioCell Defendants argue *Sparling* and similar decisions are on all fours here. (CardioCell Defs.' Mot. 13:11–15:16.) They contend the Complaint contains "numerous allegations that make it clear that CardioCell was the actual target of Defendants' alleged wrongdoing." (*Id.*) And when CardioCell failed to perform, Defendants argue Plaintiffs were "harmed the same way as any other investor." (*Id.*)

The Court is unconvinced, as it appears the Complaint was carefully crafted with this potential roadblock in mind. The Complaint includes many factual allegations about actions taken towards Plaintiffs individually, as opposed to the CardioCell entity. As summarized in one paragraph:

> Plaintiffs were directly damaged by Defendants' actions because Defendants manipulated Plaintiffs in a unique way and caused them to increase their investment to $20 million by creating the impression that Plaintiffs were investing in a diverse portfolio of four Stemedica subsidiaries, each focused on different stem cell indications and different multi-billion-dollar products, including cardiovascular and skin therapeutic products. Defendants subsequently persuaded Plaintiffs that it was in Plaintiffs' best interest to roll all of their interest into CardioCell by exchanging their subsidiaries' shares for CardioCell shares. Defendants then collapsed CardioCell and eliminated Plaintiffs from the picture. Importantly, before Plaintiffs invested in CardioCell, CardioCell had no funds, so Plaintiffs' investment was the one used to establish CardioCell and generate the valuable clinical data and launch the clinical trials. No other CardioCell shareholder was targeted, manipulated, and damaged like Plaintiffs.

(FAC ¶ 35.) Supporting factual allegations for these claims are found throughout the Complaint. (*See generally id.* ¶¶ 77–407.) Plaintiffs also claim that some of the predicate acts occurred before they invested in CardioCell, such as when certain Defendants allegedly provided Plaintiffs with a business plan containing false and misleading statements about clinical trials and the value of the business's technology. (*Id.* ¶ 503.) Accepting these allegations as true, Plaintiffs plausibly plead they were injured not simply because of "a fraud on [CardioCell]," but rather because they suffered a distinct injury. *See Sparling*, 864 F.2d at 636.

25cv0459

Moreover, it is difficult to squarely fit Plaintiffs' allegations into the garden-variety shareholder case. *Sparling*, 864 F.2d at 636. Plaintiffs' allegation that they were personally targeted to combine their large equity interests in several different subsidiaries into CardioCell through a fraudulently induced contract suggests they suffered "an injury distinct from that to other shareholders." *See id.* at 641. Consequently, the Court is unpersuaded by the CardioCell Defendants' challenge to the first component of statutory standing for RICO.

### 2. Causation

In *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992), the Supreme Court interpreted the phrase "by reason of" in 18 U.S.C. § 1964(c) to require, as elements for a civil RICO recovery, both proximate and but-for causation. "The requirement of proximate cause seeks to 'limit a person's responsibility for the consequences of that person's own acts.'" *Takeda Pharms. Co.*, 943 F.3d at 1248 (quoting *Holmes*, 503 U.S. at 268). "Put another way, 'the proximate-cause requirement generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct.'" *Id.* (citation modified) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).

Hence, this requirement "demand[s] . . . some direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268. The Ninth Circuit uses three factors from *Holmes* to gauge this requirement. *See Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (listing factors). "When factual questions control the outcome of the analysis," the plaintiffs "must be allowed to make their case through presentation of evidence." *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150, 1172 (D. Alaska 2025) (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002)).

The CardioCell Defendants argue there is not a sufficient link between Plaintiffs' injury and Defendants' alleged conduct. (CardioCell Defs.' Mot. 15:17–16:10.) Defendants contend Plaintiffs' allegations show "CardioCell was destroyed by

25cv0459

Stemedica's numerous contract breaches." (*Id.*)  Defendants thus argue the but-for cause of Plaintiffs' injuries is Stemedica's failure to perform on its stem cell commitments, not the purported racketeering activity.  (*Id.*)

This argument is missing the persuasive force found in some of Defendants' other plausibility challenges.  Plaintiffs allege Defendants controlled Stemedica and caused the purported breaches as part of the fraudulent scheme, as well as that multiple Defendants personally engaged in fraud.  (*See, e.g.*, FAC ¶¶ 490, 503.)  Plaintiffs plausibly allege that Defendants' conduct was the but-for cause of their injuries.  And they "have satisfactorily alleged that Defendants proximately caused their claimed damages at the pleadings stage."  *See Takeda Pharms. Co.*, 943 F.3d at 1260.  The Court thus denies Defendants' Rule 12(b)(6) challenge on this ground.[6]

## C.    Pattern of Racketeering Activity

David Howe and the CardioCell Defendants' Motions challenge whether Plaintiffs sufficiently plead a pattern of racketeering activity—the third and fourth elements of a RICO claim.  *See Glob. Master Int'l Grp., Inc.*, 76 F.4th at 1271.  A pattern of racketeering activity is "a series of related predicates that together demonstrate the existence or threat of continued criminal activity."  *RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325, 330 (2016) (citing *H.J. Inc.*, 492 U.S. at 239).  Such acts are "known as predicate acts."  *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015).  There are two potential pleading defects with this component of Plaintiffs' RICO claims.

---

[6] Defendants also argue the RICO claims fail because Plaintiffs' allegations "(1) demonstrate that the alleged fraudulent misrepresentations underlying the RICO claims were true, and (2) contradict their theory that Defendants secretly planned from the outset to 'systematically destroy' CardioCell." (CardioCell Defs.' Mot. 16:20–18:12 (quoting FAC ¶ 10).)  This attack is a nonstarter under Rule 12(b)(6).  The Complaint alleges the statements were fraudulent not because CardioCell and the subsidiaries' "intellectual property was worthless and had no potential, but because Defendants allegedly intended to induce the investment under false pretenses and then systematically destroy the subsidiaries and CardioCell by depriving them of resources while retaining their valuable intellectual property." (FAC ¶ 10.)  Defendants' argument requires the Court to construe the Complaint in their favor, which the Court cannot do here.  *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 989 (9th Cir. 2009).

- 23 -

25cv0459

### 1.     David Howe's Predicate Acts

David Howe moves to dismiss the substantive RICO claim, arguing the Complaint does not sufficiently allege he committed a predicate act.  (D. Howe's Mot. 6:24–10:23.)  RICO's definition of racketeering activity includes "any act or threat involving . . . bribery . . . which is chargeable under State law and punishable by imprisonment for more than one year."  18 U.S.C. § 1961(1)(A).

The Complaint lists twenty predicate acts, some of which the Court excerpted above. (FAC ¶ 503.)  As to David Howe, the Complaint invokes California's commercial bribery statute, California Penal Code section 641.3(c).  (*Id.*)  This offense is punishable by imprisonment not to exceed one year if the bribe is one thousand dollars or less, but a longer sentence is authorized "if the amount of the bribe exceeds one thousand dollars."  Cal. Penal Code § 641.3(c).  Therefore, for bribes that are over a thousand dollars, California's commercial bribery offense qualifies as "racketeering activity" under RICO. *See* 18 U.S.C. § 1961(1)(A); *see also Bunnett & Co., Inc. v. Gearheart*, No. 17-cv-01475-RS, 2018 WL 1070298, at *5 (N.D. Cal. Feb. 27, 2018) (analyzing alleged California commercial bribery predicates for a civil RICO claim).

So, California's commercial bribery law fits into RICO's mold, but Plaintiffs must plausibly plead David Howe committed that offense as part of the pattern of racketeering activity. *See, e.g.*, *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 531 n.7 (9th Cir. 1987) ("In addition, the plaintiff must also prove the elements of the predicate act.").  The commercial bribery statute provides:

> Any employee who solicits, accepts, or agrees to accept money or any thing of value from a person other than his or her employer, other than in trust for the employer, corruptly and without the knowledge or consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives an employee money or any thing of value under those circumstances, is guilty of commercial bribery.

Cal. Penal Code § 641.3(a).  Under this offense, "employee" is defined as "an officer, director, agent, trustee, partner, or employee." *Id.* § 641.3(d)(1).  The offense also defines

- 24 -

"corruptly" as a specific intent to defraud "(A) his or her employer, (B) the employer of the person to whom he or she offers, gives, or agrees to give the money or a thing of value, (C) the employer of the person from whom he or she requests, receives, or agrees to receive the money or a thing of value, or (D) a competitor of any such employer." *Id.* § 641.3(d)(3).

The "corruptly" element "does not necessarily require proof of intent to injure." *People v. Riley*, 240 Cal. App. 4th 1152, 1163 (2015). "An intent to defraud is an intent to deceive another person for the purpose of gaining a material advantage over that person or to induce that person to part with property or alter that person's position by some false statement, false representation of fact, wrongful concealment or suppression of the truth, or by any artifice or act designed to deceive." *Id.* (quoting *People v. Pugh*, 104 Cal. App. 4th 66, 72 (2002)). Such an intent can also be shown through a "dishonest stratagem." *Id.* (quoting *People v. Dieguez*, 89 Cal. App. 4th 266, 279 (2001)).

According to the Complaint, David Howe worked for Stemedica between 2005 and 2011 as its Senior Vice President and Medical Director. (FAC ¶ 56.) However, when it comes to describing David Howe's relationship with Stemedica after 2011, the Complaint is vague. (*See id.*) Plaintiffs allege that after 2011, David Howe "remained associated" with the entity "by means of recruiting U.S. patients for NovaStem and Rivadavia's cardiovascular and other stem cell treatments at Clinica Santa Clarita and other clinics in Mexico using Stemedica's stem cells," and he was identified as a "medical consultant" for Stemedica. (*Id.*) As for how David Howe contributed to the RICO violation, the Complaint alleges in the sixteenth predicate act that:

> Between 2013 and 2020, Maynard Howe, Roger Howe, and David Howe repeatedly recruited U.S. patients for cardiovascular and other stem cell treatments in Mexico and elsewhere using Stemedica's stem cells. In exchange, David Howe received payments in the amount of approximately $10,000 per patient without knowledge of Stemedica and/or Stemedica's shareholders. David Howe committed this predicate act multiple times, as detailed herein.

(*Id.* ¶ 503.)

25cv0459

David Howe contends the Complaint is missing the necessary allegation that he was an officer, director, agent, trustee, partner, or employee of Stemedica from 2013 to 2020. (D. Howe's Mot. 7:19–8:1.)  He also contends the Complaint does not adequately allege he acted "corruptly" within the meaning of the commercial bribery statute. (*Id.* 8:1–4.)  In response, Plaintiffs posit that David Howe acted as an "agent" within the meaning of the statute by recruiting patients for medical tourism, and they argue the Complaint sufficiently alleges Howe was part of the overarching RICO scheme.  (Opp'n to D. Howe's Mot. 19:3–24:2.)  The parties also tussle over whether Rule 9(b)'s particularity requirement should apply to this claim, but that issue is not dispositive.

Under Rule 12(b)(6), the Court agrees that Plaintiffs do not allege a plausible commercial bribery offense involving David Howe.  The Complaint lacks non-conclusory allegations demonstrating David Howe acted as an "employee" of Stemedica within the meaning of California Penal Code section 641.3(d)(1).  Plaintiffs claim he was an "agent," but that is a legal conclusion, which must be supported by the attendant factual allegations. *See, e.g.*, *Falcocchia v. Saxon Mortg., Inc.*, 709 F. Supp. 2d 860, 864 n.4 (E.D. Cal. 2010); *see also Iqbal*, 556 U.S. at 680–81.

Further, although the Complaint rivals a tome, the Court does not discern allegations demonstrating that David Howe acted corruptly with a specific intent to defraud within the meaning of California Penal Code section 641.3(d)(3).  Therefore, David Howe's arguments are persuasive, and the Court grants his Motion to Dismiss the ninth claim.  And because Plaintiffs do not allege a substantive RICO violation against David Howe, the Court also grants his request to dismiss the tenth claim for RICO conspiracy. *See Sanford*, 625 F.3d at 559.  The Court has not previously addressed these claims against David Howe, so they are dismissed with leave to amend.  *See* Fed. R. Civ. P. 15(a); *see also Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004) (listing the five leave-to-amend factors).

- 26 -

25cv0459

## 2. The CardioCell Defendants' Pattern

The CardioCell Defendants contend the Complaint fails to sufficiently allege the pattern element of the RICO claim against them. (CardioCell Defs.' Mot. 18:13–19:9.) A pattern under RICO "requires at least two acts of racketeering activity" within a ten-year period. 18 U.S.C. § 1961(5). The statute's "statement that a pattern 'requires at least' two predicates implies 'that while two acts are necessary, they may not be sufficient.'" *H.J. Inc.*, 492 U.S. at 237 (quoting *Sedima, S.P.R.L.*, 473 U.S. at 497 n.24). Thus, RICO's statutory requirement "concerns only the minimum *number* of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved." *Id.* at 238.

To allege a pattern, the plaintiffs "must show that the racketeering predicates are related, *and* that they amount to or pose [an implicit or explicit] threat of continued criminal activity." *United States v. Freeman*, 6 F.3d 586, 596 (9th Cir. 1993) (quoting *H.J. Inc.*, 492 U.S. at 239); *see also id.* at 597. These two elements are referred to as "relatedness" and "continuity." *H.J. Inc.*, 492 U.S. at 239–40.

"Racketeering predicates are related if they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *Freeman*, 6 F.3d at 596 (quoting *H.J. Inc.*, 492 U.S. at 233). "Continuity," on the other hand, "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241–42.

Plaintiffs' RICO claim relies on over five hundred paragraphs of allegations and identifies twenty predicate acts under 18 U.S.C. § 1962(c). Having sorted the predicates into their proper bins, the Court notes the five CardioCell Defendants are implicated in the following acts:

- o Maynard Howe: Acts 1, 2, 3, 4, 5, 8, 9, 10, 12, 16, 17, and 20.
- o Roger Howe: Acts 1, 2, 3, 5, 6, 7, 8, 10, 12, 16, and 20.

25cv0459

o   Nikolai Tankovich: Acts 1, 2, 3, 4, 5, 6, 8, and 20.

o   Craig Carlson: Acts 11 and 12.

o   Dirk O'Hara: Acts 10 and 12.

(*See* FAC ¶ 503.)

The CardioCell Defendants argue that even though Plaintiffs allege numerous predicate acts, Plaintiffs "fail to sufficiently assert how they are related or the existence of continuity."   (CardioCell Defs.' Mot. 18:13–19:9.)   The Court finds this argument is persuasive as to some—but not all—of these Defendants.

### i.      The Howe Brothers and Nikolai Tankovich

With respect to Defendants Maynard Howe, Roger Howe, and Nikolai Tankovich, the Court is satisfied that Plaintiffs sufficiently plead both elements to satisfy RICO's pattern requirement.  The Complaint ties these three Defendants to numerous predicate acts that span multiple years and several phases of the alleged scheme.  (*See* FAC ¶ 503.)  At the Rule 12(b)(6) stage, those allegations are sufficient to support both the relatedness and continuity requirements under RICO.

Starting with relatedness, the alleged predicates are not isolated or disconnected events.  The Complaint alleges that, beginning in 2013, Maynard Howe, Roger Howe, and Nikolai Tankovich repeatedly made false statements to Plaintiffs about CardioCell's value, clinical progress, exclusivity, and commercialization prospects during meetings, calls, written business materials, and presentations. (FAC ¶ 503.)  Plaintiffs further allege that: (1) Roger Howe and Nikolai Tankovich entered into secret agreements from 2014 to 2018 to sell CardioCell's exclusive cardiovascular rights without CardioCell's knowledge; (2) Roger Howe and the others made additional false statements in March 2018 to induce Plaintiffs to exchange valuable shares into additional equity in CardioCell; and (3) Maynard Howe allegedly attempted to extort CardioCell's CEO in May 2018 to pressure Plaintiffs into a highly unfavorable deal.  (*Id.*)  Read together, those allegations plausibly describe acts with the "same or similar purposes," including inducing or coercing

- 28 -

25cv0459

Plaintiffs' investment decisions, diverting or encumbering CardioCell's rights for Stemedica's benefit, and concealing the resulting harm.  *See Freeman*, 6 F.3d at 596.

As for continuity, the Complaint alleges all three Defendants engaged in repeated fraudulent conduct starting in 2013, and it alleges that Roger Howe and Nikolai Tankovich continued the scheme through secret agreements lasting from 2014 to 2018.  (*See* FAC ¶ 502.)  The pleading further alleges that: (1) all three participated in the March 1, 2018, consolidation-related misrepresentations; (2) Maynard Howe engaged in the May 3, 2018, extortion of CardioCell's CEO; and (3) all three participated in the alleged February 2025 transfer of Stemedica and its assets "to avoid liability to Plaintiffs and other creditors." (*Id.*)  Those allegations, taken as true, describe more than a short-lived burst of purported criminal activity.  They depict repeated predicate conduct extending over years, which is enough to support continuity at the pleading stage.  *See H.J. Inc.*, 492 U.S. at 241–42. Accordingly, the Court denies Maynard Howe, Roger Howe, and Nikolai Tankovich's Motion to Dismiss the RICO claims based on the pattern requirement.

### ii.    Craig Carlson and Dirk O'Hara

In contrast, the Complaint does not adequately allege a RICO pattern as to Defendant Craig Carlson or Defendant Dirk O'Hara.  The Complaint names each of them in two alleged predicate acts, but that alone is insufficient.  *See H.J. Inc.*, 492 U.S. at 237. Plaintiffs also must satisfy the relatedness and continuity elements.  *See Freeman*, 6 F.3d at 596.

As to Craig Carlson, the Complaint first alleges that on September 4, 2018, Carlson emailed Plaintiff Leshkov with a falsified amendment to the ALTACO Agreement to show that the stem-cell-based cardiovascular indication was excluded from that agreement.[7]

---

[7]  The ALTACO Agreement is allegedly a "manufacturing and distribution agreement with a Kazakhstan company, ALTACO." (FAC ¶ 189.)  Under the ALTACO Agreement, Stemedica allegedly granted ALTACO "exclusive rights for all stem cell indications, including cardiovascular indications, in Kazakhstan, Kyrgyzstan, Uzbekistan, Tajikistan, and Turkmenistan." (*Id.* ¶ 191.)  Plaintiffs contend this agreement violated the exclusive license that Stemedica granted CardioCell for the manufacturing, exploration, and commercialization of cardiovascular therapy using stem cells across the globe. (*Id.* ¶ 193; *see also id.* ¶ 7.)

25cv0459

(FAC ¶ 503.)  Second, the Complaint alleges more generally that between May 2018 and March 2019, Carlson, along with others, made false statements by phone and email that Stemedica would amend the Rivadavia Agreement, and those statements were purportedly made to induce Plaintiffs to enter into amendments to the Equity Exchange Agreement.[8] (*Id.*)  Under that deal, Plaintiffs consolidated their investments into CardioCell by exchanging their ownership interests in other Stemedica subsidiaries for additional shares in CardioCell.  (*See id.* ¶ 21; *see also id.* ¶¶ 218–49.)

As to Dirk O'Hara, the pleading is similarly narrow.  It alleges that he participated in a May 4, 2018, conference call proposing two allegedly sham deal options, and that he joined the same generalized misrepresentations regarding amending the Rivadavia Agreement during May 2018 to March 2019 to induce Plaintiffs to modify the Equity Exchange Agreement.  (FAC ¶ 503.)

Even assuming those alleged acts are sufficiently related, the Complaint does not plausibly allege continuity as to either Defendant.  The allegations against O'Hara span from May 2018 to March 2019, and the allegations against Carlson are confined to that same general period, with a specific September 2018 email, plus the broader May 2018-to-March 2019 misrepresentations.  (*See* FAC ¶ 503.)  That is a short, closed period tied to a discrete commercial objective: persuading Plaintiffs to accept particular deal terms, amendments, or positions regarding the ALTACO and Rivadavia arrangements and the Equity Exchange Agreement.  Nothing in the alleged facts suggests that Carlson's or O'Hara's alleged conduct extended beyond that period, or that their alleged acts projected into the future with a threat of repetition.  *See Freeman*, 6 F.3d at 596 (explaining continuity requires showing the related acts "pose a threat of continued criminal activity").

---

[8] Like the ALTACO Agreement, the Rivadavia Agreement is allegedly a master manufacturing and distribution agreement with Rivadavia, which granted Rivadavia exclusive rights for all stem cell indications in Mexico.  (FAC ¶ 196.)  Plaintiffs similarly allege that this side agreement violated CardioCell's exclusive license from Stemedica.  (*Id.* ¶¶ 196–200.)

25cv0459

This deficiency is sharpened by the absence of broader, non-conclusory allegations that connect either Defendant to the longer-running predicate acts that are pleaded against other Defendants. Carlson is not alleged to have participated in the 2013–2014 investment-pitch misrepresentations, the 2014–2018 secret rights agreements, the March 2018 extortion allegations, the 2020–2021 financial statement allegations, or the alleged fraudulent transfer. (*See* FAC ¶ 503.) O'Hara likewise is not named in those earlier or later predicate acts. (*See id.*) Thus, Carlson and O'Hara are linked to a handful of acts clustered around about a year, all of which are directed toward a related dispute that allegedly involved fraud on Plaintiffs in connection with the Equity Exchange Agreement. (*See id.*)

Given these allegations, Plaintiffs plead Carlson and O'Hara participated in a limited episode of activity, but not the kind of continued criminal activity that RICO's pattern requirement demands. *See H.J. Inc.*, 492 U.S. at 243 ("Congress was concerned in RICO with long-term criminal conduct."). Thus, the Complaint does not plead a plausible RICO claim against these Defendants, and the Court grants Carlson and O'Hara's Motion to Dismiss the RICO claims.[9]

## II.    State Law Causes of Action

Looking beyond the RICO claims, Plaintiffs allege ten state law causes of action. Both parties cite Delaware law for the third claim for breach of fiduciary duty against the CardioCell Defendants. (*See* CardioCell Defs.' Mot. 23 n.10; Opp'n to CardioCell Defs.' Mot. 22:12–13.) The parties apply California law to the remaining claims. (*See generally* CardioCell Defs.' Mot.; Steinhauser's Mot.; Opp'n to CardioCell Defs.' Mot.) The Court

---

[9] Because Plaintiffs do not plead a substantive violation of RICO against Craig Carlson or Dirk O'Hara, the Court is unconvinced that Plaintiffs plead a plausible RICO conspiracy against these Defendants. There are insufficient factual allegations demonstrating that Carlson and O'Hara knew about and agreed to facilitate the alleged sprawling RICO scheme. *Cf. Salinas v. United States*, 522 U.S. 52, 65 (1997) ("The evidence showed that Marmolejo committed at least two acts of racketeering activity when he accepted numerous bribes and that Salinas knew about and agreed to facilitate the scheme. This is sufficient to support a conviction under § 1962(d).").

25cv0459

follows the parties' lead. *Cf. Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006).

### A.    Statute of Limitations

As an initial matter, the CardioCell Defendants raise a parallel challenge to the state law fraud and breach of fiduciary duty claims on statute of limitations grounds. (CardioCell Defs.' Mot. 19:6–21:2.)  This argument is unavailing for many of the same reasons the Court discussed above when assessing the timeliness of the RICO claims.  Both California and Delaware law allow for contractual tolling.  *See Wind Dancer Prod. Grp. v. Walt Disney Pictures*, 10 Cal. App. 5th 56, 78–80 (2017); *ISN Software Corp. v. Richards, Layton & Finger, P.A.*, 226 A.3d 727, 737 (Del. 2020).  Each jurisdiction has a "discovery rule" that may delay accrual of Plaintiffs' claims or toll the statute of limitations, and each rule can be triggered by inquiry notice.  *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 808 (2005) ("The discovery rule only delays accrual until the plaintiff has, or should have, inquiry notice of the cause of action."); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (noting that under Delaware's discovery rule, the limitations period is tolled, and it runs on discovery of the basis of the cause of action or of facts sufficient to put a person on notice).

The Court again underscores that it is only appropriate to dismiss Plaintiffs' state law claims "when the running of the statute of limitations is apparent on the face of the complaint." *See Thomas*, 124 F.4th at 1191.  Considering the parties' Tolling Agreement, as well as allegations in the Complaint that support application of the respective jurisdictions' discovery rules, the Court finds Plaintiffs' state law fraud and breach of fiduciary duty claims are not subject to dismissal under Rule 12(b)(6) on this basis. *See id.*

### B.    Fraudulent Inducement

Several of the CardioCell Defendants seek dismissal of Plaintiffs' two claims for fraudulent inducement. (CardioCell Defs.' Mot. 21:3–22:16.)  "Fraud in the inducement" occurs when the promisors know what the agreement they are signing contains, but their consent is induced by fraud. *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 415

- 32 -

25cv0459

(1996).    To prove a claim of fraudulent inducement, plaintiffs must show: (1) a misrepresentation, false representation, concealment, or nondisclosure, (2) knowledge of falsity; (3) intent to defraud or to induce plaintiffs to enter into a contract; (4) justifiable reliance; and (5) resulting damage.  *See Lazar v. Superior Ct.*, 12 Cal. 4th 631, 638 (1996).

Plaintiffs' first cause of action is for "fraudulent inducement to invest in CardioCell" against Maynard Howe, Roger Howe, and Nikolai Tankovich.    (FAC ¶¶ 419–26.) Plaintiffs allege these Defendants made misrepresentations, including that "CardioCell had $35 million of stem cells at its disposal and did not have to manufacture any stem cells for the duration of the clinical trials," and that "CardioCell had the exclusive worldwide license for the cardiovascular indication and stem cell manufacturing know-how."  (*Id.* ¶ 421.)

Under Plaintiffs' second claim, they allege they were fraudulently induced to enter into the Equity Exchange Agreement.  (FAC ¶¶ 427–49.)  Plaintiffs contend "the Howe brothers made false statements to Leshkov and Vikhrieva about the value of the [Stemedica] subsidiaries as to induce them to roll their interest in the subsidiaries into CardioCell."  (*Id.* ¶ 428.)

The CardioCell Defendants generally argue the two fraudulent inducement claims lack plausibility because "Plaintiffs' own allegations concede Defendants' alleged statements about the potential of CardioCell were not false."  (CardioCell Defs.' Mot. 21:12–14.)  This argument was unpersuasive when Defendants levied it against the RICO claims above, and it remains unpersuasive here.  The Court cannot construe the Complaint in Defendants' favor.  Their other arguments are similarly unpersuasive. (*See id.* 21:3–22:16.)  Hence, the Court denies Maynard Howe, Roger Howe, and Nikolai Tankovich's Motion to Dismiss the first cause of action.  The Court likewise denies Defendants Roger Howe and Maynard Howe's Motion to Dismiss the second cause of action.

However, having applied Rules 12(b)(6) and 9(b), the Court is not persuaded that the second cause of action states a fraudulent inducement claim against the other named Defendant, Dirk O'Hara.  Plaintiffs allege O'Hara committed fraud because he offered Plaintiffs "two deals that made no economic sense," which were intended to deceive

- 33 -

Plaintiffs "about their options with respect to the subsidiaries." (FAC ¶ 433.) O'Hara allegedly "proposed the two unacceptable deals to induce Leshkov and Vikhrieva to enter into a deal consolidating their interest in the subsidiaries into CardioCell as the only viable option." (*Id.* ¶ 434.) The Court is unpersuaded that Plaintiffs adequately plead O'Hara made "a misrepresentation" under Rules 12(b)(6) and 9(b). *See Lazar*, 12 Cal. 4th at 638. Nor is the Court convinced that Plaintiffs plausibly plead "justifiable reliance" for this claim. *See Lazar*, 12 Cal. 4th at 638. The Court thus dismisses the second claim against O'Hara with leave to amend.

### C. Fraudulent Concealment

In the same vein, Defendants Roger Howe and Nikolai Tankovich attack the plausibility of the fifth cause of action for fraudulent concealment. "The required elements for fraudulent concealment are (1) concealment or suppression of a material fact; (2) by a defendant with a duty to disclose the fact; (3) the defendant intended to defraud the plaintiff by intentionally concealing or suppressing the fact; (4) the plaintiff was unaware of the fact and would have acted differently if the concealed or suppressed fact was known; and (5) plaintiff sustained damage as a result of the concealment or suppression of the material fact." *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024).

In moving to dismiss this claim, Roger Howe and Nikolai Tankovich again make factual arguments that the Court finds are unsuitable for resolution at the pleadings stage. Defendants focus on one aspect of the fraudulent concealment claim—the lead up to the Equity Exchange Agreement—to argue Plaintiffs must have been aware of the allegedly concealed facts. (*See* CardioCell Defs.' Mot. 23:1–19.) This argument relies on a restrictive interpretation of the claim that is not supported by the Complaint or Rule 12(b)(6)'s framework. (*See* FAC ¶¶ 454–65.) Because Defendants' plausibility challenge misses the mark, the Court denies the Motion to Dismiss the fifth cause of action for fraudulent concealment.

25cv0459

### D.      Breach of Fiduciary Duty

The Court switches gears from the fraud claims to the breach of fiduciary duty claim. Under Delaware law, a claim "for breach of fiduciary duty has only two formal elements: (i) the existence of a fiduciary duty and (ii) a breach of that duty." *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1191 (Del. Ch. 2025).

The CardioCell Defendants draw the Court's attention to the breach of fiduciary duty claim and raise arguments under Rule 12(b)(6). (CardioCell Defs.' Mot. 23:20–24:23.) However, having reviewed the claim, the Court finds it is subject to dismissal under Rule 8. The breach of fiduciary duty claim starts to run afoul of Rule 8 when the Complaint bundles all five CardioCell Defendants together. (FAC ¶ 441.) Then, in one paragraph, the Complaint alleges those five CardioCell Defendants

> breached their fiduciary duties by, inter alia: (i) failing to disclose and concealing the Organismo Agreement, Rivadavia Agreement, and ALTACO Agreement; (ii) causing Stemedica to enter into those agreements and provide CardioCell's rights and stem cells to Organismo, Rivadavia, and ALTACO at CardioCell's expense; (iii) making misrepresentations and misleading statements to CardioCell's shareholders, Leshkov and Vikhrieva, about CardioCell's potential and independence as to induce them to enter into the Equity Exchange Agreement and roll their $15 million interest in StemProtein, StemCutis, and Stemedica International into CardioCell; (iv) making misrepresentations about CardioCell's potential business deals with JZT and their revenue-generating potential; (v) failing to assist CardioCell with resolving Stemedica's inadequate stem cell supply to CardioCell; (vi) failing to assist with returning the CardioCell rights for Mexico; (vii) failing to answer investors' questions about stem cell availability to CardioCell required to complete the clinical trials; (viii) interfering with CardioCell's fund-raising efforts; and (ix) failing to disclose that Stemedica's plan was to deprive CardioCell of funds and stem cells and prevent the completion of the clinical trials and commercialization of the products.

(FAC ¶ 444.)

As the Ninth Circuit has made clear, this claim is subject to dismissal as a disfavored "shotgun pleading." *See Gibson v. City of Portland*, 165 F.4th 1265, 1288 (9th Cir. 2026). The third cause of action asserts multiple breach of fiduciary duty claims "against multiple

25cv0459

defendants without specifying which of the defendants are responsible for which acts or omissions." *See id.* (quoting 35A C.J.S. *Fed. Civ. Proc.* § 310 (2025)). The claim also incorporates by reference the Complaint's 439 paragraphs of prior allegations, which is another indicator of a shotgun pleading. (FAC ¶ 440.) *See Gibson*, 165 F.4th at 1288. And although breach of fiduciary duty claims can be based on group action taken by a company's directors, most of Plaintiffs' allegations do not fit into that bucket. *See Smith v. Van Gorkom*, 488 A.2d 858, 893 (Del. 1985).

To untangle the alleged violations, the Court would need to sift through hundreds of paragraphs of allegations and match each potential breach of fiduciary duty to the respective CardioCell Defendant. The Court declines to do so. *See Gibson*, 165 F.4th at 1290 ("Rule 8 provides district courts with an additional *tool* that they *may* use to dismiss shotgun pleadings when identified—not a *rule* necessarily *requiring* district courts to do so, however prudent it may be."). Therefore, the Court dismisses this claim with leave to amend under Rule 8(a).

### E. Fraudulent (Voidable) Transfer

Three of the CardioCell Defendants and Michael Steinhauser move to dismiss the Complaint's eighth cause of action. In that claim, Plaintiffs allege Roger Howe, Maynard Howe, Nikolai Tankovich, and Michael Steinhauser aided and abetted a violation of California's law governing voidable transfers. (FAC ¶¶ 480–87.) "California's version of the Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq.; UVTA) governs claims for voidable or fraudulent transfers—transfers that invalidly place certain property beyond the reach of the original owner's creditors." *MACH-1 RSMH, LLC v. Darras*, 103 Cal. App. 5th 1288, 1292–93 (2024). "The UVTA is a contemporary retooling of the common law remedies available to unsecured creditors seeking payment from debtors who evade collection." *Nagel v. Westen*, 59 Cal. App. 5th 740, 747 (2021). "Originally enacted as the Uniform Fraudulent Transfer Act in 1986, its retitling in 2016 reflected the Legislature's intent to reduce misconceptions that the law requires proof of fraudulent intent." *Id.* (citation modified).

- 36 -

25cv0459

"The UVTA sets forth the elements of a claim challenging the transfer of a debtor's asset." *Darras*, 103 Cal. App. 5th at 1300 (citing Cal. Civ. Code §§ 3439.04, 3439.05). Among other things, the law provides "a transfer is voidable if the debtor made the transfer with 'actual intent to hinder, delay, or defraud any creditor.'" *Id.* (citing Cal. Civ. Code § 3439.04(a)(1)). The UVTA defines a "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, license, and creation of a lien or other encumbrance." Cal. Civ. Code § 3439.01(m). A "creditor" is "a person that has a claim." *Id.* § 3439.01(c). A "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 3439.01(b). "Importantly, while California law originally required creditors to reduce their underlying claims to judgment before seeking to set aside voidable transfers, the UVTA allows creditors to maintain a voidable transfer action before obtaining a judgment on the underlying claim." *Darras*, 103 Cal. App. 5th at 1300–01 (citations omitted) (citing *Brown v. Campbell*, 100 Cal. 635, 644 (1893); *Cortez v. Vogt*, 52 Cal. App. 4th 917, 930–31 (1997)).

Plaintiffs plead two fraudulent transfer claims in their sixth and seventh causes of action against Stemedica, SanoStem, and another Defendant not at issue here. (FAC ¶¶ 466–79.) Plaintiffs allege Stemedica has been sold to SanoStem. (FAC ¶ 31.) Their sixth and seventh claims allege this transfer is voidable because it was done "with actual intent to hinder, delay, or defraud Plaintiffs as Stemedica's creditors."[10] (*Id.* ¶ 470; *see also id.* ¶ 478.)

---

[10] After the filing of the Complaint, Stemedica went bankrupt. (*See* ECF No. 50.) Thus, the claims against Stemedica have been automatically stayed. *See* 11 U.S.C. § 362(a); *see also, e.g.*, *In re Mellor*, 734 F.2d 1396, 1398 (9th Cir. 1984) ("The automatic stay arises by operation of law upon the filing of a petition for bankruptcy, and prevents creditors of the bankrupt [entity] from seeking to enforce any lien on the property of the estate."). "As a general rule, the automatic stay of section 362(a) protects only the debtor, property of the debtor or property of the estate. It does not protect non-debtor parties or their property. Thus, section 362(a) does not stay actions against guarantors, sureties, corporate affiliates,

25cv0459

The Motions to Dismiss concern the eighth claim, which alleges aiding and abetting liability based on the alleged fraudulent transfer found in the earlier causes of action. (*See* FAC ¶¶ 480–87.) "Several California cases have held that a party may be liable for fraudulent transfer as a coconspirator or aider and abettor." *Optronic Techs., Inc. v. Celestron Acquisition, LLC*, 108 Cal. App. 5th 770, 784–85 (2025) (collecting cases).

To illustrate, in *Optronic Techs., Inc.*, the plaintiff, Orion, had sued a Chinese company, Ningbo Sunny, in federal court in an antitrust action. 108 Cal. App. 5th at 775. "The federal court entered a judgment in favor of Orion for over $50 million." *Id.* Further, to defeat a request seeking an asset-related restraining order, Ningbo Sunny filed a declaration where it promised to "not transfer any of its cash or other assets located in the United States to a location outside of the United States other than in the ordinary course of business while post-trial motions and appeals remain pending." *Id.* at 777. In a separate lawsuit, Orion sued Celestron Acquisition, LLC under the UVTA, alleging "that after the federal court entered judgment against Ningbo Sunny, but before Orion was permitted to collect on the judgment, Celestron and Ningbo Sunny arranged to have Celestron pay an approximately $4.2 million debt to Ningbo Sunny that was not yet due." *Id.* In doing so, "Celestron undermined Orion's ability to collect on its judgment by eliminating a significant accounts receivable asset, and by sending the funds to China, effectively putting them out of Orion's reach." *Id.*

On appeal, the California Court of Appeal held Celestron could not be directly liable to Orion for purposes of the UVTA because there is no authority holding that "a debtor's debtor may be held directly liable to the debtor's creditor as a transfer beneficiary under the UVTA." *Optronic Techs., Inc.*, 108 Cal. App. 5th at 783–84. That conclusion raised the follow-up question of whether Orion could hold Celestron vicariously liable under a

---

or other non-debtor parties[.]'" *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 246 (9th Cir. 1994) (citation modified).

No party has asked the Court to deviate from the general rule in this case. The Court therefore proceeds to address the aiding and abetting claim against the remaining Defendants, even though this claim is related to the fraudulent transfer claims against Stemedica. *See id.*

25cv0459

conspiracy or aiding and abetting theory. *Id.* at 783. The court concluded Orion adequately alleged such a claim. *Id.* at 785–86. It reasoned that "Orion alleged that Celestron and Ningbo Sunny arranged and completed the transfer outside the course of ordinary business for the purpose of thwarting Orion's efforts to collect on its judgment against Ningbo Sunny." *Id.* at 786. Further, Orion "alleged that Celestron was aware of Orion's judgment and [the] declaration about not transferring assets out of the country." *Id.* Finally, "Orion alleged that Celestron 'directly participated in a scheme to orchestrate the Fraudulent Transfer,' and was 'separately liable because [Celestron] aided and abetted and conspired in the wrongful conduct.'" *Id.* (alteration in original). The Court of Appeal thus held the trial court erred in dismissing the fraudulent transfer claim. *Id.* at 787.

Turning to the allegations here, Plaintiffs allege Roger Howe, Maynard Howe, Nikolai Tankovich, and Michael Steinhauser "were aware of Plaintiffs' draft complaint and/or Plaintiffs' claims before February 4, 2025." (FAC ¶ 482.) Indeed, Plaintiffs contend the parties entered into a Tolling Agreement on June 24, 2021, as well as six amendments to that contract, which tolled the statute of limitations for Plaintiffs' claims through February 28, 2025. (*See* FAC ¶¶ 410–17.) Plaintiffs further aver that on February 4, 2025, "Stemedica transferred its assets to SanoStem with [an] actual intent to hinder, delay, or defraud Plaintiffs as Stemedica's creditors." (*Id.* ¶ 483.) Plaintiffs claim Defendants "knew this transfer was being made to evade Plaintiffs' collection efforts." And despite their knowledge, these "Defendants assisted with the fraudulent transfer by, among other things, preparing and signing documents and advising Stemedica on how to evade Plaintiffs' claims." (*Id.* ¶ 486.) There are additional factual allegations to support these averments. (*See id.* ¶¶ 391–407.)

The Court starts with the more straightforward challenge to the eighth claim. Roger Howe, Maynard Howe, and Nikolai Tankovich argue the Complaint fails to allege a fraudulent transfer claim because "the gravamen of Plaintiffs' claim is that Stemedica destroyed CardioCell by failing to comply with contractual obligations to supply stem cells and funding." (CardioCell Defs.' Mot. 24:25–26:7.) In other words, these Defendants

25cv0459

contend the fraudulent transfer claim must fail because Plaintiffs' other causes of action fail. (*See id.*)  Because the Court was unpersuaded above by Defendants' challenge to some of the underlying claims, this argument, too, is unpersuasive.

Second, these Defendants posit that the eighth claim fails because Plaintiffs "do not allege they were a creditor of the moving Defendants, nor do they allege the moving Defendants were recipients of the fraudulent transfer." (CardioCell Defs.' Mot. 25:4–6.) This argument overlooks that the eighth claim pleads vicarious liability for aiding and abetting a fraudulent transfer, which is recognized under California law. *See Optronic Techs., Inc.*, 108 Cal. App. 5th at 784–85.  Because Defendants do not address that theory, their challenge misses the mark, and the Court denies Roger Howe, Maynard Howe, and Nikolai Tankovich's Motion to Dismiss the eighth cause of action.

Michael Steinhauser's Motion to Dismiss comes closer to the target.  He argues: "Because Plaintiffs have alleged no facts, nor could they, to show that an alleged fraudulent transfer of Stemedica to SanoStem occurred, Plaintiffs cannot show that Steinhauser 'aided and abetted' in a fraudulent transfer."[11]  (Steinhauser's Mot. 5:25–28.)  *See In re Ryan*, No. 05-32933DM, 2008 WL 4829947, at *3 (Bankr. N.D. Cal. Oct. 29, 2008) ("Without the underlying tort of fraudulent transfer, under California law the [plaintiffs] have no independent claim against defendant . . . for a conspiracy to commit, or aid and abet in, the tortious act of fraudulent transfer.").

The decisive issue for Steinhauser's Motion, then, is whether a transfer between Stemedica and SanoStem has occurred.  Steinhauser argues that "Plaintiffs admit in their Amended Complaint that no transfer has occurred yet."  (Steinhauser's Mot. 6:25–28.)

---

[11]  Plaintiffs and Michael Steinhauser disagree over whether Rule 9(b) applies to this cause of action. (*See* Steinhauser's Mot. 4:24–5:10; Opp'n to Steinhauser's Mot. 9:14–25.)  This Court has applied Rule 9(b) to claims "for actual fraudulent transfer," as opposed to claims for "constructive fraudulent transfer," which do not include an element of fraud. *Bank of Texas v. Patel*, No. 16-CV-2692-BAS(BGS), 2017 WL 2985133, at *3 (S.D. Cal. July 12, 2017); *see also, e.g.*, *Kelleher v. Kelleher*, No. 13-CV-05450-MEJ, 2014 WL 94197, at *5–6 (N.D. Cal. Jan. 9, 2014).  Regardless, the arguments raised in Steinhauser's Motion to Dismiss more readily fit under Rule 12(b)(6), as opposed to Rule 9(b)'s particularity requirement.  So, the Court finds this issue does not impact the outcome of Steinhauser's Motion.

25cv0459

"Plaintiffs acknowledge that Shivinder Deol, SanoStem's Global Chairman, e-mailed Plaintiffs' counsel on March 12, 2025, asserting, among other things, that 'no money has been paid to date. If the sale does get voided, that will mean eventually, no money will be transferred' in connection with the sale of Stemedica to SanoStem." (*Id.* 7:3–7 (emphasis omitted) (quoting FAC ¶ 407).) Plaintiffs respond that the email Steinhauser selectively quotes from the Complaint "clearly state[s] that a sale has occurred which may get voided (presumably if this lawsuit is successful)." (Opp'n to Steinhauser's Mot. 11:13–20.) "The fact that the email says no money has yet been paid does not mean that the referenced sale that was publicly announced has not occurred." (*Id.* 11:18–20.)

The Court repeats the familiar rule that it must accept the Complaint's factual allegations as true and construe them in Plaintiffs' favor when resolving Steinhauser's Rule 12(b)(6) Motion. *See Iqbal*, 556 U.S. at 679. Whether a transfer has in fact occurred may be a disputed issue, but the Complaint plainly alleges such a transfer has taken place. (*See, e.g.*, FAC ¶ 30 ("[T]he Howe brothers engineered a sale of Stemedica to a newly created company, SanoStem."); *id.* ¶ 31 (alleging "SanoStem's website (sanostem.com) announced the February 4, 2025 'full acquisition' in Stemedica"); *id.* ¶ 398 (alleging one of Defendants wrote to Plaintiffs: "Dear Nina and Sergey, Duniya SanoStem Inc. (SanoStem) has fully acquired Stemedica's assets including all the IND").) Suffice it to say, the Court cannot pierce the allegations and determine which party is telling the truth. *See Iqbal*, 556 U.S. at 679. There are sufficient allegations to plead the existence of a "transfer" under the UVTA's broad definition. *See* Cal. Civ. Code § 3439.01(m). Consequently, Steinhauser's Motion to Dismiss is denied.[12]

---

[12]  Michael Steinhauser also echoes the CardioCell Defendants' argument that Plaintiffs are not "creditors" under the UVTA because they do not allege a viable theory of recovery with respect to their underlying claims. (Steinhauser's Mot. 7:13–20.) Steinhauser's challenge comes up short for the same reason the CardioCell Defendants' argument fails above.

25cv0459

### F.     Unjust Enrichment

Defendants move to dismiss the twelfth cause of action, which is styled as a claim for "unjust enrichment."   In their final claim, Plaintiffs allege Defendants enriched themselves, and Plaintiffs "seek an order from this Court disgorging all profits, benefits, and other compensation obtained by the individual Defendants due to their wrongful conduct."  (FAC ¶¶ 525–30.)

As David Howe's Motion points out, "[t]here is no cause of action in California labeled 'unjust enrichment.'" *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022).  Plaintiffs respond that this Court "recently denied a motion to dismiss a similar claim."  (Opp'n to D. Howe's Mot. 25:1–2 (citing *Cosmonova, LLC v. BioFilm, Inc.*, 763 F. Supp. 3d 1157, 1171 (S.D. Cal. 2025)).)  But this Court did not make that decision. Rather, the undersigned has routinely dismissed claims for unjust enrichment at the pleadings stage. *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1055 (S.D. Cal. 2023) ("Plaintiff's final cause of action is for 'unjust enrichment,' which is not a stand-alone cause of action." (citing *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011))).  Consequently, the Court grants the request to dismiss the unjust enrichment cause of action.  Because amendment would be futile, this claim is dismissed with prejudice.

**CONCLUSION**

In light of the foregoing, the Court **GRANTS** David Howe's Motion to Dismiss. (ECF No. 37.)  In addition, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants Maynard Howe, Nikolai Tankovich, Craig Carlson, Roger Howe, and Dirk O'Hara's Motion to Dismiss.  (ECF No. 38.)  Finally, the Court **DENIES** Michael Steinhauser's Motion to Dismiss. (ECF No. 39.)  Specifically:

(1)  The Court **GRANTS** the request to dismiss the ninth and tenth claims for violations of RICO against David Howe, Craig Carlson, and Dirk O'Hara.  These claims are dismissed **WITHOUT PREJUDICE**.

25cv0459

(2) The Court **GRANTS** the request to dismiss the second claim for fraudulent inducement against Dirk O'Hara.   This claim is dismissed **WITHOUT PREJUDICE**.

(3) Under Rule 8, the Court **DISMISSES** the third claim for breach of fiduciary duty against Maynard Howe, Nikolai Tankovich, Craig Carlson, Roger Howe, and Dirk O'Hara.  This claim is dismissed **WITHOUT PREJUDICE**.

(4) The Court **GRANTS** the request to dismiss the twelfth claim for unjust enrichment against Maynard Howe, Nikolai Tankovich, Craig Carlson, Roger Howe, Dirk O'Hara, David Howe, and Michael Steinhauser.  This claim is dismissed **WITH PREJUDICE**.

(5) As to all other claims, the Motions to Dismiss are **DENIED**.

If Plaintiffs choose to file a Second Amended Complaint, it must be filed no later than **April 9, 2026**.  Plaintiffs may not add any new parties or causes of action without leave of court.  If Plaintiffs do not file a Second Amended Complaint, then any outstanding Answer to the First Amended Complaint must be filed no later than **April 16, 2026**.

**IT IS SO ORDERED.**

DATED: March 26, 2026

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

- 43 -

25cv0459